UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BERTRUM JEAN, Individually and as the surviving father of BOTHAM SHEM JEAN, ALLISON A. JEAN, Individually and as the surviving mother of BOTHAM SHEM JEAN and ALLISA E. FINDLEY as the Administrator of the estate of BOTHAM SHEM JEAN, *Plaintiffs,* | § § § § § § § § § | |
| VS. | § § | CIVIL ACTION NO. 3:18-CV-2862 |
| THE CITY OF DALLAS, TEXAS AND AMBER GUYGER, *Defendants.* | § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW, Bertrum Jean, Individually as the surviving father of Botham Shem Jean, Allison A. Jean, Individually as the surviving mother of Botham Shem Jean and Allisa E. Findley as the Administrator of the Estate of Botham Shem Jean, deceased, ("Plaintiffs") complaining of Defendants the City of Dallas, Texas and Amber Guyger ("Guyger') and for cause would show the Honorable Court as follows:

### I.

### NATURE OF THE ACTION

1.      This is an action brought by the Plaintiffs against The City of Dallas, Texas and Amber Guyger for her use of excessive force resulting in the wrongful death of Botham Shem Jean ("Jean") under the color of law, in violation of his individual rights under the Fourth Amendment

of the United States Constitution and, consequently, in violation of his civil rights pursuant to 42 U.S.C. § 1983.

2.      Plaintiffs allege that Chief of Police Renee Hall ("Chief Hall"), the final policymaker for the Dallas Police Department, with the authority for setting policies, including training of the Dallas Police Officers, the Dallas City Council and the City Manager, vested with all powers of the City and the determination of all matters of policy, had a duty, but failed to implement and enforce such policies, practices and procedures for the DPD that respected Jean's constitutional rights.

3.      Chief Hall and the Dallas City Council's failure to implement the necessary policies and the (de facto) implementation of unconstitutional policies, caused Jean to experience an unwarranted and excruciating physical and mental anguish before his ultimate death.  For these civil rights violations and other causes of action discussed herein, Plaintiffs seek answers and compensation for their respective damages.

## II.
## PARTIES

4.      Plaintiff, Bertrum Jean is a citizen and a resident of Castries, St. Lucia. Bertrum is the surviving father of Botham Shem Jean, decedent, and brings this wrongful-death action under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below.

5.      Plaintiff, Allison A. Jean is a citizen and a resident of Castries, St. Lucia.  Allison is the surviving mother of Botham Shem Jean, decedent, and brings this wrongful-death action under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below.

6.      Plaintiff, Allisa E. Findley is a resident of New York, NY.  Allisa is qualified, and

acting as the Representative of the Estate of Botham Shem Jean, and brings this survival action under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below.

7.      Defendant, the City of Dallas, is a municipality located in Dallas County, Texas. The City of Dallas funds and operates the DPD, which, along with the Dallas City Council, Dallas City Manager's office and Chief Hall, are responsible for the implementation of the DPD's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit. The DPD is also responsible for preventive, investigative, and enforcement services for all citizens of the City of Dallas. All actions that form the basis of this lawsuit were performed pursuant to policies and procedures, customs and practices of Defendant, the City of Dallas. The CITY OF DALLAS may be served with citation herein by and through its agent for service of process, Warren Ernst, City Attorney, Dallas City Hall, 1500 Marilla Street, Dallas, Texas 75201. Additional service is being made on Mayor Mike Rawlings, 1500 Marilla Street, Room 5EN, Dallas, Texas 75201.

8.      Defendant, Amber Guyger, upon information and belief, is a resident of Dallas County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of her employment for the City of Dallas and DPD.  At all times relevant to this lawsuit, it was Officer Guyger's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the DPD's rules, regulations, policies and procedures, customs and/or practices relating to the use of excessive and/or deadly force.  Defendant Guyger may be served with citation at the Dallas Police Department, 1400 S. Lamar, Dallas, Texas 75215 or wherever she may be found.

## III.

## JURISDICTION AND VENUE

9.      Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, *inter alia*, the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities.

10.      Venue is proper in this court because the causes of action occurred within the Northern District of Texas, Dallas Division.

## IV.

## FACTS

11.      After graduating in the top of his class in Castries, St. Lucia, at age 19, Jean came to the United States to attend Harding University in Searcy, Arkansas.   While at Harding University, Jean was an influential member of the student body who participated in student government, was a member of Sub T-16 social club, sang with the Good News Singers and was involved with numerous service and outreach events in the community.   Jean had an enthusiasm for life that was contagious.   Jean graduated with a bachelor's degree in accounting and management and information systems.   Soon after graduating from Harding University, Jean began his career at accounting firm PricewaterhouseCoopers, one of the nation's leading professional services firms. Jean was on the partnership track at the firm and was considered to be one of the rising stars within the international corporation. In addition to being an elite member of the Dallas workforce, Jean served as a worship leader in the international Church of Christ— serving the Dallas West Church of Christ.   Jean was extremely ambitious and hoped to one day return to the nation of Saint Lucia and run for the position of Prime Minister.

12.      On September 6, 2018 at approximately 9:30 p.m., Defendant Guyger clocked out

of her work shift at Dallas Police Department Headquarters located at 1400 Lamar Street Dallas, Texas 75215 after allegedly working a thirteen (13) hour patrol shift.  At all relevant times, Defendant Guyger was in her departmental issued police uniform as she drove into the Southside Flats Apartment Complex (the "Southside") located at 1210 Lamar Street Dallas, TX 75215.

13.     At or about 9:41 p.m., Defendant Guyger entered the security gates of the Southside and allegedly parked her vehicle on the fourth floor of the parking garage. Defendant Guyger exited her vehicle and upon information and belief walked towards the fourth floor resident area of the Southside. After exiting her car and entering the complex Defendant Gugyer would have been confronted immediately with two signs, one of the outside and the other on the inside of the complex entrance, both indicating she had arrived to "Level 4" of the complex. Defendant Guyger had to travel approximately one hundred fifty [150] yards from her car, passing around fifteen [15] fourth floor apartment doors, each bearing an illuminated apartment number and most displaying a unique floor mat, door marker or decoration of some kind. Nevertheless, at approximately 9:53 p.m., Defendant Guyger arrived at apartment number 1478 where Jean was then present as the lawful inhabitant.

14.     For some unknown reason, Defendant Guyger disregarded the brightly colored red mat prominently displayed directly in front of Jean's door. Defendant Guyger also disregarded the eye level illuminated door number indicating she was standing at apartment 1478 and not hers. Defendant Guyger, allegedly entered her key fob into the key hole of Jean's apartment. The door would have not produced the identical chime Defendant Guyger hears daily at her apartment, which would indicate to a reasonable police officer that she had entered her key into the wrong keyhole if that is indeed what happened. In fact, the light above the keyhole would have flashed

red, indicating to Defendant Guyger that her key did not match the lock she was then attempting to access. Light from the hallway would have also entered the apartment from the open door. Additional lighting emanated from the television and computer in the apartment itself. Together the available lighting provided sufficient illumination for Defendant Guyger to observe the layout, furniture, and decor of the apartment, as well as the features, clothing and posture of Jean who was then unarmed and not fully clothed as she conducted her investigation.  Nevertheless, Defendant Guyger unlawfully entered Jean's apartment and discovered Jean in a seated position on his sofa.

15.     After opening the door to Jean's apartment, Defendant Guyger stated in an interview with the Texas Rangers that she drew her service weapon and began issuing verbal commands to Jean, who was lawfully in his apartment. Jean attempted to comply by slowly arising from his seated position.    Without any lawful justification to do so and not asking the questions that a reasonable well-trained officer would have, Defendant Guyger fired upon Jean, striking him in the chest although he was unarmed and not attempting to harm her or any other person.

16.     After shooting Jean in his own apartment, Defendant Guyger began shouting additional commands to Jean. Jean plead out desperately inquiring why Defendant Jean shot him. Aware Jean was not committing a penal offense and that she had struck Jean with at least one round from her service weapon, Defendant Guyger called her attorney and 911 to report the shooting. In an attempt to cover-up for shooting Jean, Defendant Guyger allegedly made certain comments to Jean, knowing she was being recorded, who was then still suffering from the gunshot wound to his chest and in a great deal of pain. At no time did Defendant Guyger attempt to render emergency aid to Jean or take any lifesaving measures.  Jean was allowed to remain on the ground as he struggled to survive in extreme pain.

17.     Upon information and belief, Jean was not in possession of a weapon at the time Officer Guyger fired at him. In fact, there was not a weapon in the sight of Officer Guyger when she fired her gun, fatally striking Jean.

18.     Officer Guyger unlawfully shot and killed Jean without any warning, although she was not in imminent danger <u>and</u> when less deadly alternatives were available.

19.     Officer Guyger failed to conduct an objectively, reasonable assessment of the facts when she chose to use deadly force without properly attempting to use de-escalation tactics to apprehend Jean before discharging her service weapon.  At no time did Officer Guyger call for cover prior to entering Jean's apartment.

20.     Defendant Guyger alleges she observed the apartment door ajar and believed a burglary to be taking place. Nevertheless, Defendant Guyger failed to secure the location by shutting the door and calling for back up while taking a tactical position outside of the apartment. By simply following proper police procedures and the best police practices and not the protocol of the DPD to "shoot first and ask questions later", Defendant Guyger would have not shot Jean.

21.     Paramedics and additional law enforcement personnel arrived to the scene of the shooting sometime after Defendant Guyger fired the shots and found Jean still suffering from the gunshot wound inflicted by Defendant Guyger. Emergency Medical Technicians immediately began rendering aid to Jean and transferred him to a gurney where he was transported to an ambulance before being driven to a nearby hospital. Medical professionals continued to treat Jean after he arrived to the hospital, however, he eventually succumbed to his wounds.

22.     After additional law enforcement personnel arrived to the scene of the shooting, Defendant Guyger was not placed under arrest but was instead allowed to continue to roam about

the crime scene. Upon information and belief, as is the practice and custom of the Dallas Police Department ("DPD"), Defendant Guyger was allowed to make several phone calls prior to giving a statement to investigators and at some point was permitted to both re-enter the apartment of Jean as well as her own apartment.

23.     Chief Hall immediately and rightfully considered the incident an Officer Involved Shooting (OIS) as Defendant Guyger was in full uniform at the time of the shooting, was performing the duties of a law enforcement officer, was donning a badge, used her service weapon and was behaving as a police officer when she shot Jean after issuing verbal commands to him in his home but failed to charge Defendant Guyger with a crime.

24.     The subsequent DPD homicide investigation, immediately initiated following the deadly shooting, was characterized by bias, partiality and a lack of thoroughness and/or professionalism, specifically designed to ratify the behavior and cover-up the misconduct of Defendant Guyger. Detectives sought warrants for the home of Jean with the specific intent of discovering evidence of illegality on the part of the decedent that could be used to justify the behavior of Defendant Guyger although it had nothing to do with Guyger's decision to shoot Jean. No warrants were initially sought for the apartment, motor vehicle and/or service locker of Defendant Guyger— locations that potentially held important evidence probative to the homicide investigation underway.

25.     Unidentified Dallas Police Officer sources immediately began anonymously providing information to local media outlets designed to cast the murder of Jean by Defendant Guyger in the best possible light. Sources offered that the emergency phone call by Defendant Guyger appeared sincere and substantiated the false narrative that the shooting was a reasonable

accident to protect Guyger. Anonymous police sources offered to media that the physical evidence at the crime scene substantiated Defendant Guyger's version of events before conducting a thorough investigation. On the day of Jean's memorial, media published a search warrant affidavit DPD investigators failed to seal indicating drugs and drug paraphernalia was recovered from the home of the decedent, all designed to protect Defendant Guyger.

26.     Defendant Guyger has been a police officer for less than five years yet the shooting of Jean represents the second suspicious shooting of an unarmed suspect of color. Upon information and belief, Defendant Guyger was not required to undergo any mental counseling and/or training after the first officer involved shooting she was involved in. Défendant Guyger's Pintrest account demonstrates that she is a dangerous individual with highly violent and anti-social propensities. Défendant, Guyger's posts include statements like "Personally I think I deserve a medal for getting through this week without stabbing someone in the neck with a fork"; "People are so ungrateful. No one ever thanks me for having the patience not to kill them"; "I wear all black to remind you not mess with me, because I'm already dressed for your funeral (saved to love to laugh with comment "yah I got meh a gun a shovel and gloves if I were u back da fuck up and get out of meh fucking ass."; "Stay low, go fast, kill first, die last, one shot, one kill, no luck, all skill" was saved to her quotes for inspiration. Such post were available to the public and violated DPD's social media polices however Defendant Guyger was never reprimanded for the same. To the contrary, following the murder of Jean, Defendant Guyger was given time to scrub her social media accounts before her name was released to the public by the Dallas Police Department. The data deleted from Facebook, Twitter and Instagram represents active spoliation by Defendants Guyger and the City of Dallas.

**PLAINTIFFS' ORIGINAL COMPLAINT** – Page 9

27.     The DPD's written policy on use of force is not the de facto policy of the DPD. The de facto policy is that which Officer Guyger employed when she decided to enter Jean's apartment without proper cover and fired shots at Jean without warning and any attempt to de-escalate.

28.     The DPD has a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn, when there is no imminent threat of bodily harm or other justifiable reason to do so. The DPD trains its officers to use deadly force even when there exist no immediate threat to themselves or others.

29.     The DPD did not provide adequate training to Officer Guyger as it relates to the use of deadly force and the use of non-deadly force.

30.     The DPD did not provide adequate training to Officer Guyger on proper arrest and confrontation techniques or entering what is perceived to be an active crime scene.

31.     The DPD did not provide adequate training to Officer Guyger on appropriate methods and techniques to control situations similar to the one encountered by her on September 6, 2018.

32.     The DPD failed to adequately discipline officer Guyger for the misuse of force and/or the employment of deadly force in the previous officer involved shooting in which she fired her service weapon at an unarmed suspect.

33.      Chief Hall, the final policymaker for the DPD, the Dallas City Council and the City knew or should have known that the training provided to Officer Guyger was inadequate or nonexistent.

34.      Officer Guyger should have been well-trained to deal with unarmed citizens posing no threat of imminent bodily harm to her, other officers or the general public.  Officer Guyger should have been well-trained how to deal with what is perceived to be an active crime scene and the need to secure cover before confronting the suspects.

35.      Officer Guyger had a clear view of Jean, however it is apparent, that instead of using any sort of de-escalation techniques, she opted to use deadly force.

36.      Officer Guyger opened Jean's apartment door and immediately drew her weapon without an evaluation of what occurred or what was transpiring.  She simply opened fire without having any knowledge of the true situation.  Essentially, Officer Guyger was ill-trained, and as a result, defaulted to the defective DPD policy: to use deadly force even when there exist no immediate threat of harm to themselves or others.

37.      There existed no justification whatsoever for Defendant Guyger's use of deadly force. Jean was in his apartment and was not committing a penal offense. Jean was totally unaware of what was transpiring when Officer Guyger fired the deadly shots.  Jean was not attempting to harm anyone nor did he appear menacing, threatening or dangerous in any manner.

38.       There is no credible evidence whatsoever that Officer Guyger or anyone else was in imminent danger that would indicate that the use of deadly force was justified.

39.     Officer Guyger's unlawful and unwarranted acts, lack of training, lack of discipline and the official customs or policies of the DPD was the proximate cause of Jean's death.

40.     At all times material hereto, Officer Guyger was acting in the scope of her employment as agent, servant and employee of the DPD, a part of Defendant, the City of Dallas within its executive branch and were performing a governmental function.

41.     Moreover, no reasonably competent officer would have concluded that Officer Guyger's actions described herein would not, and did not, violate Jean's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Officer Guyger's conduct was justified.

42.     As a direct and proximate result of Officer Guyger's conduct, Plaintiffs have sustained substantial damages and pecuniary loss.

43.     Jean was twenty-six (26) years old when he was fatally killed by Officer Guyger. Jean was very well liked.  He was in good health, with a reasonable life expectancy of living at least 58 more years to age 84.  Jean leaves behind his parents and two siblings.

44.     Bertrum and Allison Jean have suffered pecuniary loss from the ___**death**___ of their son by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. Bertrum and Allison Jean will suffer anguish, grief, and sorrow as a result of Jean's ___**death**___ and are likely to continue to suffer for a long time in the future. Moreover, Bertrum and Allison Jean's suffering was multiplied by Defendant City of Dallas' recklessly actions by failing to seal warrant information that would cast their slain son in a negative light on the day of his memorial service. Defendant City of Dallas,

acting through agents within the Dallas Police Department, further violated Bertrum and Allison

Jean by leaking information to the media in order to bolster the defense of Defendant Guyger and

creating a basis for Defendant Guyger's case to be removed from Dallas County.  For these losses,

Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

45.     Upon information and belief, the DPD has not implemented policies and procedures

to aggressively curtail death and/or injuries as a result of the improper use of deadly force.

## V.     CAUSES OF ACTION

**A.     Cause of Action against Amber Guyger under 42 U.S.C. §1983 for Violation of the Plaintiffs' Fourth Amended Right to be free from excessive force.**

46.      Plaintiffs hereby adopt, incorporate, re-state and re-allege paragraphs 1 through 45,

inclusive, with regard to all causes of action.

47.     Plaintiffs would show that Jean was killed as a direct result of Defendant Guyger's

use of force that was clearly excessive and the excessiveness of which was clearly unreasonable.

That is, Defendant Guyger, without justification and the need to do so, used excessive force as

described above and killed Jean without legal justification. Defendant Guyger's use of force was

clearly excessive and clearly unreasonable because Jean never made any threatening gestures

toward Defendant Guyger and did not pose an immediate threat to the safety of Defendant

Guyger or others.

48.     Defendant Guyger was not provoked when she fired into an occupied residence for

no lawful or justifiable reason. Jean died as a result of a gunshot wound to his chest.  The excessive

and deadly force used by Defendant Guyger was not reasonable or justified, nor was it necessary

under the circumstances.

**PLAINTIFFS' ORIGINAL COMPLAINT** – Page 13

49.     Defendant Guyger's actions were not objectively reasonable because Jean did not pose an immediate risk of serious physical harm to Guyger or any other person.

50.     The force used by Defendant Guyger was objectively unnecessary, excessive and unreasonable under the circumstances, as Jean did not pose an immediate threat to the safety of Defendant Guyger or others and the use of such excessive and deadly force was unnecessary. Rather, Defendant Guyger embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact, caused Jean to suffer extreme and severe mental and emotional distress, agony and anxiety.

51.     Further, Guyger's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Guyger shot and killed Jean. *See, e.g., Reyes v. Bridgewater,* 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear:  an officer cannot use deadly force without an immediate serious threat to himself or others."). More specifically, the right to be free from the use of excessive force was clearly established under the particular circumstances presented to Jean. *See Lytle v. Bexar Cty., Tex.,* 560 F.3d 404, 417–18 (5th Cir. 2009) ("It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.").

52.     As a result of these Constitutional violations to Jean, Plaintiffs seek compensation, individually and as the Administrator on behalf of the Estate of Botham Shem Jean, deceased, as set forth more specifically in the section of this Complaint entitled "Damages."

**B.     Cause of Actions against the City of Dallas under 42 U.S.C. § 1983 for violation of the Plaintiffs' Fourth Amendment Rights.**

53.     The City of Dallas is liable for all damages suffered by the Plaintiffs pursuant to

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the Dallas Police Department of which the City Council, the City Manager, the Mayor, and Chief of Police Hall all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein. Specifically, DPD policy concerning the use of force allows police officers to shoot body center mass and terminate any perceived threat— even when the perceived threat is unreasonable.

### 1. The City of Dallas failed to train its officers on use of force

54.     Plaintiffs incorporate regarding paragraphs 1 through 53 as if fully set forth herein. Prior to September 6, 2018, the Dallas City Council, the City Manager of Dallas and Chief Hall knew or should have known that Defendant Guyger exhibited a pattern of escalating encounters with the public.

55.     Defendant Guyger was acting under color of law and acting pursuant to customs, practices and policies of the City of Dallas and the DPD in regards to the use of deadly force as authorized and/or ratified by the Dallas City Council, Mayor Rawlings and Chief Hall. Jean was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the City of Dallas failing to provide proper training, adequate supervision or discipline in dealing with individuals such as Jean in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

56.     With respect to the claims made the basis of this lawsuit, the City, the DPD, and Chief Hall failed to adequately train its officers on how to deal with individuals, specifically during what is perceived an active crime scene and the subsequent use of deadly force as described above.  The failure to train its officers in a relevant respect reflects a deliberate indifference by

the Dallas City Council, Mayor Rawlings, and Chief Hall to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

57.     The City of Dallas and the DPD, by and through Chief Hall and the Dallas City Council, have an inadequate policy of training officers regarding the following areas of law enforcement:

    a.     The use of proper and appropriate detention and seizure procedures.

    b.     The use of excessive and/or deadly force.

    c.     The proper use of less deadly means.

    d.     The proper use of cover and the pursuit of a suspect.

    e.     De-escalation tactics

58.     Defendant Guyger was acting under the color of law and acting pursuant to customs, practices and policies of the City of Dallas and the DPD in regards to the use of deadly force as authorized and/or ratified by the Dallas City Council and Chief Hall.  Jean was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the City of Dallas failing to provide proper training, adequate supervision or discipline in dealing with individuals such as Jean in violation of 42 U.S.C. §1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

59.     The City of Dallas's policy of inadequate and improper training of police officers on proper detention and seizure procedures and the use of excessive and/or deadly force, resulted in the constitutional deprivations and damages alleged herein.

60.     The City of Dallas and the DPD failed to adequately train and failed to adequately supervise or discipline Officer Guyger despite her unlawful conduct.  It was not until a public outcry that Chief Hall finally terminated Guyger.

61.     Officer Guyger's lack of training by the DPD led to the use of excessive and deadly force and, ultimately, her killing Jean.

62.     As a direct cause and result of the constitutional violations as set forth herein, Jean incurred extreme pain, injuries and, ultimately, Jean's death for which the Plaintiffs seek compensation, as set forth more specifically in the section of this Complaint entitled "Damages."

63.     The DPD has longstanding records of not providing DPD officers with adequate training on de-escalation techniques intended to prevent instances of excessive and deadly force and extrajudicial killings by Dallas Police officers.

64.     The actual practice or custom of the DPD regarding the use of deadly force is to "shoot first and ask questions later."

65.     As a result of the lack of training and the official custom or policies of the DPD, there have been a number of deadly police shootings of unarmed minorities.

66.     On or about July 24, 2012, unarmed James Harper ("Harper") was fatally shot by DPD officer Brian Rowden ("Rowden").  Rowden pursued Harper on foot and fired a shot at Harper as he ran away. Rowden was not disciplined for the unlawful killing of Harper. On or about March 10, 2013, unarmed Clinton Allen ("Allen") was fatally shot 7 times by DPD officer Clark Staller.  Allen was wrongfully gunned down although he held both hands up. Clark Staller,

despite previously falsifying a police report prior to the shooting death of Allen, was allowed to remain on as an officer and was not disciplined for the death of Allen. Clark Staller was allowed to prepare his statement of the incident with the assistance of his attorney and was not asked any questions to determine the veracity of his statements. On or about October 14, 2013, a DPD officer shot Bobby Bennett ("Bennett"), an unarmed individual, and attempted to falsify a police report but a video exposed the attempted cover-up.  David Blair, an unarmed individual was standing outside of his east Oak Cliff apartment on October 2, 2013, when a pair of Dallas Police Officers harassed him for no lawful reason.  The officers approached him, followed him to his apartment and shot at him 14 times as he stepped out of his apartment for no lawful reason.  Blair's story surfaced just a week after a video circulated of a Dallas police officer shooting Bennett, a man with mental challenges, after he stood up from a chair he set in the middle of a cul-de-sac.  Police initially claimed the man lunged at them, but the video showed otherwise. An aggravated assault charge against the wounded man has since been dropped.  On December 10, 2013, 19-year-old Kelvion Walker was still in the vehicle with his hands up when a Dallas police officer shot him. On August 27, 2015, an unarmed Bertrand Syjuan Davis was fatally shot by Officer Matthew Terry.  According to multiple witness accounts, immediately upon arriving at the scene, Officer Terry failed to conduct an objectively-reasonable assessment of the facts, drew his gun and shot Bert several times including once in the back, without any verbal warning. Per witnesses, Officer Terry was not facing or reacting to an imminent threat of death or serious bodily injury to him or any other person at the time he fired multiple shots that struck Bert, including one to the back. Officer Terry was not disciplined by the DPD for his wrongful conduct. On January 18, 2017, Officers Christopher Hess and Jason Kimpel used excessive and deadly force resulting in the

death of 21 year old Genevive Dawes and the injuries to Virgilio Rosales. As Dawes drove her vehicle in reverse at a very slow rate of speed, Hess and Kimpel fired at least 13 shots through the passenger side window where Rosales was seated, striking Dawes five times in the neck, her right tricep, left arm, upper left chest and right forearm. Dawes's right earlobe was also partially amputated. Dawes was transported to Baylor Hospital where she later died as a result of her injuries.  Hess's reasoning for firing at the moving vehicle was not supported by body cam evidence.  Despite body cam footage that shows Dawes was not trying injure anyone as she reversed her vehicle, Hess and Kimpel were not terminated for their violation of DPD policy.  In fact, the DPD and the city of Dallas attempted to cover-up this shooting until the body cam footage was released to the Dallas District Attorney's office almost six months later.  Hess was indicted for the death of Dawes.

67.    There exists a persistent, widespread practice of police shootings that result from the training or lack thereof, received by DPD officers.  Upon information and belief, DPD officers were trained by individuals with little or no experience working in the field.

68.    Criticism of the DPD's policies and procedures regarding the use of deadly force was first made by Geoffrey P. Alpert in his 1987 report.  In this report, Alpert points out that a new philosophy and a new approach to force was needed and would be required in order for Dallas to overcome its institutional training issues.

69.    The report further stated that in order for Dallas to enter the 1990's with a set of police policies, procedures and customs commensurate with its high set of municipal values, a

conscious decision must be made to overhaul a system creaking with age and tradition, and made obsolete by the challenges of a new generation of citizens.

70.     After the death of James Harper, Chief Brown indicated that the following policies and procedures would be implemented, but has yet to formally implement each and recently removed them from the DPD's website:

a.     ***Formalize a process of concurrent investigative review with the FBI Civil Rights Office of all officer involved shootings***

This step was intended to reassure the public that the DPD is conducting a detailed and comprehensive investigation and that the findings are based upon facts uncovered by the investigation. The DPD has requested the FBI to conduct this type of review on several occasions.

b.     ***Implement a more comprehensive Response to Resistance reporting system***

A "Response to Resistance" report details the actions a suspect took against an officer and the steps an officer was required to take to overcome this resistance. A comprehensive reporting system was intended to allow for a more detailed analysis of incidents involving violence against officers and their response. Information gained was intended to be used to assist in developing and refining tactics, training and policy. The report was also intended to provide public transparency regarding the amount of force officers take in the performance of their duties.

c.     ***Develop a foot pursuit policy***

A formalized foot pursuit policy was intended to enhance officer safety by providing officers with a foundation on which to make decisions during these high risk activities with the intent of reducing hazardous consequences and preventing, when possible, the escalation of

enforcement action into lethal force confrontations.

### d.      Re-implement the Digital Video Recorder (DVR) Review Team

The DVR Team had been temporarily inactive while a panel of Police Deputy Chiefs reviewed the proper role for the Team. The dash cam video reviews conducted by this team can serve as a training tool for the Department while building public confidence that the Department proactively examines officer performance to ensure compliance with departmental and public expectations.

### e.      Implement a mandatory electronic control weapon (Taser) training policy for all officers

Currently, all officers that are trained with an electronic control weapon are required to carry one if available.

### f.      Enhance the Department's consensual search policy to include the requirement for a written and/or recorded consent

Implementing this step was intended to create greater public confidence in the consensual searches performed by DPD Officers, protect officers against false allegations of illegal search and bolster court cases where the search is critical to proving the charge.

### g.      Research best practices that have come from critical incidents or institutional failures in public safety from around the nation

In recent years, several major city police departments have been placed under consent decrees. The DPD proposes to research the positive practices and policies that have been developed as a response to these failures as a way to improve DPD's internal training, policy, officer safety and service delivery. This step was intended to include a review of the recommendations stemming from the 1988 Congressional Hearings that occurred in Dallas.

### h.      Assemble a special Community Policing Strategic Team of officers for the Dixon Circle community

This step was intended to create a special team of officers responsible for addressing chronic crime and underlying quality of life issues present in the Dixon Circle community, while opening sustainable communications with this neighborhood to build trust between the residents and the DPD. The Police Athletic League was intended to play a vital role in this team effort to provide constructive alternatives for youth in the area. If successful, this concept will serve as a model for effecting positive change in other communities with similar crime and quality of life issues.

71.      As noted above, Officer Guyger used excessive and deadly force for no lawful reason when she shot Jean without any warnings and for no lawful reason.

72.      There is no evidence that Officer Guyger and any other person were in imminent danger or in fear of serious bodily injury.  There were no signs of any danger that would indicate or suggest that the use of deadly force was justified.

73.      The DPD's "Drawing or Displaying Firearms" general order requires that a threat, or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display his firearm.

74.      There is no indication that Officer Guyger attempted to use her intermediate weapon before resulting to the use of deadly force.  General Order 901.04(D)(3) Levels of Control; Electronic Control Weapon (Taser) is an intermediate weapon, and is only justified for situations when the officer believes empty hand control will be ineffective.

75.     At the time Officer Guyger drew her weapons, Jean had not done anything to justify Officer Guyger's use of deadly force.  Jean was unarmed and lawfully in his apartment at the time he was shot and had not placed Officer Guyger or any other person in fear of imminent death or seriously bodily injury.

76.     The drawing of an Officer's weapon inherently assumes that the use of force will cause death or serious bodily injury to the suspect, and is to be applied under very narrowly defined circumstances.

77.     According to Dallas Police General Order 906.02(D), "Authorization to Use Deadly Force," "Officers will only use deadly force to protect themselves or another person from imminent death or serious bodily injury."

78.     General Order 906.02(E), "Drawing or Displaying Firearms," requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm.

79.     Officer Guyger's unlawful and unwarranted acts, lack of training and the official customs or policies of the DPD caused Jean's wrongful death.

80.     Plaintiffs would show that Officer Guyger's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the DPD, in regard to the use of deadly force for which the Dallas City Council, the City of Dallas and Chief Hall knew or should have known, but never provided the requisite and proper training.

81.     Moreover, no reasonably competent official would have concluded that the actions of Officer Guyger described herein would not violate Jean's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances, could have believed that Officer Guyger's conduct was justified.

82.     Upon information and belief, the DPD has not implemented policies and procedures previously described to aggressively curtail deadly shooting cases that have been a major problem since the early eighties, when the DPD was the subject of a Federal Investigation, that continue to exist today.  The City of Dallas's failure to properly train, supervise and discipline its officers was the proximate cause of the violation of Jean's constitutional rights.

83.     As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained substantial damages and pecuniary loss. Based on these constitutional violations and the injuries and other damages sustained, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**2.     The City of Dallas failed to adequately supervise or discipline its officers for violent, aggressive, and excessive force and, in failing to do so, ratified and encouraged the conduct of its officers, including Guyger.**

84.     Plaintiff incorporates by reference paragraphs 1 through 83 as if fully set forth herein.

85.     On Plaintiffs' governmental liability claim against the City of Dallas for failing to supervise and/or discipline its officers for prior violations and the resulting lack of supervision:

    a.     the City of Dallas and Chief Hall failed to adequately supervise and/or discipline its employees in handling usual and recurring situations with which they deal;

    b.     Chief Hall and the Dallas City Council was deliberately indifferent to the need to

supervise and/or discipline its officers and/or employees adequately; and

c.  the failure to adequately supervise and/or discipline its officers proximately caused the deprivation of Jean's constitutional rights.

86.  Despite having knowledge of Defendant Guyger's violation of the DPD's policies and other best police practice as described above, the City of Dallas, the City Council and Chief Hall refused to adequately discipline Defendant Guyger. The City of Dallas's failure to adequately supervise and/or discipline its officers was therefore the moving force behind Plaintiffs' damages.

## VI.   DAMAGES

87.  **Actual damages.**  Plaintiffs incorporate by reference paragraphs 1 through 86 as if fully set forth herein.  Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs and Defendants should be held jointly and severally liable for the following damages:

a.  **Estate of Botham Shem Jean (Survival Claim).**

1.  Conscious pain and mental anguish suffered by Botham Shem Jean prior to his death; and
2.  Funeral and burial expenses.
3.  Exemplary Damages.

b.  **Bertrum Jean (as wrongful death beneficiary of Botham Shem Jean).**

1.  Mental anguish—the emotional pain, torment, and suffering experienced by Bertrum Jean because of the death of Botham Shem Jean—that Bertrum Jean sustained in the past and that he will, in reasonable probability, sustain in the future;
2.  Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Bertrum Jean would have received from Botham Shem Jean had he lived—that Bertrum Jean sustained in the past and that he will, in reasonable probability, sustain in the future;

3.  Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Bertrum Jean would have received from Botham Shem Jean had he lived—that Bertrum Jean sustained in the past and that he will, in reasonable probability will sustain in the future.

**c.  Allison Jean (as wrongful death beneficiary of Botham Shem Jean).**

1.  Mental anguish—the emotional pain, torment, and suffering experienced by Allison Jean because of the death of Botham Shem Jean—that Allison Jean sustained in the past and that she will, in reasonable probability, sustain in the future;

2.  Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Allison Jean would have received from Botham Shem Jean had he lived—that Allison Jean sustained in the past and that she will, in reasonable probability, sustain in the future;

3.  Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Allison Jean would have received from Botham Shem Jean had he lived—that Allison Jean sustained in the past and that she will, in reasonable probability will sustain in the future.

88.  **Punitive/Exemplary Damages against Amber Guyger.**  Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of Guyger was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of the Plaintiffs.  As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.

89.  Prejudgment and post judgment interest.

90.  Costs of court.

91.  Reasonable and necessary attorney's fees incurred by the Plaintiff through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

92.     Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## VII.     CONDITIONS PRECEDENT

93.     Plaintiffs reserve their rights to plead and prove the damages to which they are entitled to at the time of trial.  All conditions precedent to Plaintiffs' recovery have been performed or have occurred.

## VIII.     TRIAL BY JURY

94.     Plaintiffs have paid a jury fee and demands trial by jury.

## IX.     PRAYER

95.     WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled.


Respectfully submitted,


By: /s/ DARYL K. WASHINGTON
    Daryl K. Washington
    State Bar No. 24013714
    WASHINGTON LAW FIRM, PC
    325 N. St. Paul St., Suite 3950
    Dallas, Texas 75201
    214-880-4883
    214-751-6685 - fax
    Email: dwashington@dwashlawfirm.com

S. LEE MERRITT
State Bar No. PA 314891
MERRITT LAW FIRM, LLC
1910 Pacific Ave., Suite 11500
Dallas, TX. 75021
888-647-3041
888-339-2050 -fax
slm@merrittatlaw.com


Benjamin L. Crump (PENDING PRO-HAC
ADMISSION)
BEN CRUMP LAW PLLC
122 s. Calhoun St.240 N Magnolia Drive
Tallahassee, FL 32301
850-224-2020
ben@bencrump.com


**ATTORNEYS FOR PLAINTIFFS**