IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BERTRUM JEAN, Individually and as the surviving father of BOTHAM SHEM JEAN, ALLISON A. JEAN, Individually and as the surviving mother of BOTHAM SHEM JEAN, and ALLISA E. FINDLEY as the Administrator of the Estate of BOTHAM SHEM JEAN, | § § § § § § § § | |
| | § | CIVIL ACTION NO. |
| *Plaintiffs* | § | 3:18-CV-2862-M |
| v. | § § | |
| THE CITY OF DALLAS and AMBER GUYGER, | § § § | |
| *Defendants* | § § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT CITY OF DALLAS'S MOTION PURSUANT TO RULE 12(b)(6) TO DISMISS THE PLAINTIFFS' CLAIMS ALLEGED AGAINST IT IN THE PLAINTIFFS' ORIGINAL COMPLAINT

**Daryl K. Washington**
State Bar No. 24013714
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883
214-751-6685 (fax)
dwashington@dwashlawfirm.com

**S. Lee Merritt**
State Bar No. PA 314891
**MERRITT LAW FIRM, LLC**
1910 Pacific Ave., Suite 11500
Dallas, Texas 75201
888-647-3041
888-339-2050 (fax)
slm@merrittatlaw.com

**Benjamin L. Crump**
(PENDING PRO-HAC ADMISSION)
**BEN CRUMP LAW, PLLC**
122 S. Calhoun St.
Tallahassee, Florida 32301
850-224-2020
ben@bencrump.com

**ATTORNEYS FOR PLAINTIFFS**

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................iv

I.    INTRODUCTION..................................................................................................1

II.   ARGUMENT & AUTHORITIES.............................................................................2

      A.    Standard applicable to the City's Rule 12(b)(6) motion ......................2

      B.    Pleading standard applicable to municipal liability claims............................3

            1.    Plaintiffs need not precisely identify the specific policy
                  or policymaker.....................................................................4

            2.    Plaintiffs need not show that that the policymaker
                  actually intended the constitutional injury ...........................6

      C.    Plaintiffs allege facts that, if true, state a plausible basis for
            municipal liability.............................................................................7

            1.    Plaintiffs identify the customs, practices, and policies
                  at issue ...............................................................................7

            2.    Plaintiffs sufficiently identify a policymaker ..........................9

            3.    Plaintiffs sufficiently allege that the City's policies,
                  customs, and practices were the "moving force"
                  behind Jean's constitutional injuries .....................................10

                  a.    The City's facially unconstitutional policy to
                        "shoot first and ask questions later" .........................10

                  b.    The City's failure to train and discipline its
                        officers on use of force..............................................12

                        i.    The City's failure to train its officers.............18

                        ii.   The City's failure to supervise and
                              discipline its officers .......................................22

TABLE OF CONTENTS (CONT'D)

Page

  D.  Alternatively, Plaintiffs ask that they be granted leave to amend any defects in their complaint if this Court is of the opinion that Plaintiffs' claims against the City are deficient in any respect ...................................................................................................24

III. PRAYER .........................................................................................................25

CERTIFICATE OF SERVICE...........................................................................................26

TABLE OF AUTHORITIES

**Cases** <span style="float:right">**Page**</span>

*Alvarez v. City of Brownsville,*
    904 F.3d 382 (5th Cir. 2018)........................................................................ 4, 6, 13

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................. 3, 4, 5, 9

*Bd. of Cty. Comm'rs v. Brown,*
    520 U.S. 397 (1997) .................................................................. 13, 14, 18, 19, 20

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .............................................................................. 4, 5, 9

*Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,*
    520 U.S. 397 (1997) .......................................................................................... 13

*Brosseau v. Haugen,*
    543 U.S. 194 (2004) .......................................................................................... 20

*Brown v. City of Houston,*
    297 F. Supp. 3d 748 (S.D. Tex. 2017)......................................................... 5, 8, 12

*City of Canton v. Harris,*
    489 U.S. 378 (1989) .................................................................................... 20, 21

*Connick v. Thompson,*
    563 U.S. 51 (2011) ............................................................................................ 20

*Doe v. Robertson,*
    751 F.3d 383 (5th Cir. 2014).............................................................................. 3

*Dyer v. Fyall,*
    322 F. Supp. 3d 725 (N.D. Tex. 2018) ............................................................... 7

*E.G. v. Bond,*
    Civ. No. 1:16-CV-0068-BL,
    2016 WL 8672774 (N.D. Tex. Sept. 9, 2016) ........................................... 5, 12, 21

*Estate of Davis ex rel. McCully v. City of N. Richland Hills,*
    406 F.3d 375 (5th Cir. 2005) ............................................................................. 6

## TABLE OF AUTHORITIES (CONT'D)

**Cases (cont'd)**                                                        **Page**

*Farmer v. Brennan,*
511 U.S. at 837 (1994) ............................................................................ 7, 14, 15

*Flanagan v. City of Dallas, Tex.,*
48 F. Supp. 3d 941 (N.D. Tex. 2014) ........................ 5, 6, 12, 18, 19, 21, 24

*Flores v. City of Palacios,*
381 F.3d 391 (5th Cir. 2004) ............................................................................ 11

*Foman v. Davis,*
371 U.S. 178 (1962) ............................................................................ 24

*Grandstaff v. Borger,*
767 F. 2d 161 (5th Cir. 1985) ............................................................................ 14

*Groden v. City of Dallas,*
826 F.3d 280 (5th Cir. 2016) ............................................................................ 5, 9

*Hare v. City of Corinth,*
74 F.3d 633 (5th Cir. 1996) ............................................................................ 7

*Hartzog v. Hackett,*
711 F. App'x 235 (5th Cir. 2018) ............................................................................ 6, 7

*Johnson v. City of Shelby,*
135 S. Ct. 346 (2014) ............................................................................ 2, 3

*Lormand v. U.S. Unwired, Inc.,*
565 F.3d 228 (5th Cir. 2009) ............................................................................ 2

*Milam v. City of San Antonio,*
113 Fed. Appx. 622 (5th Cir. 2004) ............................................................................ 22

*Monell v. Dep't of Soc. Servs. of the City of New York,*
436 U.S. 658 (1978) ............................................................................ 3

*Pena v. City of Rio Grande City,*
879 F.3d 613 (5th Cir. 2018) ............................................................................ 18

TABLE OF AUTHORITIES (CONT'D)

**Cases (cont'd)** <u>**Page**</u>

*Peterson v. City of Fort Worth, Tex.,*
    588 F.3d 838 (5th Cir. 2009) ............................................................. 12

*Piotrowski v. City of Houston,*
    237 F.3d 567 (5th Cir. 2001).............................................. 4, 6, 13

*Roberts v. City of Shreveport,*
    397 F.3d 287 (5th Cir. 2005) ............................................................. 21

*Sanchez v. Gomez,*
    283 F. Supp. 3d 524 (W.D. Tex. 2017)............................. 5, 8, 12, 21, 24

*Schaefer v. Whitted,*
    121 F. Supp. 3d 701 (W.D. Tex. 2015)................................................. 5

*Smith v. Brenoettsy,*
    158 F.3d 908 (5th Cir. 1998) ............................................................... 6

*Spiller v. City of Tex. City Police Dept,*
    130 F.3d 162 (5th Cir. 1997) ............................................................. 21

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ............................................................................. 10

*Test Masters Educ. Servs., Inc. v. Singh,*
    428 F.3d 559 (5th Cir. 2005)............................................................... 2

*Thomas v. City of Galveston, Tex.,*
    800 F. Supp. 2d 826 (S.D. Tex. 2011)............................................... 5, 8

*Thompson v. Upshur Cnty.,*
    245 F.3d 447 (5th Cir. 2001) ............................................................... 7

*U.S. ex rel. Hebert v. Dizney,*
    295 Fed. App'x 717 (5th Cir. 2008)................................................... 24

*U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.,*
    336 F.3d 375 (5th Cir. 2003) ............................................................. 24

TABLE OF AUTHORITIES (CONT'D)

**Cases (cont'd)**                                                                    <u>Page</u>

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.,*
   355 F.3d 370 (5th Cir. 2004)..................................................................................... 3

*Westfall v. Luna,*
   903 F.3d 534 (5th Cir. 2018)............................................................................. 13, 14

*Wright v. Denison Indep. Sch. Dist.,*
   No. 4:16-CV-615, 2017 WL 2262778 (E.D. Tex. May 24, 2017).............................................. 5

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................. 3

Plaintiffs Bertrum Jean and Allison Jean, individually and as the surviving parents of Botham Jean, and Allisa E. Findley, as the Administrator of the Estate of Botham Jean, file this Response to Defendant the City of Dallas's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Original Complaint and Brief in Support (Doc. 7) (the "Motion"). The City's Motion should be denied for the following reasons:

## I.    INTRODUCTION

When Amber Guyger fatally shot Botham Jean on September 6, 2018, she became the latest among the numerous Dallas police officers in recent years who have used deadly force against citizens when no imminent threat of harm existed. Jean's family filed suit against the City of Dallas (the "City") on October 27, 2018. (Doc. 5). Now, the City has moved to dismiss their municipal liability cause of action,[1] contending that Plaintiffs' claims—that Botham Jean's death was caused by the City's policy to "shoot first and ask questions later" and by the City's failure to train, supervise, or discipline its officers—are not plausible. (Doc. 7 at 8).

The City's persistent, widespread pattern of unlawful police officer shootings reveals the inadequacies of the City's training and discipline of its officers, as well as the City's unwritten policy and custom of using deadly force where no immediate threat of harm exists. (Doc. 5 at ¶ 66). Jean was not the first unarmed person of color Guyger unlawfully shot. In 2017, during a traffic stop, Guyger was attempting to view a woman's

---

[1] Notably, the City *does not* question the sufficiency of Plaintiffs' pleading of a constitutional violation.

1

identification when a man who was also in the car allegedly tried to take Guyger's taser.[2] Guyger shot Uvaldo Perez, who was also unarmed. (*Id.*). However, the City never disciplined Guyger or required she attend any special training after the first shooting which, along with her shooting of Jean, occurred within her first four years as a police officer. (*Id.*). It was not until well-after Jean's homicide—and only then after substantial public outcry—that the City terminated Guyger. (Doc. 5 at ¶ 60). Before even investigating Jean's death, the City's first, knee-jerk reaction was to protect Guyger and publicly defend her conduct, even as the City permitted Guyger to destroy or conceal evidence potentially unfavorable to her. (*Id.* at ¶¶ 24–25).

As shown below, Plaintiffs have adequately pled a claim for municipal liability against the City. The City's challenge to those pleadings should be, in all things, denied.

## II.   ARGUMENT & AUTHORITIES

## A.   Standard applicable to the City's Rule 12(b)(6) motion.

Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 231 (5th Cir. 2009) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)). A complaint will not be dismissed merely because it contains an imperfect statement of the legal theory supporting the claim asserted. *Johnson v. City of Shelby,* 135 S. Ct. 346, 346 (2014). Federal pleading rules simply

---

[2] Dana Branham & Naomi Martin, *Dallas Officer Who Shot Man in his Own Apartment was Involved in 2017 Shooting of a Suspect*, DALLASNEWS.COM (Sept. 9, 2018, 8:30 pm), *available at* https://www.dallasnews.com/news/dallas-police/2018/09/08/dallas-officer-shot-man-apartment-involved-2017-shooting-suspect (last accessed Dec. 19, 2018).

call for "a short and plain statement of the claim showing that the pleading is entitled to relief." *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

A court must first distill well-pleaded factual allegations, whose truth is presumed, from any unsupported legal conclusions, whose truth cannot be assumed. *See, e.g., Doe v. Robertson*, 751 F.3d 383, 388 (5th Cir. 2014). When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A complaint must fail if it offers only "naked assertions devoid of further factual enhancement." *Id.* at 678. Importantly, the Court should not evaluate the merits of the allegation, but satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

**B.    Pleading standard applicable to municipal liability claims.**

The City seems to criticize virtually every aspect of the Plaintiffs' municipal liability claim.  In doing so, the City largely ignores Plaintiffs' actual pleadings and the standards applicable to the pleading of a municipal liability claim. Accordingly, a discussion of both is warranted here, as context makes it rather clear that Plaintiffs have adequately pled their claims against the City.

To hold a municipality liable under section 1983 (*i.e., Monell*[3] liability), a plaintiff must establish three essential elements: (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose "moving force" is the policy or custom.  *Alvarez*

_____

[3] *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978).

*v. City of Brownsville,* 904 F.3d 382, 389 (5th Cir. 2018). An official policy can take the form of a written policy, ordinance, or regulation; or an official policy can arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy. *Id.* at 389–90. That policy, in turn, must be the "moving force" behind the constitutional violation. *Id.* at 390. In all, these elements "distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001).

### 1.    Plaintiffs need not precisely identify the specific policy or policymaker.

An important question, in the Rule 12(b)(6) context, becomes the standard to be applied to municipal liability pleadings in light of *Iqbal*[4] and *Twombly*.[5] Generally speaking, *Iqbal* and *Twombly* establish a heightened standard for federal pleadings. In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*—decided before *Iqbal* and *Twombly*—the Supreme Court refused to apply a heightened pleading standard to section 1983 claims against municipalities.[6] *Leatherman*, 507 U.S. 163, 168 (1993). Despite seeming to conflict somewhat with *Iqbal* and *Twombly, Leatherman* remains good law and, as such, courts have decided to apply a less onerous pleading standard to municipal liability claims in light of *Leatherman.*

---

[4] *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).
[5] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).
[6] Such claims must allege facts supporting three essential elements: (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018); *see also Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 694 (1978).

Courts attempting to reconcile these cases have recognized that, before discovery, it is incredibly rare that a plaintiff will have access to (or personal knowledge of) specific details about the existence or absence of internal policies or practices that led to the constitutional violation. *See Thomas v. City of Galveston, Tex.*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011); *see also Brown v. City of Houston*, 297 F. Supp. 3d 748, 767 (S.D. Tex. 2017); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 532 (W.D. Tex. 2017); *E.G. v. Bond*, Civ. No. 1:16-CV-0068-BL, 2016 WL 8672774, at *5 (N.D. Tex. Sept. 9, 2016), report & recommendation adopted by Civ. No. 1:16-CV-068-C, 2017 WL 129019 (N.D. Tex. Jan. 13, 2017). Accordingly, while surviving a motion to dismiss requires "more than boilerplate allegations" and mere recitations of the elements, courts have not required plaintiffs alleging that an official policy exists to plead "*specific* facts that *prove* the existence of a policy." *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718 (W.D. Tex. 2015) (emphasis added). Thus, a municipal liability claim complies with *Twombly* and *Iqbal* where the complaint contains at least some further detail, such as "the specific topic of the challenged policy or training inadequacy" that caused the constitutional injury. *Wright v. Denison Indep. Sch. Dist.*, No. 4:16-CV-615, 2017 WL 2262778, at *4 (E.D. Tex. May 24, 2017); *see also Flanagan v. City of Dallas, Tex.*, 48 F. Supp. 3d 941, 947 (N.D. Tex. 2014) (quoting *Twombly* and *Iqbal*).

Further, the Fifth Circuit does not require a plaintiff to identify "the specific identity of the policymaker" to survive a motion to dismiss. *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016). "[T]he specific identity of the policymaker is a legal question that need not be pled; the complaint need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." *Id.* At the

5

pleading stage, therefore Plaintiffs need only allege that a policymaker for the City promulgated or ratified the policies or inadequacies that Plaintiffs alleged caused the constitutional injury.

### 2. Plaintiffs need not show that that the policymaker actually intended the constitutional injury.

To sufficiently allege a "moving force," plaintiffs must plead facts supporting a direct causal link between the targeted policy and the constitutional violation. *Alvarez,* 904 F.3d at 390. Unless the policy is determined to be unconstitutional on its face, plaintiffs must allege that an otherwise facially innocuous policy or custom was implemented with "deliberate indifference" to the "known or obvious consequence" that a constitutional violation would result. *Piotrowski,* 237 F.3d at 579. "Deliberate indifference" is pleaded by alleging that the policymaker was aware of facts from which it could infer the policy or custom posed a substantial risk of serious harm. *Flanagan***Error! Bookmark not defined.***, 48 F. Supp. 2d at 957 (citing *Smith v. Brenoettsy,* 158 F.3d 908, 912 (5th Cir. 1998)).

While courts have held that an official must actually "draw the inference" that conduct poses a substantial risk of serious harm,[7] the City asks this Court to impose an additional element on the deliberate-indifference standard: that the "official's response indicates the official subjectively intended that harm occur." (Doc. 7 at 14) (quoting *Hartzog v. Hackett,* 711 F. App'x 235, 235–36 (5th Cir. 2018). However, Judge Boyle in *Dyer*

---

[7] *See Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375, 381 (5th Cir. 2005).

*v. Fyall* expressly rejected this "actual-intent-to-harm" element, explaining that some Fifth Circuit panels have incorrectly relied on another case, *Hare v. City of Corinth,* as establishing this requirement. *Dyer v. Fyall*, 322 F. Supp. 3d 725, 737–38 (N.D. Tex. 2018); *see also Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). Those cases—including *Hartzog v. Hackett,* on which the City relies—have applied the deliberate-indifference standard established in *Farmer v. Brennan. See Farmer v. Brennan*, 511 U.S. at 837, 842 (1994); *Hartzog*, 711 F. App'x 235; *Thompson v. Upshur Cnty.*, 245 F.3d 447 (5th Cir. 2001); *Hare*, 74 F.3d at 633.[8]

Far from approving an actual-intent standard, however, "the Supreme Court in *Farmer* cast doubt on the intent-to-harm requirement," even in the context of inmate claims. *Dyer*, F. Supp. 3d at 739; *see also Farmer*, 511 U.S. at 835 (explaining that, while "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). Therefore, the actual-intent element does not apply here.

---

[8] Each of these cases applies the standard to Eighth Amendment claims involving prison inmates and (in *Hare*) pretrial detainees. The concurring opinion in *Hare* cautioned that "(1) application of the "deliberate indifference" test (for determining cruel and unusual punishment of convicts) to pretrial detainees' claims is inconsistent with prior Supreme Court decisions that detainees are guiltless individuals protected by a broader Due Process Clause right to be free from any punishment whatsoever; and (2) even if pretrial detainees are to be shielded only from cruel and unusual punishment as measured by the 'deliberate indifference' standard, the majority opinion's failure to consistently articulate fully the *Farmer v. Brennan* definition of that standard runs the risk of affording pretrial detainees less protection from inhumane treatment than convicted criminals." *Hare*, 74 F.3d at 650–51 (Dennis, J., concurring).

C.      **Plaintiffs allege facts that, if true, state a plausible basis for municipal liability.**

   1.      **Plaintiffs identify the customs, practices, and policies at issue.**

At the pleading stage of the litigation, a plaintiff need not specifically state what the municipal policy is and is permitted to rely on minimal factual allegations. *Thomas*, 800 F. Supp. 2d at 842-43; *see also Brown*, 297 F. Supp. 2d at 767; *Sanchez*, 283 F. Supp. 2d at 532. Such "minimal factual allegations" can include, but are not limited to, "past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Thomas*, 800 F. Supp. 2d at 843-44. In *Brown*, for instance, Chief Judge Rosenthal found the plaintiff's municipal liability allegations sufficient where he: (1) identified the relevant policymakers—present and former district attorneys; (2) identified the relevant policy or custom and practice—the "do whatever it takes" conviction culture; and (3) alleged that this policy of obtaining convictions at all costs was the "moving force" behind his unconstitutional conviction and injury. *Brown*, 297 F. Supp. 3d at 766.

The Original Complaint sufficiently identifies the targeted policies and customs. First, Plaintiffs clearly identify the specific topic of the custom or policy—to "shoot first and ask questions later"—which was the "moving force" behind Jean's constitutional injuries. (*See id.* at ¶¶ 3, 20, 27, 64). Second, Plaintiffs also allege that Jean's injuries were caused by failing to adequately train DPD officers, including Guyger, regarding the proper use of force—particularly against an unarmed civilian who poses no imminent threat of harm (*Id.* at ¶¶ 2, 28). And third, Plaintiffs allege that even when officers,

including Guyger, violated police department policy, the City failed to adequately discipline them, or to provide them adequate supervision to prevent the same injuries that befell Jean from recurring. (*Id.* at ¶ 86).

These allegations are sufficient to provide the City with "fair notice" of Plaintiffs' municipal liability claims and the grounds on which they rest, as well as permit this Court to infer "more than the mere possibility of misconduct" by the City regarding its various failures. *See Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 555 n. 3.  More importantly, these allegations identify the specific topic of the alleged policy, training, or discipline inadequacy. Accordingly, Plaintiffs have identified the customs, practices, or policies they contend are the moving force behind the constitutional violations at issue.

### 2.    Plaintiffs sufficiently identify a policymaker.

Since a plaintiff is only required to plead facts "showing the challenged policy was promulgated or ratified by a policymaker,"[9] Plaintiffs more than satisfied that burden here. Although not required to do so, Plaintiffs specifically allege two policymakers: (1) "Chief of Police Renee Hall ("Chief Hall"), the policymaker for the Dallas Police Department ["DPD"], with the authority for setting policies, including training of the Dallas Police Officers," and (2) "the Dallas City Council and the City Manager, vested with all powers of the City and the determination of all matters of policy." (Doc. 5 at ¶ 2). As alleged, these policymakers promulgated or ratified the policies that subject the City to Section 1983 liability.

---

[9] *Groden*, 826 F.3d at 285.

It is further evident that, unlike what the City suggests, Plaintiff did not identify Chief Hall as the sole policymaker. (*See* Doc. 7 at 8–9) (claiming that "Plaintiffs must allege facts sufficient to allow the Court to infer that Chief Hall's actions, as the DPD's final policymaker," alone support Plaintiffs' claims against the City). Plaintiffs' municipal liability claim against the City need not rest on Chief Hall's actions alone. Nevertheless, at this stage, Plaintiffs have sufficiently identified a policymaker.

### 3. Plaintiffs sufficiently allege that the City's policies, customs, and practices were the "moving force" behind Jean's constitutional injuries.

For municipal liability to attach, the City's policies, customs, or practices must be alleged to have been the "moving force" behind the constitutional violations suffered by the Plaintiffs. In support of this element, Plaintiffs provide far more than bare conclusory allegations, as the City would portray them. (Doc. 7 at 1, 10, 16–18).

### a. The City's facially unconstitutional policy to "shoot first and ask questions later."

Plaintiffs expressly note that it is the City's "shoot first and ask questions later" policy that resulted in Jean's death. (Doc. 5 at ¶¶ 20, 27, 64). Specifically, Plaintiffs distinguish the City's written policy on the use of force from the City's "de facto policy" of using force (even deadly force) even where there is no immediate threat. (*Id.* at ¶27–28). Such a policy in itself is facially unconstitutional. It is well-settled in both Supreme Court and Fifth Circuit precedent that the use of deadly force is objectively reasonable in only one circumstance—when the suspect poses an immediate threat to the officers or others. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Flores v. City of Palacios*, 381

10

F.3d 391, 398 (5th Cir. 2004). This de facto policy, Plaintiffs allege, has resulted in

numerous deadly policy shootings of unarmed minorities:

- James Harper, though unarmed, was fatally shot by DPD officer Brian Rowden as he ran away on July 24, 2012;
- Clinton Allen, also unarmed, was fatally shot 7 times by DPD officer Clark Staller on March 10, 2013, even while Allen held both hands up;
- David Blair, also unarmed, was standing outside of his apartment on October 2, 2013, when for no lawful reason, a pair of DPD officers harassed him, approached him, and followed him to his apartment before shooting at him 14 times;
- Bobby Bennett, an unarmed man with mental challenges, was shot on October 14, 2013 by another DPD officer, who attempted to falsify a police report but a video exposed the attempted cover-up. Although the officer initially claimed Bennet lunged at him, the video showed otherwise;
- Kelvion Walker was still in a vehicle with his hands up when a DPD officer shot the 19-year-old on December 10, 2013;
- Bertrand Syjuan Davis, also unarmed, was fatally shot multiple times by DPD officer Matthew Terry on August 27, 2015, including once in the back. According to multiple witness accounts, immediately upon arriving at the scene, Officer Terry failed to conduct an objectively-reasonable assessment of the facts before drawing his gun and shooting Davis repeatedly, without any verbal warning and while there was no imminent threat of death or serious bodily injury to Officer Terry or any other person; and
- Genevive Dawes, also unarmed, was seated in a vehicle with Virgilio Rosales on January 18, 2017, when DPD officers Christopher Hess and Jason Kimpel fired at least 13 shots through the passenger side window where Rosales was seated, injuring Rosales and killing 21-year-old Dawes. Hess's reasoning for firing at the vehicle was unsupported by body cam evidence that shows Dawes very slowly reversing the vehicle and in a direction that posed no threat of harm to anyone.

(Doc. 5 at ¶¶ 65–66). Plaintiffs allege that this unconstitutional policy was a moving force

behind Jean's injury: "By simply following proper police procedures and the best police

practices and not the protocol of the DPD to 'shoot first and ask questions later',

Defendant Guyger would have not shot Jean." (*Id.* at ¶ 20). Plaintiffs need not also

provide facts to show the City was deliberately indifferent with regard to the policy

alleged, because deliberate indifference is presumed from a policy that is unconstitutional on its face. *Piotrowski*, 237 F.3d at 579.[10]

Additionally, at the pleading stage, Plaintiffs need only specify the topic of the policy giving rise to the City's liability. *Sanchez,* 283 F. Supp. 3d at 532; *Flanagan,* 48 F. Supp. 2d at 947. Although the City contends that Plaintiffs alleged "the 'kitchen sink' of generalized policies," it admits that it understands the targeted policy: "[T]hat the DPD had a constitutionally deficient policy on the use of deadly force." (Doc. 7 at 10). The City's "shoot first and ask questions later" policy is precisely that. Given that, in *Brown v. City of Houston,* the plaintiff's identification of the relevant policy as the District Attorney's office's "do whatever it takes" conviction culture was sufficient, Plaintiffs' identification of the "shoot first, ask questions later" policy is more than adequate to survive the City's motion to dismiss.  *Brown*, 297 F. Supp. 3d at 766.

### b.    The City's failure to train and discipline its officers on use of force.

"All failure to act claims, such as [Plaintiffs'] failure to train, supervise, and discipline claims, involve the same basic elements: inadequacy, deliberate indifference, and causation." *Bond*, 2016 WL 8672774, at *11. A failure to train officers with deliberate indifference to citizens' constitutional rights constitutes a policy or custom for the purposes of municipal liability. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009).

---

[10] As shown below, however, the Plaintiffs' allegations support the City's deliberate indifference as well.

"Deliberate indifference" generally requires more than just a single instance that causes a constitutional violation—rather, there needs to be some pattern of similar violations that is so clearly inadequate as to be obviously likely to result in a constitutional violation. *Westfall v. Luna,* 903 F.3d 534, 552 (5th Cir. 2018). "A pattern [of failing to discipline officers] could evidence not only the existence of a policy but also official deliberate indifference." *Piotrowski*, 237 F.3d at 582. That is because policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action." *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997) (noting that police may, "in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need."). This pattern also tends to show that the policymaker's conduct, and not "factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id.* at 407–08.

But even where such a pattern does not exist, a single incident of a violation may support liability. *Piotrowski*, 237 F.3d at 579; *Alvarez*, 904 F.3d at 390. One violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bryan Cnty,* 520 U.S. at 409. Although narrow, this "single-incident exception" generally applies where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the

13

highly predictable consequence of the particular policy or custom. *Westfall*, 903 F.3d at

554. "The high degree of predictability may also support an inference of causation—that

the municipality's indifference led directly to the very consequence that was so

predictable." *Bryan Cnty,* 520 U.S. at 409–410. Such was the case in *Grandstaff v. Borger*,

where officers were "quick to fire" at the suspect and "recklessly killed" an innocent third

party in the process—conduct the Fifth Circuit has deemed "egregious." *See Westfall,* 903

F.3d at 552 (quoting *Grandstaff v. Borger*, 767 F. 2d 161, 171 (5th Cir. 1985)).

Alleging that the City has known of the need to enact policies and training

procedures in order to address a persistent problem with officers' unlawful use of force

indicates that the City actually drew the inference that inadequacies in training or

discipline posed a substantial risk of the same constitutional injuries inflicted upon Jean.

Moreover, the Supreme Court has explained that factfinders may conclude that an

"official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*,

511 U.S. at 842. For instance, as the *Farmer* court illustrated:

> if an Eighth Amendment plaintiff presents evidence showing that a
> substantial risk of inmate attacks was "longstanding, pervasive, well-
> documented, or expressly noted by prison officials in the past, and the
> circumstances suggest that the defendant-official being sued had been
> exposed to information concerning the risk and thus 'must have known'
> about it, then such evidence could be sufficient to permit a trier of fact to
> find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842–43. It follows that, when a plaintiff alleges that a substantial risk

of police officers unlawfully using deadly force is "longstanding, pervasive, well-

documented, or expressly noted" by City officials in the past—and circumstances show

14

that the City (the defendant here) has been exposed to such information—such facts

support actual knowledge of the risk. *Id.*

Plaintiffs have unmistakably alleged that Guyger's unlawful use of deadly force

against Jean was part of, and resulted from, the City's decades-long pattern of failing to

train and discipline officers in the constitutional use of force. More specifically, Plaintiffs

allege past incidents of misconduct by both Guyger and other officers. To begin with,

Plaintiffs allege that "on July 24, 2012, DPD officer Brian Rowden fatally shot James

Harper as he ran away." (Doc. 5 at ¶ 66). After James Harper's death, former Dallas Police

Chief Brown announced that the DPD would employ numerous policies and procedures

intended to avoid such abuses.[11] (*Id.* at ¶ 70).

The unlawful police shootings, nevertheless, continue:

---

[11] Among those policies and procedures were:

- Formalizing a process of concurrent investigative review with the FBI Civil Rights Office of all officer involved shootings in order to reassure the public that the DPD conducts detailed and comprehensive investigations and that the findings are based upon facts uncovered by the investigation (Doc. 5 at ¶ 70.a.);
- Implementing a more comprehensive Response to Resistance reporting system intended to assist in developing and refining tactics, training, and policy; and to provide public transparency regarding the amount of force officers take in the performance of their duties (*Id.* at ¶ 70.b.);
- Developing a foot pursuit policy that would provide officers with a foundation on which to make decisions during these high risk activities with the intent of reducing hazardous consequences and preventing, when possible, the escalation of action into lethal force confrontation (*Id.* at ¶ 70.c.);
- Re-implementing the Digital Video Recorder (DVR) Review Team as a training tool for the DPD while building public confidence that the DPD proactively examines officer performance to ensure compliance (*Id.* at ¶ 70.d.);
- Implementing a mandatory electronic control weapon (Taser) training policy for all officers, given that all officers trained with a Taser are now generally required to carry one (*Id.* at ¶ 70.e.);
- Enhancing the DPD's consensual search policy to include the requirement for a written and/or recorded consent to create greater public confidence in the consensual searches performed by DPD Officers, and to protect officers against false allegations of illegal search (*Id.* at ¶ 70.f.); and
- Researching best practices that have come from critical incidents or institutional failures in public safety from around the nation to improve DPD's internal training, policy, officer safety, and service delivery, incorporating recommendations from the 1988 Congressional Hearings that occurred in Dallas (*Id.* at ¶ 70.g.).

- On March 10, 2013, DPD officer Clark Staller fatally shot unarmed Clinton Allen 7 times, despite Allen having his hands up;

- On October 2, 2013, two DPD officers shot at unarmed David Blair 14 times for no apparent reason after following Blair to his apartment for no lawful reason;

- On October 14, 2013, another DPD officer shot unarmed Bobby Bennett, a man with mental challenges;

- On December 10, 2013, a DPD officer shot unarmed Kelvion Walker while he was still in a vehicle with his hands up;

- On August 27, 2015, DPD officer Matthew Terry fatally shot unarmed Bertrand Davis several times in the back; and

- On January 18, 2017, DPD officers Christopher Hess and Jason Kimpel fatally shot at unarmed Genevive Dawes 13 times, fatally striking her 5 times and injuring Virgilio Rosales while the two were still inside a vehicle and not an imminent threat of serious harm to anyone.

(*Id.* at ¶ 60). Several of these officers were not terminated or disciplined in the wake of these events, despite video evidence and witness testimony showing that the officers were not facing the imminent threat of serious harm required to justify using lethal force. (*Id.*) (officers Staller, Terry, Hess, and Kimpel, for instance). For instance, Staller was allowed to remain on as an officer and was not disciplined for the death of Allen. (*Id.*). And, despite body cam footage showing that Hess and Kimpel shot at Dawes and Rosales when facing no threat of imminent harm in violation of DPD policy, Kimpel was never disciplined. (*Id.*). Hess was not terminated until almost seven months later when the case became public, after which Hess was indicted for Dawes' death. (*Id.*).

In several cases, the officers were even permitted to attempt shielding evidence showing facts contrary to the officers' story. (*Id.*) (including the officer who shot Bennett,

as well as officer Kimpel and officer Hess, who was later indicted for homicide). Staller was even allowed to prepare his statement of the incident with the assistance of his attorney and was not asked any questions to determine the veracity of his statements, despite having previously falsified a police report in another incident. (*Id.*). The DPD and the City also attempted to cover-up the unlawful shooting that killed Dawes until the body cam footage was released to the Dallas District Attorney's office almost six months later. (*Id.*).

Officer Guyger's conduct, consistent with these other officers' behavior in these recurring encounters with civilians posing no immediate harm—and consistent with her own prior conduct—is so egregious that the single-incident exception applies. Already in her brief police career, Guyger had shot another unarmed minority prior to her encounter with Jean. (*Id.* at ¶ 26). And, like other DPD officers, Guyger was permitted to hide potentially unfavorable evidence on her social media accounts—even though her publicly available posts violated the City's DPD policies, for which she was never disciplined. (*Id.*). Astoundingly, Guyger was even permitted to re-enter Jean's apartment, where the shooting occurred. (*Id.* at ¶ 22). When Guyger called 911 to report Jean's shooting, Plaintiffs also allege she made statements intended to bolster her story and to counter any claim that her shooting was unjustified. (*Id.* at ¶ 16). This story, Plaintiffs claim, was bolstered by statements anonymous DPD sources provided to the media, claiming that physical evidence substantiated Guyger's claims, even before fully investigating that evidence. (*Id.* at ¶ 25). Guyger's shooting of Jean was the predictable result of the City's failure to train or discipline its officers in how to respond to these

recurring situations presenting an obvious potential for the violation that Guyger committed against Jean. Such pleadings necessarily implicate the City's indifference as the direct cause of Guyger's unjustified killing of Jean. *Bryan Cnty,* 520 U.S. at 409–410.

The years of civilian deaths like Jean's, which also have their origins in the City's training and disciplinary failures, allege "a pattern of similar constitutional violations" more than adequate to give the City notice of Plaintiffs' claims. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018). As alleged, Guyger shot Jean, without regard to whether he posed any imminent threat of harm and without warning, resulting in Jean's death. (Doc. 5 at ¶¶ 18, 27, 71). This egregious consequence could hardly be surprising under the DPD's "shoot first, ask questions later" policy followed by Guyger here and in previous incidents for which she was not disciplined. (*Id.* at ¶¶ 20, 64). Thus, even this single incident shows the City's deliberate indifference.

### i.      The City's failure to train its officers

These repeated incidents demonstrate a failure on the part of the City to adequately train—if at all—its officers on the proper use of force, and certainly satisfies Plaintiffs' pleading requirements at this stage of the proceedings. *See Flanagan,* 48 F. Supp. 3d at 947 (plaintiffs can provide fair notice by, among other things, describing past incidents of misconduct by the defendant to others). Judge Lynn in *Flanagan* held that plaintiffs stated a claim for failure-to-train by alleging that the City had notice of a pattern of similar constitutional violations which were "fairly similar to what ultimately transpired," and that:

(1)     due to an acknowledged and obvious lack of training in the use of excessive force, DPD officers have shot dozens of unarmed individuals over the past several years based on the DPD's actual custom of "shoot first, ask later";

(2)     due to this lack of training, Officer Staller caused Allen's death; and

(3)     Councilman Caraway and Chief Brown have both acknowledged the need for further officer training.

*Id.* at 957. This is precisely what Plaintiffs allege here, stating that, as is evident from a pattern of constitutional violations similar to that which resulted in Jean's death:

(1)     the Dallas Police Department "trains its officers to use deadly force even when there exist[s] no immediate threat to themselves or others" as part of its protocol to "shoot first and ask questions later"(Doc. 5 ¶ 20, 28);

(2)     due to this lack of proper training, Officer Guyger caused Jean's death (*Id.* at ¶¶ 39, 79); and

(3)     former Chief Brown previously acknowledged the need for further officer training that the City has elected not to implement (*Id.* at ¶ 70).

Not only do the facts alleged support the existence of a policy of using unlawful deadly force where no imminent threat of harm exists, they also show a deliberate indifference to the fatal constitutional violations that have continued to occur as a result. *Bryan Cnty.*, 520 U.S. at 407–08. This pattern of similar violations and misconduct further demonstrates the causal link between the City's policies of failures to train or discipline its officers and the resulting constitutional injuries. *Id.* The need to ensure that police officers are properly trained in the use of deadly force is obvious, as the United States Supreme Court has observed:

[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. *Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said*

> to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) (emphasis added); *see also Connick v. Thompson*, 563 U.S. 51, 63–71, (2011) (recognizing, but refusing to extend, the single-incident principle); *Bryan Cnty.*, 520 U.S. 397 (same).

Here, Guyger's use of a firearm in this manner and under these circumstances is an archetypical use of deadly force, and it is clearly established law that shooting an unarmed, unthreatening suspect is a Fourth Amendment violation which was plainly foreseeable to the City when it failed to adequately train its officers. *See, e.g., Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). Plaintiffs allege that, despite this knowledge, the City failed to adequately train its officers in:

- The use of proper and appropriate detention and seizure procedures;

- The use of excessive and/or deadly force;

- The proper use of less deadly means;

- The proper use of cover and the pursuit of a suspect; or in

- De-escalation tactics.

(*Id.* at ¶ 57).

The City has known for decades that such institutional training failures have led officers to use precisely the unlawful force that caused the same constitutional injuries that resulted in Botham Jean's death.[12] Moreover, the Supreme Court has explained that

---

[12] *See* pages 10–11 and 14–16 above, noting at least seven other instances of Dallas police officers shooting citizens who posed no imminent threat of harm since 2012, despite Chief Brown and others identifying the

the need for this training, which Plaintiffs plainly allege the City did not provide to any of the DPD officers, is "so obvious" that even a single incident is sufficient to show "deliberate indifference" on the part of the municipality. *Harris*, 489 U.S. at 390 n.10. And, it is the lack of this exact type of training provided to these officers that was the "moving force" behind Guyger's shooting of Botham Jean—a highly predictable consequence of the City's persistent training failures. Thus, Plaintiffs state a claim for failure-to-train.

The City now strains to characterize this list of training failures as "facially deficient." (Doc. 7 at 11). But the authority the City cites does not support this proposition. *See, e.g., Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (while evidence was insufficient to raise a fact issue to prevent summary judgment, the court did not dispute that alleging inadequate "training on deadly force," including the requirement to issue a warning first, would satisfy the pleading standards); *see also, e.g., Bond*, Civ. No. 1:16-CV-068-C, 2017 WL 129019, at *4 (N.D. Tex. Jan. 13, 2017) (plaintiffs alleged only that defendants "knew of the risks . . . posed by inadequate training" but alleged no specific policy or topic related to training whatsoever); *Spiller v. City of Tex. City Police Dept*, 130 F.3d 162, 167 (5th Cir. 1997) (no claim of failure to train).

Ultimately, however, to survive the City's Rule 12(b)(6) motion, all Plaintiffs had to do was identify the specific topic of the challenged training inadequacy. *Sanchez,* 283 F. Supp. 3d at 532; *Flanagan,* 48 F. Supp. 2d at 947. Having alleged that the City failed to provide adequate training on the use of excessive and deadly force, proper arrest and

---

need for policies and training were necessary to address the City's institutional training issues that lead to these unlawful killings. (Doc. 5 at ¶¶ 66–70).

confrontation techniques, and appropriate methods and techniques to control situations like the one Guyger encountered on September 6, 2018, Plaintiffs more than satisfied this burden. (*Id.* at ¶¶ 34-42, 57, 79).

> ### ii.   The City's failure to supervise and discipline its officers.

Failure to supervise and discipline officers can also give rise to municipal liability. "[M]unicipal policymakers who fail to supervise and to discipline their police officers, acting with deliberate indifference to the citizen's rights, could create municipal liability if the lack of supervision causes a deprivation." *Milam v. City of San Antonio,* 113 Fed. Appx. 622, 628 (5th Cir. 2004). The Fifth Circuit in *Milam* explained:

> [E]ven though a policymaker's response to a particular incident may not cause the injury, the response might provide evidence of the content of a municipality's policies. That is, the failure to take disciplinary action in response to an illegal arrest, when combined with other evidence, could tend to support an inference that there was a preexisting de facto policy of making illegal arrests: the policymaker did not discipline the employee because, in the policymakers' eyes, the employee's illegal conduct actually conformed with municipal policy.

*Id.*

The City's response to Guyger's shooting of Jean, as Plaintiffs have alleged it, is also sufficient to support municipal liability. In pertinent part, Plaintiffs plead that, after shooting a suspect of color previously, "Guyger was not required to undergo any mental counseling and/or training after the first officer involved shooting she was involved in." (Doc. 5 at ¶ 26). Consistent with how the City has responded to other unlawful shootings, Plaintiffs allege that:

> Despite having knowledge of Defendant Guyger's violation of the DPD's policies and other best police practice as described above, the City of Dallas,

> the City Council and Chief Hall refused to adequately discipline Defendant
> Guyger. The City of Dallas's failure to adequately supervise and/or
> discipline its officers was therefore the moving force behind Plaintiffs'
> damages.

(*Id.* at ¶ 86). Even if Guyger's prior unlawful shooting did not result in death, Botham

Jean was not so fortunate. Had the DPD disciplined, retrained, or supervised Guyger

after the prior incident, Plaintiffs allege that Jean would be alive today. (*Id.* at ¶ 20).

In the wake of Jean's death, the City's decision not to terminate Guyger until

prompted by public outcry further demonstrates its tacit approval of Guyger's conduct.

The City's ratification of Guyger's conduct is further apparent from the facts that Guyger

was permitted to re-enter Jean's apartment (and her own) after the shooting and to make

several phone calls before giving investigators her statement. (Doc. 5 at ¶ 22). Plaintiffs

further allege that the City spoliated evidence by permitting Guyger to scrub her social

media accounts. (*Id.* at ¶ 26). Despite initiating a homicide investigation immediately

after the shooting, including seeking a warrant for Jean's apartment, the City did not

likewise seek a warrant for Guyger's apartment, vehicle, or service locker—all of which

Plaintiffs note potentially held evidence relevant to the investigation. (*Id.* at ¶ 24).

This pattern mirrors—indeed, exceeds—the City's other failures to discipline

officers involved in unlawful shootings. A constitutional violation was the highly

predictable consequence of the DPD not adequately disciplining its officers, including

Guyger. This failure to discipline indicates that, in the City's eyes, these officers' illegal

conduct actually conformed with "the de facto policy of the DPD"—to use excessive force

without warning or attempt to de-escalate a situation where no imminent harm exists.

23

(*Id.* at ¶ 27). Plaintiffs' Complaint goes well beyond the minimal requirement to identify the specific topic of the challenged inadequacy of the City to discipline or supervise its officers. *Sanchez,* 283 F. Supp. 3d at 532; *Flanagan,* 48 F. Supp. 3d at 947.

**D.    Alternatively, Plaintiffs ask that they be granted leave to amend any defects in their complaint if this Court is of the opinion that Plaintiffs' claims against the City are deficient in any respect.**

As noted in detail above, Plaintiffs believe they have adequately pled sufficient claims against the City.  Thus, the City's motion should be denied.

However, in the event that this Court believes that Plaintiffs' complaint is deficient in some respect, Plaintiffs respectfully request that they be granted leave to amend their complaint.  Federal Rule of Civil Procedure Rule 15(a) mandates that "'leave to amend shall be freely given when justice so requires,' and should be granted absent some justification for refusal." *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182. Thus, leave should be given unless some combination of the following factors weighs heavily against amendment: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failures to cure deficiencies by prior amendment; (4) undue prejudice to the opposing party; and (5) the futility of the amendment.  *See U.S. ex rel. Hebert v. Dizney,* 295 Fed. Appx. 717, 724 (5th Cir. 2008). Here, none of these factors are present and, accordingly, if Plaintiffs' allegations are deficient in some respect, Plaintiffs ask that they be granted leave to amend their complaint.

### III.   PRAYER

For these reasons, Plaintiffs Bertrum Jean and Allison Jean, individually and as the surviving parents of Botham Jean, and Allisa E. Findley, as the Administrator of the Estate of Botham Jean, respectfully request that the City's motion to dismiss be denied in its entirety. Alternatively, to the extent this Court believes that Plaintiffs' complaint is lacking in any regard, then Plaintiffs request that they be given an opportunity to amend. Plaintiffs further request such other relief to which they may be justly and equitably entitled.

Respectfully submitted,

By: ___/s/ Daryl K. Washington___

**Daryl K. Washington**
State Bar No. 24013714
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883
214-751-6685 - fax
dwashington@dwashlawfirm.com

**S. Lee Merritt**
State Bar No. PA 314891
**MERRITT LAW FIRM, LLC**
1910 Pacific Ave., Suite 11500
Dallas, Texas 75201
888-647-3041
888-339-2050 (fax)
slm@merrittatlaw.com

and

**Benjamin L. Crump**
(PENDING PRO-HAC ADMISSION)
**BEN CRUMP LAW, PLLC**
122 S. Calhoun St.
Tallahassee, Florida 32301

25

850-224-2020
ben@bencrump.com

**ATTORNEYS FOR PLAINTIFFS**

CERTIFICATE OF SERVICE

I hereby certify that on **December 19, 2018**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

Jason G. Schuette
Senior Assistant City Attorney
jason.schuette@dallascityhall.com
and
Amy I. Messer
Senior Assistant City Attorney
amy.messer@dallascityhall.com

7DN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201

*Attorneys for Defendants,*
*City of Dallas and*
*Amber Guyger*

/s/ Daryl K. Washington
**Daryl K. Washington**