IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BERTRUM JEAN, Individually and as the surviving father of BOTHAM SHEM JEAN, ALLISON A. JEAN, Individually and as the surviving mother of BOTHAM SHEM JEAN, and ALLISA E. FINDLEY as the Administrator of the Estate of BOTHAM SHEM JEAN, | § § § § § § § § | CIVIL ACTION NO. |
| | § | 3:18-CV-2862-M |
| *Plaintiffs* | § | |
| v. | § § | |
| THE CITY OF DALLAS and AMBER GUYGER, | § § § | |
| *Defendants* | § § | |

**PLAINTIFFS' OBJECTIONS TO FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

**Daryl K. Washington**
State Bar No. 24013714
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883
214-751-6685 (fax)
dwashington@dwashlawfirm.com

**S. Lee Merritt**
State Bar No. PA 314891
**MERRITT LAW FIRM, LLC**
1910 Pacific Ave., Suite 11500
Dallas, Texas 75201
888-647-3041
888-339-2050 (fax)
slm@merrittatlaw.com

**Benjamin L. Crump**
**BEN CRUMP LAW, PLLC**
122 S. Calhoun St.
Tallahassee, Florida 32301
850-224-2020
ben@bencrump.com

**ATTORNEYS FOR PLAINTIFFS**

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................................................... V

I.   SUMMARY ................................................................................................................1

II.  ARGUMENT ..............................................................................................................4

   A.   Standard of review for objections to a magistrate's order .............................4

   B.   Even under the exceedingly difficult—if not impossible to
        satisfy—standards the Ruling sets forth, Plaintiffs' allegations
        of municipal liability are more than sufficient to state a claim
        under Section 1983 ...............................................................................................4

      1.   The Ruling's mandates pleading with more specificity
           than what the pleading standard for municipal-
           liability claims demands .........................................................................4

      2.   Rather than recognize the obvious pattern of unlawful
           police shootings here, the Ruling requires allegations
           that some unwarranted number of identical instances
           of violations happened in the same year Jean was shot....................9

         a.   Other unlawful police shootings need not be
              identical to Guyger's shooting of Jean to be
              sufficiently "similar" to show a pattern....................................9

         b.   The seven other incidents of Dallas police
              officers shooting unarmed minorities where no
              imminent   threat   of   harm   existed   are
              "sufficiently numerous" to show a pattern............................12

         c.   The Ruling ignores that the other similar police
              shootings have happened for so long that they
              show a custom of such misconduct; they need
              not have occurred the same year as Jean was
              killed ..........................................................................................14

TABLE OF CONTENTS

Page

    d.    Municipal-liability plaintiffs face a Catch-22 in attempting to establish a pattern of violations under the Ruling's impossibly high standard .......................16

3.    The Ruling would effectively eliminate the single-incident exception; yet even under its impossible standard, the facts of this case exemplify its application ...................................................................................................18

4.    When Guyger shot Jean, it was consistent with her deficient training and the City's "shoot first, ask questions later" policy—the moving forces behind Jean's death and Plaintiffs' injuries .......................................22

CONCLUSION & PRAYER ..............................................................................................25

CERTIFICATE OF SERVICE..............................................................................................27

TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*Alvarez v. City of Brownsville,*
   904 F.3d 382 (5th Cir. 2018) ............................................................................ 18

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................... 4, 5, 6

*Board of Cty. Comm'rs of Bryan Cty v. Brown,*
   520 U.S. 397 (1997) ....................................................................................... 18

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................... 4, 5, 6

*Brown v. City of Houston,*
   297 F. Supp. 3d 748 (S.D. Tex. 2017) ............................................................ 5, 8

*Canton at v. Harris,*
   489 U.S. 378 (1989) ....................................................................................... 19

*Cole v. Carson,*
   No. 14-10228, ---S.W.3d--- (5th Cir. Aug. 20, 2019) ................................... 12, 17

*D.B. v. City of McKinney, Tex.,*
   No. 4:16-CV-00965, 2017 WL 9285514 (E.D. Tex. Sept. 8, 2017) (slip. op.) ...................... 5

*E.G. v. Bond,*
   No. 1:16-CV-0068-BL, 2016 WL 8672774 (N.D. Tex. Sept. 9, 2016) ................................. 6

*Farmer v. Brennan,*
   511 U.S. 837 (1994) ................................................................................. 18, 19

*Flanagan v. City of Dallas, Tex.,*
   48 F. Supp. 3d 941 (N.D. Tex. 2014) ............................... 5, 6, 7, 10, 13, 14, 17

*Gooding v. Ketcher,*
   838 F. Supp. 2d 1231 (N.D. Okla. 2012) ............................................................ 5

*Grandstaff v. Borger,*
   767 F. 2d 161 (5th Cir. 1985) ............................................................. 18, 20, 21

## TABLE OF AUTHORITIES (CONT'D)

**Cases (cont'd)**                                                                                    **Page**

*Hall v. City of Waller,*
   No. H–16–3269, 2017 WL 2772576 (S.D. Tex. June 27, 2017) (mem. op.) ....................... 5

*Harper v. City of Dallas, Tex.,*
   Civ. No 3:14-CV-02647-P, 2015 WL 13729793 (N.D. Tex. Aug. 13, 2015) ..................... 13

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,*
   507 U.S. 163 (1993) ................................................................................................ 5, 6

*McClendon v. City of Columbia,*
   258 F.3d 432 (5th Cir. 2001) ...................................................................................... 21

*Mitchell v. City of New Orleans,*
   184 F.Supp.3d 360 (E.D. La. May 2, 2016) ................................................................. 5

*Morgan v. Hubert,* 335 F. App'x 466, 472 (5th Cir. 2009) .......................................... 8

*Oporto v. City of El Paso.,*
   No. EP–10–CV–110–KC, 2010 WL 3503457 (W.D. Tex. Sept. 2, 2010) .................... 12, 14

*Peña v. City of Rio Grande City,*
   879 F.3d 613 (5th Cir. 2018) .................................................................................. 5, 21

*Piotrowski v. City of Houston,*
   237 F.3d 567 (5th Cir. 2001) ..................................................................................... 18

*Rocha v. Schroeder,*
   283 Fed. Appx. 305 (5th Cir. 2008) ........................................................................ 12, 24

*Sanchez v. Gomez,*
   283 F. Supp. 3d 524 (W.D. Tex. 2017) ...................................................................... 5, 8

*Schaefer v. Whitted,*
   121 F. Supp. 3d 701 (W.D. Tex. 2015) ........................................................................ 5

*Schultea v. Wood,*
   47 F.3d 1427 (5th Cir. 1995) .................................................................................... 7, 8

## TABLE OF AUTHORITIES (CONT'D)

**Cases (cont'd)**     **Page**

*Speck v. Wiginton,*
606 F. App'x 733 (5th Cir. 2015) (per curiam) ..................................................... 5

*Tennessee v. Garner,*
471 U.S. 1 (1985) ........................................................................................ 12

*Thomas v. City of Galveston, Tex.,*
800 F. Supp. 2d 826 (S.D. Tex. 2011) ....................................................... 5, 6, 7, 8

*Westfall v. Luna,*
903 F.3d 534 (5th Cir. 2018) ................................................................ 18

*Williams v. City of Denton, Tex.,*
No. 4:17-CV-00811, 2019 WL 438403 (E.D. Tex. Jan. 10, 2019) ..................... 7, 8

*Wright v. City of Dallas,*
No. 3:09-CV-1923-B, 2010 WL 3290995 (N.D. Tex. July 19, 2010) ................ 6, 7

*Zadeh v. Robinson,*
902 F.3d 483 (5th Cir. 2018) ................................................................ 17

**Statutes**

28 U.S.C. § 636(b)(1) ....................................................................................... 1, 4

FED. R. CIV. P. 72(b) ......................................................................................... 1

FED. R. CIV. P. 72(b)(3) ...................................................................................... 4

**PLAINTIFFS' OBJECTIONS TO FINDINGS, CONCLUSIONS, AND
RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Bertrum Jean and Allison Jean, individually and as the surviving parents

of Botham Jean, and Allisa E. Findley, as the Administrator of the Estate of Botham Jean,

pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1), file these

Objections to the August 12, 2019 Findings, Conclusions, and Recommendation (the

"Ruling") (Doc. 33) in which the United States Magistrate Judge recommended granting

Defendant City of Dallas's Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 7).

## I.    SUMMARY

The Ruling interprets the pleading standards for municipal liability allegations

that make it exceedingly difficult—if not impossible—for Section 1983 plaintiffs to state

a claim against a city. First, finding a complaint insufficient even when it describes the

specific topic of the targeted policy, procedures, or failures in supervision, training, and

discipline—and elaborates to the extent possible without discovery—imposes an

impermissibly high standard of the sort this jurisdiction has rejected. Such highly specific

facts are peculiarly within the knowledge of defendants and generally unavailable to

plaintiffs before discovery. Second, to allege that a city policy of police misconduct is

evident from a pattern of similar incidents, the Ruling requires plaintiffs to identify a

substantial number of incidents that are functionally identical to, and occurred within the

same year as, the incident in question. In these ways, the Ruling creates a Catch-22 for

municipal-liability plaintiffs attempting to show that a pattern of violations is attributable

to city policy. Finally, by ignoring similarities between the egregious facts of the shooting

death of unarmed Botham Jean and those cases in which a single incident supported attributing police misconduct to city policy and training failures—while absolving cities that neglect properly training officers to use deadly force, so long as they are trained in other areas—the Ruling effectively eliminates this single-incident exception.

Even in the face of such a daunting standard as the Ruling applies, however, Plaintiffs' allegations here are more than sufficient to state a municipal-liability claim. Plaintiffs allege at least seven other strikingly similar instances since 2012 in which Dallas police officers used deadly force against unarmed minority individuals who posed no immediate threat of serious harm. Such incidents are more "similar" than those which this Court has held sufficient to show a pattern; they need not be identical to the incident in question. Taken with allegations that the City has known for decades of a persistent problem with Dallas police officers using unconstitutional deadly force—and has publicly admitted the need for training, policies, and procedures to address the problem—these incidents are "sufficiently numerous" to show a pattern. But rather than recognize the obvious pattern, the Ruling requires alleging some unwarranted number of identical instances of violations that happened in the same year Jean was shot. On the contrary, those that occur over a long period of time are equal evidence of a pattern of similar violations. It is, thus, reasonable to infer a practice of using excessive force so widespread that it rises to the level of a custom having the force of official City policy.

When Officer Amber Guyger opened Botham Jean's apartment door and immediately drew her weapon without evaluating whether Jean posed any imminent threat of serious harm—as a reasonable officer must—her decision to open fire on Jean

was not objectively reasonable. This, Plaintiffs urge, was the result of her training to "shoot first, and ask questions later." Further, Plaintiffs allege that this was the City's policy, as evident from the decades-long pattern of similar violations by Dallas police officers known to the City. Despite this knowledge, the City gave its officers inadequate—or non-existent—training in properly using: detention and seizure procedures; deadly force; less deadly means; cover and pursuing a suspect; and de-escalation tactics. Considering that shooting deaths allegedly resulting from such deficient training in the use of deadly force continued after the City admitted the need for such training, it was obvious that the highly predictable consequence of not training officers was that they would use force in a way that risked the Fourth Amendment rights of citizens in Dallas. Because Guyger was ill-trained in these respects, Plaintiffs allege that she defaulted to the defective City policy: to use deadly force even when there existed no immediate threat of harm to herself or others. Jean's death was the direct result.

The City's failure to implement policies, procedures, and training to prevent further unlawful police shootings, together with its tacit approval of Guyger's conduct in wake of Jean's shooting, are sufficient to show an official policy of condoning such abuses—as well as the City's deliberate indifference toward the constitutional rights (and lives) of citizens in Dallas. Whether viewed as a pattern or evident from this single, egregious incident, Plaintiffs' Complaint shows that City policies were the moving force behind Botham Jean's death and, consequently, Plaintiffs' injuries.

For all these reasons, as explained further below, Plaintiffs object to the Ruling that recommends dismissing their Section 1983 claims against the City.

## II.   ARGUMENT

**A.   Standard of review for objections to a magistrate's order.**

The district judge reviews a party's objections to a magistrate's proposed findings and recommendations de novo. Fed. R. Civ. P. 72(b)(3).  "A judge of the court may accept, reject, or modify [them], in whole or in part," may receive further evidence, or may return the matter to the magistrate judge with further instructions. 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3).

**B.   Even under the exceedingly difficult—if not impossible to satisfy—standards the Ruling sets forth, Plaintiffs' allegations of municipal liability are more than sufficient to state a claim under Section 1983.**

> **1.   The Ruling's mandates pleading with more specificity than what the pleading standard for municipal-liability claims demands.**

Generally speaking, surviving a Rule 12(b)(6) motion to dismiss only demands that a complaint states a "plausible" claim—that is, the facts alleged, when accepted as true, "allow[] the court to draw the reasonable inference" that a defendant has committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, while the complaint must include more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action,"[1] demanding "detailed factual allegations" is outside what the federal pleading standards require.

The Ruling's error appears to stem from the Magistrate Judge's refusal to recognize the unique nature of claims against a municipality under Section 1983.  In the municipal liability context, under the Rule 8(a) standard even as interpreted by *Twombly*

---

[1] *Twombly*, 550 U.S. at 555 (citation omitted).

and *Iqbal*, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston, Tex.*, 800 F. Supp. 2d 826, 842–43 (S.D. Tex. 2011); *see also Speck v. Wiginton*, 606 F. App'x 733, 735–36 (5th Cir. 2015) (per curiam). That is because it is "exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas*, 800 F. Supp. 2d at 842; *see also Brown v. City of Hous.*, 297 F. Supp. 3d 748, 767 (S.D. Tex. 2017); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 532 (W.D. Tex. 2017).

The Southern District of Texas in *Thomas* found that *Twombly* and *Iqbal* did not dramatically alter the pleading standards for municipal liability claims that *Leatherman* previously held must not require more specificity than Rule 8 demands. *See Thomas*, 800 F. Supp. 2d at 842 (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).[2] *Thomas* concluded that these cases "may be reconciled, without allowing boilerplate allegations, on the one hand, or requiring plaintiffs to plead specific factual details to which they do not have access before discovery, on the other." *Id.* "Other courts, including the Northern District of Texas, have followed this common-sense approach to the factual specificity required for municipal liability claims." *E.G. v.*

---

[2] *Thomas* is not an outlier either. Many courts agree with *Thomas*'s explanation of how *Iqbal, Twombly,* and *Leatherman* are satisfied in municipal-liability claims. *See Brown*, 297 F. Supp. 3d at 767; *D.B. v. City of McKinney, Tex.*, No. 4:16-CV-00965, 2017 WL 9285514, at *4 (E.D. Tex. Sept. 8, 2017) (slip. op.); *Hall v. City of Waller*, No. H–16–3269, 2017 WL 2772576, at *4 (S.D. Tex. June 27, 2017) (mem. op.); *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718 (W.D. Tex. 2015); *Flanagan v. City of Dallas, Tex.*, 48 F. Supp. 3d 941, 947 (N.D. Tex. 2014); *Gooding v. Ketcher*, 838 F. Supp. 2d 1231, 1241 (N.D. Okla. 2012); *Peña v. Dallas Cnty. Hosp. Dist.*, No. 3:12-CV-439-N, 2013 WL 11299229, at *10 n.16 (N.D. Tex. June 26, 2013); *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 373–74 (E.D. La. May 2, 2016).

*Bond,* No. 1:16-CV-0068-BL, 2016 WL 8672774, at *6 (N.D. Tex. Sept. 9, 2016). Indeed, the Northern District has "appl[ied] the persuasive rationale set out in *Thomas* and the cases following it to avoid the arguable conflict between *Iqbal-Twombly* and *Leatherman." Id.*

While the Ruling correctly observes that no heightened standard applies to municipal-liability claims, it then demands a level of specificity that Rule 8(a) does not require for such claims. As this Court has explained, "[t]he difference between the Rule 8(a) pleading standard and an impermissible heightened pleading standard is in *the factual particularity or specificity needed to state a claim." Wright v. City of Dall.,* No. 3:09-CV-1923-B, 2010 WL 3290995, at *3 (N.D. Tex. July 19, 2010) (Ramirez, Mag. J.), *recommend. adopted,* 2010 WL 3291816 (N.D. Tex. Aug. 19, 2010) (Boyle, J.) (emphasis added). Therefore, courts in this district have expressly refused to require plaintiffs to "allege specific facts beyond those necessary to state [a] claim and the grounds showing entitlement to relief"—an "impermissible heightened pleading standard" inapplicable under Rule 8(a). *Id.*

As this Court previously recognized in *Flanagan,* a municipal-liability claim (unlike those against the officer) satisfies the federal pleading standard if it describes, for instance: "(1) past incidents of misconduct by the defendant to others; (2) multiple harms that occurred to the plaintiff himself; (3) the involvement of multiple officials in the misconduct; (4) *the specific topic* of the challenged policy or training inadequacy,"[3] or (5)

---

[3] *Flanagan v. City of Dall., Tex.,* 48 F. Supp. 3d 941, 947 (N.D. Tex. 2014) (Lynn, J.) (adopting report & recommend. of Tolliver, Mag. J.) (citing *Thomas,* 800 F. Supp. 2d at 843-44) (emphasis added).

"misconduct that occurred in the open,"[4] "together with any additional elaboration possible." *Flanagan v. City of Dall., Tex.*, 48 F. Supp. 3d 941, 947 (N.D. Tex. 2014) (Lynn, J.) (adopting report & recommend. of Tolliver, Mag. J.). "Those types of details, together with any additional elaboration possible, help to (1) 'satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests;'[5] and (2) 'permit the court to infer more than the mere possibility of misconduct.'"[6] *Id.* Finding a complaint insufficient even when it describes the specific topic of the targeted policy, procedures, or failures in supervision, training, and discipline—and elaborates to the extent possible without discovery—imposes a different, impermissibly high standard of the sort this jurisdiction has rejected. *See, e.g., Wright*, 2010 WL 3290995, at *3.

In fact, the Eastern District of Texas recently clarified that where a complaint does not "identify which training policy and/or procedures were inadequate or how this alleged inadequacy directly caused" the alleged violation in a municipal liability claim:

> The failure of specificity is no fault of Plaintiff's, . . . because he has not yet had the benefit of discovery. Plaintiff is bound by Rule 11 to allege only those facts for which he has or will likely have evidentiary support.
>
> As the Fifth Circuit explained in *Schultea v. Wood*, a plaintiff is not required to plead facts "peculiarly within the knowledge of defendants." The facts omitted here are squarely within that category.

*Williams v. City of Denton, Tex.*, No. 4:17-CV-00811, 2019 WL 438403, at *10 (E.D. Tex. Jan. 10, 2019), *report & recommend. adopted*, 2019 WL 430913 (E.D. Tex. Feb. 4, 2019) (citations

---

[4] *Thomas*, 800 F. Supp. 2d at 843-44.

[5] *Twombly*, 550 U.S. at 555 n.3 (internal quotations omitted).

[6] *Iqbal*, 556 U.S. at 679 (2009).

omitted) (quoting *Schultea v. Wood* 47 F.3d 1427, 1432 (5th Cir. 1995) and *Morgan v. Hubert*, 335 F. App'x 466, 472 (5th Cir. 2009)). Rather than dismiss the claim, the *Williams* court "allow[ed] discovery limited to the issue of the City's policies, practices, or customs regarding excessive force and police officer training regarding the use of excessive force and decide the issue of the City's liability once that discovery is complete." *Id.*

Furthermore, the Ruling disregards the Plaintiffs' need for discovery to support alleging facts that will likely have evidentiary support. City policies and training procedures have been recognized as particularly difficult to obtain—or even learn of, as necessary to allege in good faith—outside the discovery process. As noted, courts have explained that it is "exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas*, 800 F. Supp. 2d at 842; *see also Brown v. City of Hous.*, 297 F. Supp. 3d at 767; *Sanchez*, 283 F. Supp. 3d at 532. Although these courts recognize such information is generally unavailable to plaintiffs at this stage of litigation, the Ruling requires Plaintiffs to provide such information anyway. Thus, in order to survive the dismissal stage under the Ruling, plaintiffs are encouraged to allege facts unknown to them, including those "peculiarly within the knowledge of defendants," in disregard of what Rule 11 requires. *See Schultea*, 47 F.3d at 1432. Interpreting Rule 8(a) in a way that leads plaintiffs to violate Rule 11 cannot be what the Federal Rules or the Fifth Circuit intend.

**2.     Rather than recognize the obvious pattern of unlawful police shootings here, the Ruling requires allegations that some unwarranted number of identical instances of violations happened in the same year Jean was shot.**

The standard the Ruling applies will effectively eliminate Section 1983 claims against municipalities, as plaintiffs at the initial pleading stage are typically unable to offer an as-yet unspecified number of functionally identical police misconduct incidents in Dallas that equate to a constitutional violation, and unable even to discover similar enough instances of alleged misconduct.

**a.     Other unlawful police shootings need not be identical to Guyger's shooting of Jean to be sufficiently "similar" to show a pattern.**

Under the Ruling, "similar" does not mean merely similar. It means that each of the countless incidents the plaintiff must allege must also be the same as the "specific violation in question." (Doc. 33 at 11). While acknowledging that Plaintiffs cite numerous other instances of Dallas police officers using excessive deadly force in shooting unarmed minority individuals, the Ruling concludes they are not "fairly similar" to Guyger shooting Jean—an unarmed minority. (*Id.* at 13). Rather, the Ruling requires each of the other cases to also "involve[] an off-duty officer approaching what he or she believed to be a burglary taking place in his or her own home at the time of the shooting." (Doc. 33 at 13).  In other words, the Ruling goes beyond mere "similarity" and requires that any prior incidents be functionally identical.

Requiring prior incidents to be so similar to the specific incident in question that they are functionally identical is inconsistent with what this Court has deemed "similar" for the purposes of establishing a pattern. In *Flanagan*, this Court concluded that the prior

incidents alleged were "similar" enough to the allegations about the shooting in question because in each instance, "the individuals involved were not provoking or resisting the police when they were shot." *Flanagan*, 48 F. Supp. 3d, at 954. The Ruling, thus, improperly magnifies the level of similarity between the prior and current incident required by this Court.

Furthermore, the Ruling relies solely on presuming that Guyger was "off-duty" to claim that "these other incidents relied upon by Plaintiffs 'are distinguishable from the instant case and do not establish a pattern.'" (Doc. 33 at 13). The Ruling cannot help but admit that the other incidents all "involved shootings of unarmed minority individuals by police officers." (*Id.* at 12). Nevertheless, the Ruling casts Guyger's shooting of Jean in a different light, describing it as "an off-duty officer approaching what he or she believed to be a burglary taking place in his or her own home at the time of the shooting." (*Id.* at 13) (citing Doc. 5 at 5–7 (including ¶¶ 13–22)).

To begin with, the Ruling claims Plaintiffs allege facts they did not. Nowhere in the cited pages in Plaintiffs' Complaint do *Plaintiffs allege* that Guyger was an "off-duty officer" or that Guyger actually "believed" a burglary in her own home was taking place when she approached Jean's apartment and killed him. (*Compare* Doc. 33 at 13 *with* Doc. 5 ¶¶ 13–22). Rather, Plaintiffs note that "*Guyger alleges* she observed the apartment door ajar and believed a burglary to be taking place." (Doc. 5 ¶ 20). Plaintiffs were merely

reciting what "Guyger stated in an interview with the Texas Rangers." (*Id.* at ¶ 15).[7] What Guyger claims she observed and believed is very much in dispute.

Not only is the Ruling's statement conclusory, however, it is a conclusion unjustified under the law. "Guyger told police that she concluded her apartment was being burglarized and gave verbal commands to the figure," drew her service weapon, and shot Jean twice.[8]  The Texas Supreme Court has determined that, under Texas law, once an off-duty police officer observes a purported crime, she becomes an on-duty officer—as a matter of law. *See Garza v. Harrison*, 574 S.W.3d 389, 403 (Tex. 2019) ("Peace officers 'retain their status as peace officers twenty-four hours a day[.]' . . . If an off-duty officer observes a crime, as a matter of law he becomes an on-duty officer."). Therefore, once Guyger observed Jean purportedly engaged in burglary, her status as an on-duty peace officer was activated, as a matter of law in Texas. *See id.* at 404.

Moreover, the on-duty/off-duty distinction is meaningless here, where the key facts the prior incidents and supporting cases share with the claims at issue here are that they all involve police officers using deadly force when there existed no immediate threat of serious harm. The Fifth Circuit recently reaffirmed that an officer is <u>not</u> justified in using deadly force "[w]here the suspect *poses no immediate threat* to the officer and no

---

[7] *See* CBS/AP, *Dallas officer who killed neighbor in his apartment said he ignored her verbal commands*, CBSNews.com (Sept. 10, 2018, 6:06 p.m.), https://www.cbsnews.com/news/botham-jean-shooting-dallas-police-officer-amber-guyger-says-victim-ignored-commands-2018-09-10/ (last visited Sept. 11, 2019) (noting that Guyger told Texas Rangers "she thought a burglar was inside her home" and fired her weapon after giving "verbal commands.").

[8] *See id.; see also* Chris Blake, *What to Know Before the Amber Guyger Murder Trial*, NBCDFW.com (Sept. 10, 2019, 4:09 p.m.) https://www.nbcdfw.com/news/local/What-to-Know-Before-the-Murder-Trial-of-Amber-Guyger-Chris-Project-558506931.html (last visited Sept. 11, 2019).

threat to others." *Cole v. Carson*, Nos. 14-10228 & 15-10045, 2019 WL 3928715 at *6, —

F.3d — (5th Cir. Aug. 20, 2019) (reh'g en banc) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11

(1985)); *see also Rocha v. Schroeder*, 283 Fed. Appx. 305, 306 (5th Cir. 2008) ("The issue is

not simply what she perceived Rocha to be doing but, critically, whether a 'reasonable'

police officer confronted with the same circumstances would have shot him."). Thus, the

Ruling improperly discounts the similarity between incidents based on presuming

Guyger was acting as an off-duty officer—rather than the common absence of any

imminent threat to justify the officers' use of deadly force in each case.

"The key common element, made sufficiently clear in the pleadings, is the alleged

repeated use of excessive deadly force, often with fatal results." *Oporto v. City of El Paso.*,

No. EP–10–CV–110–KC, 2010 WL 3503457, at *5–6 (W.D. Tex. Sept. 2, 2010). Accordingly,

Guyger's shooting of Jean was sufficiently similar to other prior unlawful uses of deadly

force by Dallas police officers to properly allege a pattern of such violations.

      **b.**    **The seven other incidents of Dallas police officers shooting unarmed minorities where no imminent threat of harm existed are "sufficiently numerous" to show a pattern.**

Although the Ruling admits that "there is no rigid rule regarding numerosity" to

show a pattern, it incorrectly demands that claims involving police officers shooting

unarmed persons must allege a similar number of violations as those that involve less

serious violations. (Doc. 33 at 13) (citing *Piñeda v. City of Hous.*, 124 F. Supp. 2d 1057 (S.D.

Tex. 2000), a warrantless entry case, and *Peterson v. City of Fort Worth*, 588 F.3d 838, 849–

50 (5th Cir. 2009), *cert. denied*, 562 U.S. 827 (2010), claiming excessive use of non-deadly

force). This Court has specifically rejected this comparison, explaining the

"seriousness . . . [of] the shooting by a police officer of an unarmed person, whatever the circumstances of the shooting may turn out to be," makes it "reasonable to allow a lower number of incidents to establish a pattern of conduct in a shooting case." *Flanagan*, 48 F. Supp. 3d at 954; *accord Harper v. City of Dall., Tex.*, Civ. No 3:14-CV-02647-P, 2015 WL 13729793, at *3 n.1 (N.D. Tex. Aug. 13, 2015) (slip. op.) (Solis, J.).

In *Flanagan*, the defense argued that, because 11 incidents over a 4-year period in *Pineda* were not enough to show a pattern, neither were the 12 incidents of Dallas police shooting unarmed people in the year the underlying violation occurred. *Flanagan*, 48 F. Supp. 3d at 954 (citing *Piñeda*, 124 F. Supp. 2d at 1070). But the *Flanagan* court disagreed, finding the following sufficient, "at the motion to dismiss stage, from which one could make a reasonable inference of a persistent, widespread practice by DPD officers of using excessive force rising to the level of a custom having the force of official City policy":

- First, of the 12 shootings alleged in the same year as the underlying incident, 3 were similar enough to suggest a pattern;

- Second, for the past dozen years, Dallas police officers shot an average of 4 unarmed people each year; and

- Third, for those shootings over the past dozen years, there were "nearly 100 open internal affairs investigations into such shootings and have been nearly as many grand jury proceedings."

*Id.* Thus, given the history of alleged shootings of unarmed people over the previous 12 years and the "seriousness" of such shootings, the *Flanagan* court held that the 3 incidents similar to the one in question were enough, despite being a lower number than the 11 incidents in *Piñeda*. *Id.*; *see also Harper*, 2015 WL 13729793, at *3 (holding that, because

allegations were so similar to those held sufficient in *Flanagan*, they were sufficient to show a pattern).

Such allegations gave "sufficient detail . . . to denote the similarities to the allegations . . . namely that the individuals involved were not provoking or resisting the police when they were shot." *Flanagan*, 48 F. Supp. 3d at 954. Three incidents similar to the one in question in *Oporto* were also enough, taken with other allegations, to show a pattern of misconduct. *Oporto*, 2010 WL 3503457, at *6. Accordingly, the Ruling is incorrect that the alleged 7 prior incidents of similar police shootings of unarmed persons are not "sufficiently numerous" to show a pattern of such violations in the Fifth Circuit. (Doc. 33 at 13).

> **c.**   **The Ruling ignores that the other similar police shootings have happened for so long that they show a custom of such misconduct; they need not have occurred the same year as Jean was killed.**

The Ruling critically misapplies the law by focusing on the frequency of the alleged similar incidents, disregarding that in the Fifth Circuit, a pattern of violations may be shown by prior incidents that occurred "frequently and/or *over a long period of time*." *Hall v. Robinson*, 618 Fed. App'x 759, 765 (5th Cir. 2015) (citing *Peterson*, 588 F.3d at 850–51). Instead, the Ruling concludes that the 7 other similar police shootings were "not 'sufficiently numerous' to demonstrate a pattern," simply because they did not happen over a short enough timespan. (Doc. 33 at 14). Attempting to contrast this case with

*Flanagan* and *Harper*—which alleged "shootings in the *same year* as the shooting at issue"[9]—the Ruling declares:

> Even assuming for purposes of this motion only that the seven prior incidents Plaintiffs cited are similar enough to reasonably infer a pattern sufficient to establish a custom or policy of insufficient training, supervision, or discipline by DPD because they involved unarmed minority individuals shot by police officers, the incidents occurred over a four-year period between 2012 and 2017.

(*Id.*). Thus, this application of the law wrongly discounts the length of time the alleged similar incidents of unlawful police shootings have continued among the Dallas PD.

In doing so, the Ruling ignores the decades-long history of Dallas police shooting unarmed people and the City's knowledge of the persistent problem with its policies on the use of deadly force and its failure to address those problems. The Ruling gives no consideration to the allegations that in 2012, after James Harper was killed, the City publicly admitted that it was deficient in numerous policies and procedures, such as training on the use of force, that the City identified were necessary to address the decades of officers using unlawful deadly force, even before Harper's death—none of which the City has yet implemented. (Doc. 5 at ¶ 70). This followed the 1987 report by Geoffrey P. Alpert criticizing Dallas PD's policies and procedures, urging that the City suffered from institutional training issues regarding the use of force. (*Id.* at ¶ 68). In order for the City to overcome these issues and enter the 1990s with a set of police policies, procedures and customs commensurate with its high set of municipal values, the report cautioned that a conscious decision must be made to overhaul a system creaking with age and tradition,

---

[9] *Id.* at 13–14.

and made obsolete by the challenges of a new generation of citizens. (*Id.* at ¶ 69). And in 1988, after a series of officer-involved shootings in Dallas, Congressional hearings were held, recommending ways to improve Dallas PD's internal training and policies in response to the City's critical failures. (*Id.* at ¶ 70(g)).

Taken with the fact that the other 6 similar incidents of unlawful police shootings alleged all occurred after 2012, these allegations show that Dallas police have continued to use lethal force against non-threatening people—particularly minorities—despite the City's knowledge that its policies regarding the use of force were deficient. (*Id.*). Therefore, when Jean was killed in 2018, Dallas police had been unlawfully using deadly force against civilians "*for so long* . . . that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson*, 588 F.3d at 850–51 (emphasis added).

The Ruling, thus, errs in focusing on the frequency of unjustified police shootings while ignoring how long Dallas officers have continued the practice.

> **d.    Municipal-liability plaintiffs face a Catch-22 in attempting to establish a pattern of violations under the Ruling's impossibly high standard.**

Demanding that prior incidents bear such a high degree of similarity to the incident in question and that they be so numerous results in a Catch-22:

- Until a constitutional violation for excessive force is proven against a Dallas police officer, future plaintiffs will be unable to point to a sufficient number of such prior incidents of constitutional violations.

- But plaintiffs cannot prove a constitutional violation until there have already been a sufficient—unspecified—number of prior violations that are sufficiently similar.

This they cannot do without discovery or without other cases finding the *same* constitutional violation.

- As a result, cities can continue to argue that there are no equivalent violations occurring, and thus, no "widespread municipal policy"—and no municipal liability.

Translation: If another Dallas police officer tomorrow shoots an unarmed black man sitting in his own apartment who, like Jean, posed no imminent threat of serious harm to anyone, the City would still escape liability for its "shoot first, ask questions later" policy—*ad infinitum.*[10] Thus, the Ruling imposes an impossible standard that this Court has previously rejected. *See Flanagan*, 48 F. Supp. 3d, at 954. It should do so again.

Only through its incorrect application of the law regarding the level of similarity, quantity, and history of prior incidents plaintiffs are required to allege just to survive dismissal on the pleadings does the Ruling justify recommending that Plaintiffs' claims against the City be dismissed. Plaintiffs further object to the Ruling for this reason.

---

[10] *See Cole v. Carson*, 2019 WL 3928715, at *20 (Willett, J., dissenting). Justice Willett of the Fifth Circuit has penned two opinions—a concurrence and, most recently, a dissent—criticizing decisions that require plaintiffs to "cite functionally identical precedent" in excessive force cases, resulting in a "catch-22":

> Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell."

*Id.* (quoting *Zadeh v. Robinson*, 928 F.3d 457, 479–80 (5th Cir. 2019) (Willett, J., concurring in part, dissenting in part)). Although the New Ruling recognizes that these cases deal with qualified immunity (Doc. 240 at 23 n.4), the same "Catch-22" occurs in municipal-liability claims, with the same consequences to plaintiffs.

### 3.   The Ruling would effectively eliminate the single-incident exception; yet even under its impossible standard, the facts of this case exemplify its application.

Even where such a pattern does not exist, a single incident of a violation may support liability. *Piotrowski v. City of Hous.,* 237 F.3d 567, 579 (5th Cir. 2001); *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018). One such violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Board of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 409 (1997). Although narrow, this "single-incident exception" generally applies where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of the particular policy or custom. *Westfall v. Luna*, 903 F.3d 534, 554 (5th Cir. 2018). "The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cty.*, 520 U.S. at 409–410. Such was the case in *Grandstaff v. Borger*, where officers were "quick to fire" at the suspect and "recklessly killed" an innocent third party in the process— conduct the Fifth Circuit has deemed "egregious." *See Westfall*, 903 F.3d at 552 (quoting *Grandstaff v. Borger*, 767 F. 2d 161, 171 (5th Cir. 1985)).

Moreover, the Supreme Court has explained that factfinders may conclude that an "official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 837, 842 (1994). For instance:

> if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.*, at 842–43. Moreover, deliberate indifference in a Section 1983 claim for municipal liability "permit[s] liability to be premised on obviousness or constructive notice," and does not require the state-of-mind requirement the Eighth Amendment does. *Id.* at 842 (discussing the less onerous deliberate-indifference test in *Canton at v. Harris*, 489 U.S. 378 (1989)). Considering that *Farmer* held such evidence imputes knowledge to officials under a more onerous standard than the one applicable to municipal-liability claims, when a plaintiff alleges a well-documented, substantial risk of police officers unlawfully using deadly force—and facts show that the defendant city has been exposed to such information—such facts support actual knowledge of the risk. *Id.*

Here, Plaintiffs allege that, even though the City knew of the well-documented, substantial risk of police officers unlawfully using deadly force due to deficient policies, procedures, and training, the City still failed to implement any such necessary policies and continued to provide its officers inadequate—or non-existent—training in:

- The use of proper and appropriate detention and seizure procedures;

- The use of excessive and/or deadly force;

- The proper use of less deadly means;

- The proper use of cover and the pursuit of a suspect; or

- De-escalation tactics.

(Doc. 5 ¶¶ 33, 57). That a civilian was killed when a Dallas police officer shot first and asked questions later—the City policy they fall back on because they are not trained in how to use force only to the degree allowed by the Constitution—is unsurprising.

Indeed, the circumstances of Guyger's shooting of Botham Jean are directly analogous to the "egregious" facts in *Grandstaff* that the Ruling acknowledges warrant the application of the single-incident exception. *See Grandstaff*, 767 F. 2d at 171. Like the officers in *Grandstaff*, Guyger "mistook an innocent" person—Jean—for a criminal suspect. (*See* Doc. 33 at 15). And, like the officers in *Grandstaff*, Guyger shot Jean "without awaiting any hostile act or sound, ultimately killing" an innocent person. (*Id.*).

Furthermore, like the city in *Grandstaff*, the City's conduct in wake of Jean's shooting is sufficient to "show an official policy of condoning such abuses." (*Id.*). By deciding not to terminate Guyger until prompted by public outcry, the City showed its tacit approval of Guyger's conduct. (Doc. 5 at ¶ 60). The City's approval of Guyger's conduct is further apparent from the City allowing Guyger to re-enter Jean's apartment (and her own) after the shooting and to make several phone calls before giving investigators her statement. (*Id.* at ¶ 22). Plaintiffs further allege that the City allowed Guyger to scrub her social media accounts to delete evidence unfavorable to her. (*Id.* at ¶ 26). And, while the City sought a warrant for Jean's apartment after the shooting, the City did not seek a warrant for Guyger's apartment, vehicle, or service locker—all of which Plaintiffs note potentially held evidence relevant to the homicide investigation the City initiated immediately after the shooting. (*Id.* at ¶ 24). Faced with these facts, however, the Ruling somehow claims that "[u]nlike *Grandstaff*, this case does not involve the collective

conduct of many individuals and multiple bad acts," painting this as a case of "the use of excessive force by one officer." (Doc. 33 at 15). The collective "conduct of both [Guyger] during the incident and the [City] in the wake of the incident" strongly demonstrate otherwise. (*Id*.). Thus, *Grandstaff* supports applying the single-incident exception here.

The standard the Ruling imposes for applying the single-incident exception in failure-to-train claims would effectively foreclose all such future claims. The Ruling suggests that a wholesale failure to train an officer in one limited area—such as training officers to use deadly force only when there is an imminent threat of serious harm—is not enough. (Doc. 33 at 15). Rather, the Ruling contends that the "exception is generally reserved for those cases in which the government actor was provided no training whatsoever." (*Id*.) (quoting *Peña*, 879 F.3d at 624). Under this rule, alleging that the officer received inadequate—or non-existent—training in: using proper and appropriate detention and seizure procedures; using excessive and/or deadly force;  properly using less deadly means; properly using cover and pursuing a suspect; or de-escalation tactics (*Id*. at ¶¶ 33, 57)  is insufficient, as long as the officer has had any training whatsoever, regardless the topic of the training.

To illustrate the gravity of the implications, as long as an officer is trained in how to enter reports or the procedure for using body cameras, there has not been a "complete failure to train," according to this articulation of the rule. (*Id*.) (citing *McClendon v. City of Columbia*, 258 F.3d 432, 442–43 (5th Cir. 2001), *vacated for reh'g en banc*, 285 F.3d 1078 (5th Cir. 2002), *decision on reh'g en banc*, 305 F.3d 314 (5th Cir. 2002)). Were this the law, cities

could opt not to train officers on anything except clerical duties, send them out to patrol the streets, and avoid liability for their inevitable wrongdoing.

Thus, even where the allegations support that a city actually—or even constructively—knew of the risk that one of its officers would cause the violation in question, the Ruling's view of deliberate indifference would absolve the City of its knowledge. Therefore, the Ruling goes beyond what the law of the United States Supreme Court and the Fifth Circuit have held is required to show deliberate indifference in a Section 1983 case. By setting such a high bar for deliberate indifference—a necessary part of establishing the single-incident exception—the Ruling makes it even more difficult to show the exception applies. Even under the Ruling's standard, however, the facts of this case show a pattern based on the single, egregious killing of Botham Jean.

4. **When Guyger shot Jean, it was consistent with her deficient training and the City's "shoot first, ask questions later" policy—the moving forces behind Jean's death and Plaintiffs' injuries.**

In a final attempt to justify dismissing Plaintiffs' claims against the City, the Ruling downplays Plaintiffs' allegations that City policies were the moving force behind their injuries, concluding that the "assertions that Officer's actions resulted from a lack of training, supervision, and/or discipline are too vague and conclusory to support the causation element for municipal liability." (Doc. 33 at 17). The Ruling's conclusion relies on *Spiller*, where allegations that "several policies 'led to' unspecified 'unconstitutional arrest and confinements' and that there was a departmental policy of "engag[ing] in conduct toward African American citizens without regard to probable cause to arrest" were not enough. (*Id*.). Plaintiffs do not fail to specify the unconstitutional conduct they

claim results directly from the City's policy of using deadly force where no imminent threat of serious harm exists, as further evident from its failures to train, discipline, or supervise its officers who do so, in violation of the constitutional rights of its citizens.

As explained above, the City publicly admitted that its policies and procedures for training its officers on the use of lethal force were deficient—after knowing for decades that the Dallas PD suffered from institutional training issues involving the use of such force, and after such force was implicated in the death of James Harper. Plaintiffs allege that, despite this knowledge, the City failed to adequately train its officers in:

- The use of proper and appropriate detention and seizure procedures;

- The use of excessive and/or deadly force;

- The proper use of less deadly means;

- The proper use of cover and the pursuit of a suspect; or in

- De-escalation tactics.

(*Id.* at ¶ 57). Considering that shooting deaths allegedly resulting from such deficient training in the use of deadly force continued, it was obvious that "'the highly predictable consequence of not training' [the] officers was that they 'would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk.'" *Peterson*, 588 F.3d at 849 (quoting *Brown v. Bryan Co., Okla.*, 219 F.3d 450, 461 (5th Cir. 2000)). Such a "high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cty.*, 520 U.S. at 409–410.

Because "Officer Guyger was ill-trained" in these respects, Plaintiffs allege that Guyger "defaulted to the defective DPD policy: to use deadly force even when there exist no immediate threat of harm to themselves or others." (Doc. 5 ¶ 36). Acting on that City policy, they allege, "Officer Guyger opened Jean's apartment door and immediately drew her weapon without an evaluation of what occurred or what was transpiring. She simply opened fire without having any knowledge of the true situation." (*Id.*). Guyger's acts are measured by what "a 'reasonable' police officer confronted with the same circumstances would have" done. *Rocha*, 283 Fed. App'x at 306. Plaintiffs explain numerous ways her conduct deviated from the constitutional contours, evidencing improper training:

- "Without any lawful justification to do so and not asking the questions that a reasonable well-trained officer would have, Defendant Guyger fired upon Jean, striking him in the chest although he was unarmed and not attempting to harm her or any other person" (Doc. 5 ¶ 15);

- "Officer Guyger failed to conduct an objectively, reasonable assessment of the facts when she chose to use deadly force without properly attempting to use de-escalation tactics to apprehend Jean before discharging her service weapon" (*Id.* at ¶ 19); and

- "Defendant Guyger failed to secure the location by shutting the door and calling for back up while taking a tactical position outside of the apartment" (*Id.* at ¶ 20).

A reasonable officer in that situation would not have shot a person who was undisputedly not resisting and compliant, unarmed, committing no crime, "never made any threatening gestures toward Defendant Guyger and did not pose an immediate threat to the safety of Defendant Guyger or others." (*Id.* at ¶ 47).

It is Guyger's failure to take the steps a reasonable officer trained to act in accordance with the constitutional limits of force would have taken—and the deficient

City policies on which Guyger acted—that Plaintiffs target as the cause of Jean's death. Ultimately, Plaintiffs allege, "[b]y simply following proper police procedures and the best police practices and not the protocol of the DPD to 'shoot first and ask questions later', Defendant Guyger would have not shot Jean." (*Id.* at ¶ 20). Because she lacked this training, Guyger defaulted to the City's de facto policy when facing her situation with Jean: Shoot first, and ask questions later. Because of her reliance on this deficient training and unconstitutional use-of-force policy, Guyger shot Botham Jean and, as a result, violated his constitutional rights and caused Plaintiffs' injuries arising from Jean's injuries and death.

### CONCLUSION & PRAYER

For these reasons, Plaintiffs Bertrum Jean and Allison Jean, individually and as the surviving parents of Botham Jean, and Allisa E. Findley, as the Administrator of the Estate of Botham Jean, object to the Findings, Conclusions, and Recommendation of the United States Magistrate Judge (Doc. 33) and, for the reasons stated here and in the Plaintiffs' original response and sur-reply to the City's motion to dismiss, ask this Court to sustain these objections and enter an order denying the City's motion to dismiss. Plaintiffs further request all other relief to which they are justly and equitably entitled.

Respectfully submitted,

By:   */s/ Daryl K. Washington*
**Daryl K. Washington**
State Bar No. 24013714
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883

214-751-6685 - fax
dwashington@dwashlawfirm.com

**S. Lee Merritt**
State Bar No. PA 314891
**MERRITT LAW FIRM, LLC**
1910 Pacific Ave., Suite 11500
Dallas, Texas 75201
888-647-3041
888-339-2050 (fax)
slm@merrittatlaw.com

and

**Benjamin L. Crump**
**BEN CRUMP LAW, PLLC**
122 S. Calhoun St.
Tallahassee, Florida 32301
850-224-2020
ben@bencrump.com

**ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on **September 12, 2019**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

| | |
|---|---|
| Mark E. Goldstucker | Amy I. Messer |
| Law Office of Mark E. Goldstucker | Senior Assistant City Attorney |
| mgoldstucker@gmail.com | amy.messer@dallascityhall.com |
| 300 North Coit Road, Suite 1125 | 7DN Dallas City Hall |
| Richardson, Texas 75080 | 1500 Marilla Street |
| | Dallas, Texas 75201 |

*Attorney for Defendant Amber Guyger*   *Attorney for Defendant City of Dallas*

*/s/ Daryl K. Washington*
**Daryl K. Washington**