## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

| | | |
|---|---|---|
| **BERTRUM JEAN, individually and as the surviving father of Botham Shem Jean, ALLISON A. JEAN, individually and as the surviving mother of Botham Shem Jean, and ALLISA E. FINDLEY as the Administrator of the Estate of Botham Shem Jean,** | § § § § § § § | |
| *Plaintiffs,* | § § | |
| **v.** | § § | **Civil Action No. 3:18-CV-2862-M** |
| **THE CITY OF DALLAS, TEXAS, and AMBER GUYGER,** | § § § | **(Lynn, C.J.)** |
| *Defendants.* | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Bertrum Jean, individually as the surviving father of Botham Shem Jean, Allison A. Jean, individually as the surviving mother of Botham Shem Jean and Allisa E. Findley as the administrator of the Estate of Botham Shem Jean, deceased, ("Plaintiffs") complaining of Defendants the City of Dallas, Texas and Amber Guyger ("Guyger") file this Amended Complaint and for cause would show the Honorable Court as follows:

### I.    NATURE OF THE ACTION

1.    This is an action brought by the Plaintiffs against The City of Dallas, Texas and Amber Guyger for her use of excessive force resulting in the wrongful death of Botham Shem Jean ("Jean") under the color of law, in violation of his individual rights under the Fourth Amendment of the United States Constitution and, consequently, in violation of his civil rights pursuant to 42 U.S.C. § 1983.

2.      Plaintiffs allege that Chief of Police Renee Hall ("Chief Hall"), the final policymaker for the Dallas Police Department ("DPD"), with the authority for setting policies, including training of the Dallas Police Officers, the Dallas City Council and the City Manager, vested with all powers of the City and the determination of all matters of policy, had a duty, but failed to implement and enforce such policies, practices and procedures for the DPD that respected Jean's constitutional rights.

3.      Chief Hall and the Dallas City Council's failure to implement the necessary policies and the (de facto) implementation of unconstitutional policies, caused Jean to experience an unwarranted and excruciating physical and mental anguish before his ultimate death. For these civil rights violations and other causes of action discussed herein, Plaintiffs seek answers and compensation for their respective damages.

## II.      PARTIES

4.      Plaintiff, Bertrum Jean is a citizen and a resident of Castries, St. Lucia. Bertrum is the surviving father of Botham Shem Jean, decedent, and brings this wrongful-death action under 42 U.S.C. § 1983 and all other applicable laws complaining of the various acts listed below.

5.      Plaintiff, Allison A. Jean is a citizen and a resident of Castries, St. Lucia. Allison is the surviving mother of Botham Shem Jean, decedent, and brings this wrongful-death action under 42 U.S.C. § 1983 and all other applicable laws complaining of the various acts listed below.

6.      Plaintiff, Allisa E. Findley is a resident of New York, NY. Allisa is qualified,

and acting as the Representative of the Estate of Botham Shem Jean, and brings this survival action under 42 U.S.C. § 1983 and all other applicable laws complaining of the various acts listed below.

7.      Defendant, the City of Dallas, is a municipality located in Dallas County, Texas.  The City of Dallas funds and operates the DPD, which, along with the Dallas City Council, Dallas City Manager's office and Chief Hall, are responsible for the implementation of the DPD's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit. The DPD is also responsible for preventive, investigative, and enforcement services for all citizens of the City of Dallas. All actions that form the basis of this lawsuit were performed pursuant to policies and procedures, customs and practices of Defendant, the City of Dallas. The City of Dallas has been served and entered a general appearance.

8.      Defendant, Amber Guyger, upon information and belief, is a resident of Dallas County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of her employment for the City of Dallas and DPD. At all times relevant to this lawsuit, it was Officer Guyger's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the DPD's rules, regulations, policies and procedures, customs and/or practices relating to the use of excessive and/or deadly force. Defendant Guyger has been served and entered a general appearance.

### III.     JURISDICTION AND VENUE

9.      Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, inter alia, the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities.

10.     Venue is proper in this court because the causes of action occurred within the Northern District of Texas, Dallas Division.

### IV.     FACTS

11.      After graduating in the top of his class in Castries, St. Lucia, at age 19, Jean came to the United States to attend Harding University in Searcy, Arkansas. While at Harding University, Jean was an influential member of the student body who participated in student government, was a member of Sub T-16 social club, sang with the Good News Singers and was involved with numerous service and outreach events in the community. Jean had an enthusiasm for life that was contagious. Jean graduated with a bachelor's degree in accounting and management and information systems. Soon after graduating from Harding University, Jean began his career at accounting firm PricewaterhouseCoopers, one of the nation's leading professional services firms. Jean was on the partnership track at the firm and was considered to be one of the rising stars within the international corporation. In addition to being an elite member of the Dallas workforce, Jean served as a worship leader in the international Church of Christ—serving the Dallas West Church of Christ. Jean was extremely ambitious and hoped to

one day return to the nation of Saint Lucia and run for the position of Prime Minister.

12.     On September 6, 2018 at approximately 9:30 p.m., Defendant Guyger clocked out of her work shift at Dallas Police Department Headquarters located at 1400 Lamar Street Dallas, Texas 75215 after allegedly working a thirteen (13) hour patrol shift. At all relevant times, Defendant Guyger was in her department issued police uniform and duty belt as she drove into the Southside Flats Apartment Complex (the "Southside") located at 1210 Lamar Street Dallas, TX 75215.

13.     At all relevant times, Defendant Guyger was a member of DPD's Crime Reduction Team ("CRT"). A specialized unit, CRT requires applicants to go through an application and interview process to earn a position on the team. Defendant Guyger's duties as a member of the CRT included assisting in the prevention of motor vehicle burglary, residential burglary, theft and other offenses.

14.     Per DPD Standard Operating Procedure 312, CRT members "are expected to exhibit the highest possible standards" of conduct, have "an extensive knowledge of search and seizure laws," and should "conduct themselves in a professional manner, treating both Citizens and suspects with dignity and respect."

15.     At or about 9:41 p.m. Defendant Guyger entered the security gates of the Southside and allegedly parked her vehicle on the fourth floor of the parking garage. Defendant Guyger exited her vehicle and upon information and belief walked towards the fourth-floor resident area of the Southside. After exiting her car and entering the complex Defendant Guyger would have been confronted immediately with two signs,

one of the outside and the other on the inside of the complex entrance, both indicating she had arrived to "Level 4" of the complex. Defendant Guyger had to travel approximately one hundred fifty [150] yards from her car, passing approximately fifteen [15] fourth floor apartment doors, each bearing an illuminated apartment number and most displaying a unique floor mat, door marker or decoration of some kind. Nevertheless, at approximately 9:53 p.m., Defendant Guyger arrived at apartment number 1478 where Jean was then present as the lawful inhabitant.

16.    For some unknown reason, Defendant Guyger disregarded the brightly colored red mat prominently displayed directly in front of Jean's door. Defendant Guyger also disregarded the eye level illuminated door number indicating she was standing at apartment 1478 and not hers. Defendant Guyger allegedly entered her electronic key fob into the keyhole of Jean's apartment. The door would have not produced the identical mechanical unlocking sound Defendant Guyger hears daily at her apartment, which would indicate to a reasonable police officer that she had entered her key into the wrong keyhole if that is indeed what happened. In fact, the light above the keyhole would have flashed red, indicating to Defendant Guyger that her key did not match the lock she was then attempting to access. Nevertheless, Defendant Guyger pushes the door open  and entered Botham Jean's apartment.

17.    Although Mr. Jean was sitting in a darkened room, light from the hallway would have entered the apartment from the open door. Additional lighting emanated from the television Mr. Jean was watching and his lit computer screen resting nearby on

an ottoman. Together the available lighting provided sufficient illumination for Defendant Guyger to observe the layout, furniture, and decor of the apartment, as well as the features, clothing and posture of Jean who was then unarmed, sitting on his couch, and not fully clothed as she conducted her visual inspection of the apartment. Despite all of this, Defendant Guyger unlawfully entered Jean's apartment and discovered Jean in a seated position on his sofa.

18.     Defendant Guyger stated in an interview with the Texas Rangers that immediately after opening the door to Jean's apartment, she drew her service weapon and began issuing verbal commands to Jean, who was lawfully in his own apartment. Jean attempted to comply by slowly arising from his seated position. Without any lawful justification to do so and not asking the questions that a reasonable, well-trained officer would have to determine whether Jean was a threat and whether force or deadly force was immediately necessary, Defendant Guyger fired upon Jean, striking him in the upper chest near the heart although he was unarmed, in his own home, and not attempting to harm her or any other person.

19.     After shooting Jean in his own apartment, Defendant Guyger began shouting additional commands to Jean. Jean plead out desperately inquiring why Defendant Jean shot him. Aware that she had struck Jean with at least one round from her service weapon, Defendant Guyger called her attorney and 911 to report the shooting. In an attempt to cover-up for shooting Jean, Defendant Guyger allegedly made certain comments to Jean, who was then still suffering from the gunshot wound to his

chest and in a great deal of pain, while she knew or should have known she was being recorded by the 911 system. At no time did Defendant Guyger attempt to render emergency aid to Jean or take any lifesaving measures, despite allegedly being trained in emergency aid by DPD. Jean was allowed to remain on the ground, bleeding out, as he struggled to survive in extreme pain.

20.     Jean was not in possession of any weapon at the time Officer Guyger fired at him. In fact, there was not a weapon in the sight of Officer Guyger when she fired her gun, fatally striking Jean.

21.     Officer Guyger initiated and escalated the interaction with Jean to the point of excessive force. Officer Guyger unlawfully shot and killed Jean without any warning, although a reasonable officer in a similar position would have known that she was not in imminent danger and had less deadly alternatives available.

22.     Officer Guyger failed to conduct an objectively reasonable threat assessment in full light of the facts available to her when she chose to use deadly force without properly attempting to use de-escalation and less-lethal tactics to question or apprehend Jean before discharging her service weapon. At no time did Officer Guyger call for cover prior to entering Jean's apartment.

23.     Defendant Guyger testified that Defendant, the City of Dallas, trains its police officer that if they cannot see the hands of a suspect, the suspect is "reaching for a weapon that's gonna [sic] be used against us."

24.     Defendant Guyger further testified that she could not see Botham Jean's

hands and therefore her training instructed her that he was going to kill her.

25.    Defendant Guyger stated that "[c]ause I couldn't see his hands, he was gonna kill me."

26.    Defendant Guyger alleges she observed the apartment door ajar and believed a burglary to be taking place, despite the fact that there were no visible signs of a forced entry on the door or doorframe outside the apartment. Defendant Guyger failed to exercise the most reasonable option available to her: secure the location by shutting the door and calling for back up while taking a tactical position outside of the apartment. Instead, Defendant Guyger entered the apartment with her gun drawn and followed her threat assessment training—looking for a suspect's hands—and DPD's "shoot first and ask questions later" custom and shot Mr. Jean in the chest. By simply following proper police procedures, and the best police practices she was allegedly trained to follow, Defendant Guyger would have not shot Jean.

27.    Instead of rendering medical aid to Mr. Jean, who was bleeding out on the floor in front of her, Defendant Guyger walked around the apartment, the hallway outside, and texted her partner, DPD Officer Martin Rivera, that she "fucked up" and needed his help.

28.    Paramedics and additional law enforcement personnel arrived to the scene of the shooting sometime after Defendant Guyger fired the shots and found Jean still suffering from the gunshot wound inflicted by Defendant Guyger. Responding DPD officers immediately began rendering aid to Jean until Emergency Medical Technicians

arrived and transferred him to a stretcher where he was transported to an ambulance before being driven to a nearby hospital. Medical professionals continued to treat Jean after he arrived at the hospital; however, he eventually succumbed to his wounds.

29.     After additional law enforcement personnel responded to the scene of the shooting, Defendant Guyger was not placed under arrest but was instead allowed to continue to roam about the crime scene. Upon information and belief, as is the practice and custom of the DPD, Defendant Guyger was allowed to remain in possession of her phone, make several phone calls prior to giving a statement to investigators, and spoke with several officers before being isolated and having her statement taken.

30.     Chief Hall immediately and rightfully considered the incident an Officer Involved Shooting (OIS) as Defendant Guyger was in full uniform at the time of the shooting, was performing the duties of a law enforcement officer, was donning a badge, used her service weapon, and was behaving as a police officer when she shot Jean after issuing verbal commands to him in his home, but failed to arrest Defendant Guyger or charge her with a crime.

31.     In Texas, it is well established that an off-duty officer can still be engaged in the lawful discharge of his duties as a Texas peace officer.

32.     Additionally, per DPD general orders, officers are considered  on-duty 24/7.

33.     The subsequent DPD homicide investigation, immediately initiated following the deadly shooting, was characterized by bias, partiality and a lack of

thoroughness and/or professionalism, specifically designed to ratify the behavior and cover-up the misconduct of Defendant Guyger. Detectives sought warrants for the home of Jean with the specific intent of discovering evidence of illegality on the part of the decedent that could be used to justify the behavior of Defendant Guyger although it had nothing to do with Guyger's decision to shoot Jean. No warrants were initially sought for the apartment, motor vehicle and/or service locker of Defendant Guyger — locations that potentially held important evidence probative to the homicide investigation underway.

34.     Unidentified Dallas Police Officer sources immediately began anonymously providing information to local media outlets designed to cast the murder of Jean by Defendant Guyger in the best possible light. Sources offered that the emergency phone call by Defendant Guyger appeared sincere and substantiated the false narrative that the shooting was a reasonable accident to protect Guyger. Anonymous police sources offered to media that the physical evidence at the crime scene substantiated Defendant Guyger's version of events before conducting a thorough investigation. On the day of Jean's memorial, media published a warrant affidavit DPD investigators failed to seal indicating drugs and drug paraphernalia was recovered from the home of the decedent, all designed to protect Defendant Guyger.

35.     Defendant Guyger has been a police officer for less than five years yet the shooting of Jean represents the second suspicious shooting of an unarmed suspect of color. In May 2017, Defendant Guyger shot and injured a suspect while responding to a request for assistance in identifying a possible parole violator. Upon information and

belief, Defendant Guyger was not required to undergo any counseling and/or additional training after this shooting.

36.    Although most of Defendant Guyger's social media and many text messages were erased in the immediate aftermath of the shooting, her Pinterest account—which was not fully deleted—demonstrates that she is a dangerous individual with highly violent and anti-social propensities. Defendant Guyger's posts include statements like "Personally I think I deserve a medal for getting through this week without stabbing someone in the neck with a fork"; "People are so ungrateful. No one ever thanks me for having the patience not to kill them"; "I wear all black to remind you not mess with me, because I'm already dressed for your funeral (saved to love to laugh with comment "yah I got meh a gun a shovel and gloves if I were u back da fuck up and get out of meh fucking ass."); "Stay low, go fast, kill first, die last, one shot, one kill, no luck, all skill" was saved to her quotes for inspiration. Such posts were available to the public and violated DPD's social media polices, however, Defendant Guyger was never reprimanded for the same. To the contrary, following the murder of Jean, Defendant Guyger was given time to scrub her social media accounts before her name was released to the public by the Dallas Police Department. The data deleted from Facebook, Twitter and Instagram represent active spoliation by Defendants Guyger and the City of Dallas.

37.    The DPD's written policy on use of force is not the de facto policy of the DPD. The de facto policy is that which Officer Guyger employed when she decided to enter Jean's apartment without proper cover and fired shots at Jean without warning and

any attempt to de-escalate.

38.    The DPD has a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn, when there is no imminent threat of bodily harm or other justifiable reason to do so. The DPD trains its officers to use deadly force even when there exists no immediate threat to themselves or others, training officers that if they cannot see a suspect's hands, it is reasonable to believe that the suspect is a deadly threat to the officer justifying the use of deadly force against the suspect.

39.    The DPD did not provide adequate training to Officer Guyger as it relates to threat assessment, the use of deadly force, and the use of non-deadly force.

40.    The DPD did not provide adequate training to Officer Guyger on proper arrest and confrontation techniques or entering what is perceived to be an active crime scene.

41.    The DPD did not provide adequate training to Officer Guyger on appropriate methods and techniques to control situations like the one encountered by her on September 6, 2018.

42.    The DPD failed to adequately discipline Officer Guyger for the misuse of force and/or the employment of deadly force in the previous officer involved shooting in which she fired her service weapon at an unarmed suspect.

43.    Chief Hall, the final policymaker for the DPD, the Dallas City Council and the City knew or should have known that the training provided to Officer Guyger was

inadequate or nonexistent.

44.    Officer Guyger should have been well-trained to deal with unarmed citizens posing no threat of imminent bodily harm to her, other officers, or the general public. Officer Guyger should have been well-trained in how to deal with what is perceived to be an active crime scene and the need to secure cover before confronting the suspects.

45.    In fact, Defendant Guyger should have been extensively trained in the appropriate response to residential burglaries-in-progress pursuant to DPD Standard Operating Procedure 1509 Burglary-In-Progress/Burglar Alarm/Open Building and DPD Standard Operating Procedure 1001 Barricaded Persons, particularly in light of her specialized role and duties on the CRT.

46.    A reasonable officer in Defendant Guyger's position would have known that they, as sworn peace officers, had a duty under Texas law to prevent crime and arrest offenders, and would know that an off-duty police officer who observes a crime immediately becomes an on-duty officer, despite her unreasonable perception that a burglary was occurring. A reasonable officer in Defendant Guyger's position would have known that, once "on duty," she was required to follow DPD best practices, including taking cover and waiting for backup before engaging what she allegedly believed was a burglary in progress.

47.    Officer Guyger had a clear view of Jean; however, it is apparent that instead of using any sort of de-escalation techniques, she opted to use deadly force immediately.

48.      Officer Guyger opened Jean's apartment door and immediately drew her weapon without a reasonable threat assessment or evaluation of what occurred or what was transpiring. She simply opened fire without having any knowledge of the situation. Essentially, Officer Guyger was ill-trained, and as a result, defaulted to the defective DPD policy and custom: to use deadly force even when there exists no immediate threat of harm to themselves or others.

49.      There existed no justification whatsoever for Defendant Guyger's use of deadly force. Jean was in his own apartment and was not committing a penal offense. Jean was totally unaware of what was transpiring when Officer Guyger fired the deadly shots. Jean was not attempting to harm anyone, nor did he appear menacing, threatening, or dangerous in any manner.

50.      There is no credible evidence whatsoever that Officer Guyger or anyone else was in imminent danger that would indicate that the use of deadly force was justified.

51.      Officer Guyger's unlawful and unwarranted acts, lack of training, lack of discipline and the official customs or policies of the DPD was the proximate cause of Jean's death.

52.      At all times material hereto, Officer Guyger was acting in the scope of her employment as agent, servant, and employee of the DPD, a part of Defendant, the City of Dallas, within its executive branch and was performing a governmental function.

53.      Moreover, no reasonably competent officer would have concluded that

Officer Guyger's actions described herein would not, and did not, violate Jean's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Officer Guyger's shooting of Mr. Jeanwas justified.

54.    As a direct and proximate result of Officer Guyger's conduct, Plaintiffs have sustained substantial damages and pecuniary loss.

55.    Jean was twenty-six (26) years old when he was fatally shot by Officer Guyger. Jean was very well liked. He was in good health, with a reasonable life expectancy of living at least 58 more years to age 84. Jean leaves behind his parents and two siblings.

56.    Bertrum and Allison Jean have suffered pecuniary loss from the death of their son by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. Bertrum and Allison Jean suffer and will continue to suffer anguish, grief, and sorrow as a result of Jean's death. Moreover, Bertrum and Allison Jean's suffering was multiplied by Defendant City of Dallas' recklessly actions by failing to seal warrant information that would cast their slain son in a negative light on the day of his memorial service.

57.    Defendant City of Dallas, acting through agents within the Dallas Police Department, further violated Bertrum and Allison Jean by leaking information to the media in order to bolster the defense of Defendant Guyger and creating a basis for

Defendant Guyger's case to be removed from Dallas County. For these losses, Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

58.    Upon information and belief, the DPD has not implemented policies and procedures to aggressively curtail death and/or injuries as a result of the improper use of deadly force.

## V.    CAUSES OF ACTION

**A.    Cause of action against Amber Guyger under 42 U.S.C. §1983 for violation of the Plaintiffs' Fourth Amendment Right to be free from excessive force.**

59.    The preceding paragraphs are hereby incorporated by reference.

60.    Plaintiffs would show that Jean was killed as a direct result of Defendant Guyger's use of force that was clearly excessive and the excessiveness of which was clearly unreasonable. That is, Defendant Guyger, without justification and the need to do so, used excessive force as described above and killed Jean without legal justification. Defendant Guyger's use of force was clearly excessive and clearly unreasonable because Jean had been watching television in his own apartment, did not have a weapon, never made any threatening gestures toward Defendant Guyger, and did not pose an immediate threat—or any threat whatsoever—to the safety of Defendant Guyger or others.

61.    Defendant Guyger was not provoked when she fired twice into an occupied residence for no lawful or justifiable reason. Jean died as a result of a gunshot wound to his chest. The excessive and deadly force used by Defendant Guyger was not

reasonable or justified, nor was it necessary under the circumstances.

62.     Defendant Guyger's actions were not objectively reasonable because Jean did not pose an immediate risk of serious physical harm to Guyger or any other person.

63.     The force used by Defendant Guyger was objectively unnecessary, excessive and unreasonable under the circumstances, as Jean did not pose an immediate threat to the safety of Defendant Guyger or others and the use of such excessive and deadly force was unnecessary. Rather, Defendant Guyger embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact, did cause Jean to suffer extreme and severe physical, mental and emotional distress, agony and anxiety.

64.     Further, Defendant Guyger's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Guyger shot and killed Mr. Jean. *See, e.g., Reyes v. Bridgewater*, 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others."). More specifically, the right to be free from the use of excessive force was clearly established under the particular circumstances presented to Defendant Guyger.

65.     As a result of these Constitutional violations to Jean, Plaintiffs seek compensation, individually and as the Administrator on behalf of the Estate of Botham Shem Jean, deceased, as set forth more specifically in the section of this Complaint entitled "Damages."

**B.**    **Cause of action against the City of Dallas under 42 U.S.C. § 1983 for violation of the Plaintiffs' Fourth Amendment Rights.**

66.    The preceding paragraphs are hereby incorporated by reference.

67.    The City of Dallas is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the Dallas Police Department of which the City Council, the City Manager, the Mayor, and Chief of Police Hall all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein. Specifically, DPD training on threat assessment in conjunction with DPD policy concerning justification for the use of deadly force allows police officers to shoot body center mass and terminate any perceived threat whose hands they cannot see—even when the perception of threat by the officer is completely unreasonable.

**1.**    **The City of Dallas's training on threat assessment is unconstitutional and has resulted in dozens of shootings of unarmed individuals.**

68.    The City of Dallas trains its officers on threat assessment and that threat assessment serves as the foundational analysis for the level of force which can be justified in interactions with suspects and the public in general.

69.    The City of Dallas trains its officers that if a suspect's hands are not visible, that suspect "is reaching for a weapon that is gonna be used against [the officers]." *See* Amber Guyger Criminal Trial Testimony at 16:13-15, Trial Court Cause No. F18-00737-Q.

70.    Further, officers are trained and instructed that if a suspect's hands are not

visible during threat assessment, the suspect "is gonna kill [them]." *Id.* at 69:24-25.

71.    DPD General Order 906.02(D) authorizes the use of deadly force by officers "to protect themselves or another person from imminent death or serious bodily injury."

72.    The DPD threat assessment training regarding a suspect's hands and the authorization to use deadly force in General Order 906.02(D), in combination, ultimately amount to an official policy or custom that merely not being able to immediately see an individual's hands during threat assessment makes that individual a deadly threat to officer safety and justifies the use of deadly force against the individual.

73.    This custom, policy, and/or training is constitutionally insufficient regarding individual's Fourth Amendment rights against unreasonable use of excessive force during a search or seizure.

74.    The Fourth Amendment prohibits the use of deadly force in non-deadly circumstances which do not pose an immediate threat of serious bodily injury and/or death.

75.    At all times material hereto, DPD's threat assessment training and official use of force policy, in combination, authorized the use of deadly force in non-deadly circumstances posing no immediate threat of serious bodily injury or death by focusing only on whether a suspect's hands are visible to the officer and equating non-visibility with a lethal threat despite the obvious truth that a suspect's hands may not be visible for a variety of non-lethal reasons, including that a suspect's hands are blocked from the

officer's view by a physical object between the officer and the suspect.

76.      Dallas officials are well-aware or should be well-aware that this training is constitutionally deficient, as it has led to dozens of police shootings of unarmed suspects.

77.      Between 2002 and July of 2013, Dallas Police Officers shot thirty-six (36) unarmed individuals.

78.      This trend not only continued but increased in the years immediately preceding the shooting of Botham Jean. In the six years preceding Jean's death, DPD officers discharged their weapons at twenty-one (21) separate individuals who were not armed with a weapon.

- 2012: (4) James Harper, Antonion Johnson, Devoncey Kelly, and Joshua Lyons

- 2013: (5) Clinton Allen, Christopher Jones, Gerardo Pinedo, Jr., Noe Montiel, and Kelvion Walker

- 2014: (4) Jacquinn McClinton, Andrew Gaynier, Jimmy Cupples, Jr., and Gregory McGee

- 2015: (3) Desmond Luster, Martin Rivas, and Bertrand Davis

- 2016: (3) John Doe, Anthony Garcia, and Shawn Diamond

- 2017: (2) Billy Scott and Genevive Dawes

79.      DPD officers in fact continue to regularly shoot at unarmed suspects. In October 2021, a DPD officer was suspended for 45 days for shooting toward an unarmed man while responding to a call in northeast Dallas. Video of the incident shows a DPD officer involved in a short foot pursuit. The officer then pulls his gun and fires past one

crouching individual toward a second individual who had his hands in the air. Fortunately, no one was injured during the incident.

80.    The City's DPD threat assessment training on which Defendant Guyger testified that she relied during her interaction with Mr. Jean informed Defendant Guyger that Botham Jean was a lethal threat to her because she could not see Mr. Jean's hands and, pursuant to General Order 906.02(D), permitted and encouraged Defendant Guyger to therefore use deadly force in such a situation.

81.    Yet Mr. Jean had nothing in his hands, was not concealing his hands, was in his own apartment, and was neither a threat nor threatening the safety of Defendant Guyger at the moment Defendant Guyger shot him.

82.    In fact, at no point in his interaction with Defendant Guyger did Jean have anything in his hands. Indeed, Mr. Jean's kitchen counter was between Defendant Guyger and Mr. Jean when Defendant Guyger shot him.

83.    Similarly, Jean did not have pockets in the shorts he was wearing, and could not have had a concealed weapon on his person with which to threaten Defendant Guyger's safety.

84.    Defendant Guyger nevertheless shot Mr. Jean center mass, through the upper chest, simply because, in her words, she "couldn't see his hands." Defendant Guyger's actions comported directly with DPD's written authorization for the use of deadly force policy and the threat assessment training received by DPD officers.

85.    The City's deficient and unconstitutional training on threat assessment and

policy justifications for the use of deadly force was a moving force behind Defendant Guyger's killing of Botham Jean as she shot Jean in comportment with her training, stating, "I couldn't see his hands, [so I thought] he was gonna kill me." *Id.* at 69:24-25.

**2.    The City of Dallas failed to adequately train its officers on use of force.**

86.    Officer Guyger's constitutionally insufficient threat assessment and use of force training by the DPD led to the use of excessive and deadly force and, ultimately, her killing Jean.

87.    The City of Dallas, the City Manager, the Mayor, and Chief of Police Hall endorsed and/or ratified the unfettered use of excessive and deadly force, even in situations where no crime was committed, through the continued use of threat assessment training and a use of force policy that, in combination, allowed DPD officers to shoot and kill suspects because the officers "couldn't see" the suspect's hands.

88.    As described above, DPD officers, including Defendant Guyger, used and continue to use excessive and deadly force against unarmed individuals when it was unnecessary and no threat to the safety of officers or others existed.

89.    As a direct cause and result of the constitutional violations as set forth herein, Jean incurred extreme pain and injuries and, ultimately, death for which the Plaintiffs seek compensation, as set forth more specifically in the section of this Complaint entitled "Damages."

90.    The DPD has a longstanding record of not providing DPD officers with adequate training on threat assessment, use of force, and de-escalation techniques

intended to prevent instances of excessive and deadly force and extrajudicial killings by Dallas Police officers.

91.    The actual practice or custom of the DPD regarding the use of deadly force, bolstered by the threat assessment training all DPD officers receive regarding a suspect's hands, is to "shoot first and ask questions later."

92.    As a result of the inadequate training and the official use of force customs and policies of the DPD, there have been a number of deadly police shootings of unarmed minorities.

93.    On or about July 24, 2012, unarmed James Harper ("Harper") was fatally shot by DPD officer Brian Rowden ("Rowden"). Rowden pursued Harper on foot and fired a shot at Harper as he ran away. Rowden was not disciplined for the unlawful killing of Harper.

94.    On or about March 10, 2013, unarmed Clinton Allen ("Allen") was fatally shot 7 times by DPD officer Clark Staller. Allen was wrongfully gunned down although he held both hands up. Clark Staller, despite previously falsifying a police report prior to the shooting death of Allen, remained an officer and was not disciplined for the death of Allen. Clark Staller was permitted to prepare his statement of the incident with the assistance of his attorney and was not asked any questions to determine the veracity of his statements.

95.    On or about October 14, 2013, a DPD officer shot Bobby Bennett ("Bennett"), an unarmed individual, and attempted to falsify a police report regarding the incident.

However, a video recording that captured the incident exposed the attempted cover-up.

96.     David Blair, an unarmed individual, was standing outside of his east Oak Cliff apartment on October 2, 2013, when a pair of Dallas Police Officers harassed him for no lawful reason. The officers approached him, followed him to his apartment and shot at him 14 times as he stepped out of his apartment for no lawful reason.

97.     Blair's story surfaced just a week after a video circulated of a Dallas police officer shooting Bennett, a man with mental challenges, after he stood up from a chair he set in the middle of a cul-de-sac. Police initially claimed the man lunged at them, but the video showed otherwise. An aggravated assault charge against the wounded man has since been dropped.

98.     On December 10, 2013, 19-year-old Kelvion Walker was sitting in a vehicle with his hands up when a Dallas police officer shot him.

99.     On August 27, 2015, an unarmed Bertrand Syjuan Davis was fatally shot by Officer Matthew Terry. According to multiple witness accounts, immediately upon arriving at the scene, Officer Terry failed to conduct an objectively reasonable assessment of the facts, drew his gun and shot Bertrand several times, including once in the back, without any verbal warning. Per witnesses, Officer Terry was not facing or reacting to an imminent threat of death or serious bodily injury to him or any other person at the time he fired. Officer Terry was not disciplined by the DPD for his wrongful conduct.

100.     On January 18, 2017, Officers Christopher Hess and Jason Kimpel used excessive and deadly force resulting in the death of 21-year-old Genevive Dawes and

injuries to Virgilio Rosales. As Dawes drove in her vehicle in reverse at a very slow rate of speed, Hess and Kimpel fired at least 13 shots through the passenger side window where Rosales was seated, striking Dawes five times in the neck, her right triceps, left arm, upper left chest and right forearm. Dawes's right earlobe was also partially amputated. Dawes was transported to Baylor Hospital where she later died because of her injuries. Hess's defense for firing at the moving vehicle was not supported by body cam evidence. Despite body cam footage that shows Dawes was not trying to injure anyone as she reversed her vehicle, Hess and Kimpel were not terminated for their violation of DPD policy. In fact, the DPD and the city of Dallas attempted to cover-up this shooting until the body cam footage was released to the Dallas District Attorney's office almost six months later. Hess was indicted for the death of Dawes.

101.    There exists a persistent, widespread practice of police shootings that result from DPD threat assessment and use of force training, or lack thereof, received by DPD officers. Upon information and belief, DPD officers were trained by individuals with little or no experience working in the field.

102.    Concerns about and criticism of DPD use of force policies and training has been longstanding, with concerns raised by citizens and the House Judiciary Subcommittee on Criminal Justice as early as 1987.

103.    Criticism of DPD's policies and procedures regarding the use of deadly force was first made by Geoffrey P. Alpert in his 1987 report. In this report, Alpert pointed out that a new philosophy and a new approach to force was needed and would be

required in order for Dallas to overcome its institutional training issues.

104.    The report further stated that in order for Dallas to enter the 1990s with a set of police policies, procedures, and customs commensurate with its high set of municipal values, a conscious decision must be made to overhaul a system creaking with age and tradition and made obsolete by the challenges of a new generation of citizens.

105.    Indeed, in May of 1987 the House Judiciary Subcommittee on Criminal Justice held a hearing in Dallas to investigate DPD's "questionable" uses of deadly force and concerns that officer-involved shootings were disproportionately affecting minority citizens throughout the city. Chairman John Conyers, Jr. explained that then-recent shootings, "and others, have raised serious questions about the department's deadly force policy, its training and how the police have been implementing it particularly within the black and Hispanic communities." The Chairman further explained that of the 60 individuals killed by DPD officers between 1980 and 1985, 48 (or 80%) were Black or Hispanic.

106.    After the 2012 death of James Harper, DPD Chief Brown indicated that the following policies and procedures would be implemented, but none were ever implemented:

> a.    *Formalize a process of concurrent investigative review with the FBI Civil Rights Office of all officer involved shootings*

107.    This step was intended to reassure the public that the DPD is conducting a detailed and comprehensive investigation into officer involved shootings and that the findings are based upon facts uncovered by the investigation. The DPD has requested

the FBI to conduct this type of review on several occasions.

        *b.     Implement a more comprehensive Response to Resistance reporting system*

108.    A "Response to Resistance" report details the actions a suspect took against an officer and the steps an officer was required to take to overcome this resistance. A comprehensive reporting system was intended to allow for a more detailed analysis of incidents involving violence against officers and their response. Information gained was intended to be used to assist in developing and refining tactics, training and policy. The report was also intended to provide public transparency regarding the amount of force officers take in the performance of their duties.

        *c.     Develop a foot pursuit policy*

109.    A formalized foot pursuit policy was intended to enhance officer safety by providing officers with a foundation on which to make decisions during these inherently high-risk activities with the intent of reducing hazardous consequences and preventing, when possible, the escalation of enforcement action into lethal force confrontations.

        *d.     Re-implement the Digital Video Recorder (DVR) Review Team*

110.    The DVR Team had been temporarily inactive while a panel of Police Deputy Chiefs reviewed the proper role for the Team. The dash cam video reviews conducted by this team can serve as a training tool for the Department while building public confidence that the Department proactively examines officer performance to ensure compliance with departmental and public expectations.

**Plaintiffs' Second Amended Complaint**               **Page 28 of 37**

> e.    *Implement a mandatory electronic control weapon (Taser) training policy for all officers*

111.    Currently, all officers that are trained with an electronic control weapon are required to carry one if available.

> f.    *Enhance the Department's consensual search policy to include the requirement for a written and/or recorded consent*

112.    Implementing this step was intended to create greater public confidence in the consensual searches performed by DPD Officers, protect officers against false allegations of illegal search, and bolster court cases where the search is critical to proving the charge.

> g.    *Research best practices that have come from critical incidents or institutional failures in public safety from around the nation*

113.    In recent years, several major city police departments have been placed under consent decrees. The DPD proposed to research the positive practices and policies that have been developed as a response to these failures as a way to improve DPD's internal training, policy, officer safety, and service delivery. This step was intended to include a review of the recommendations stemming from the 1987 Subcommittee on Criminal Justice hearings that occurred in Dallas.

> h.    *Assemble a special Community Policing Strategic Team of officers for the Dixon Circle community*

114.    This step was intended to create a special team of officers responsible for addressing chronic crime and underlying quality of life issues present in the Dixon Circle community, while opening sustainable communications with this neighborhood to build trust between the residents and the DPD. The Police Athletic League was intended to

**Plaintiffs' Second Amended Complaint**                                    **Page 29 of 37**

play a vital role in this team effort to provide constructive alternatives for youth in the area.

115.    As noted above, Officer Guyger used excessive and deadly force for no lawful reason when she shot Jean without any warnings and for no lawful reason.

116.    There is no evidence that Officer Guyger and any other person were in imminent danger or in fear of serious bodily injury. There were no signs of any danger that would indicate or suggest that the use of deadly force was justified.

117.    The DPD's "Drawing or Displaying Firearms" general order requires a threat, a reasonable belief that there is a threat to life, or that the officer have reasonable fear for their own safety and/or the safety of others, in order to authorize an officer to draw or display his firearm.

118.    Yet DPD threat assessment training instructs officers that an individual whose hands cannot be seen is an immediate threat to the life and safety of the officer or others.

119.    There is no indication that Officer Guyger attempted to use her intermediate weapon or de-escalation training before resorting to the use of deadly force. Pursuant to General Order 901.04(D)(3) a Taser, which Defendant Guyger had on her duty belt for the entirety of her interaction with Mr. Jean, is an intermediate weapon and is justified for situations in which the officer believes empty hand control will be ineffective.

120.    At the time Officer Guyger drew her firearm, Jean had not done anything

to justify Officer Guyger's decision to use deadly force. Jean was unarmed and lawfully in his own apartment at the time he was shot and had not placed Officer Guyger or any other person in fear of imminent death or seriously bodily injury. Officer Guyger merely "couldn't see" Mr. Jean's hands and, per her DPD training, assessed this fact as a sufficient threat to justify the immediate use of deadly force.

121.    The drawing of an Officer's weapon inherently assumes that the use of force will cause death or serious bodily injury to the suspect and is to be applied under very narrowly defined circumstances.

122.    According to Dallas Police General Order 906.02(D), "Authorization to Use Deadly Force," "Officers will only use deadly force to protect themselves or another person from imminent death or serious bodily injury."

123.    General Order 906.02(E), "Drawing or Displaying Firearms," requires a threat or reasonable belief that there is a threat to life or that the officer have reasonable fear for their own safety and/or the safety of others, in order to authorize an officer to draw or display her/his firearm.

124.    Officer Guyger's unlawful and unwarranted acts, lack of appropriate threat analysis training, and the official customs or policies of the DPD justifying the use of deadly force caused Jean's wrongful death.

125.    Plaintiffs would show that Officer Guyger's actions were the result of, or within the scope of, insufficient training and wrongful and reckless customs, policies, practices and/or procedures of the DPD, in regard to the use of deadly force for which

the Dallas City Council, the City of Dallas and Chief Hall knew or should have known.

126.    Moreover, no reasonably competent official would have concluded that the actions of Officer Guyger described herein would not violate Jean's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Officer Guyger's conduct and excessive use of force was justified.

127.    Upon information and belief, the DPD has not implemented the policies and procedures previously described to aggressively curtail deadly shooting cases which have been a major and longstanding problem for DPD since at least the 1980s, and continue to exist today. The City of Dallas' failure to properly train and supervise its officers in the use of force was the proximate cause of the violation of Jean's constitutional rights.

128.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained substantial damages and pecuniary loss. Based on these constitutional violations and the injuries and other damages sustained, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**3.    The City of Dallas failed to adequately supervise or discipline its officers for violent, aggressive, and excessive force and, in failing to do so, ratified and encouraged the conduct of its officers, including Guyger.**

129.    The City of Dallas and the DPD failed to adequately train and failed to adequately supervise or discipline Officer Guyger despite her unlawful conduct. It was not until a public outcry that Chief Hall finally terminated Guyger.

130.    The Defendant City of Dallas failed to supervise and/or discipline its

officers for prior violations which resulted in the following:

    a.    The City of Dallas and Chief Hall failed to adequately supervise and/or discipline its employees in handling usual and recurring situations with which they deal;

    b.    Chief Hall and the Dallas City Council was deliberately indifferent to the need to supervise and/or discipline its officers and/or employees adequately; and,

    c.    The failure to adequately supervise and/or discipline its officers proximately caused the deprivation of Jean's constitutional rights.

131. The City, City Counsel, and Chiefs of Dallas Police Department had notice each time DPD officers shot and killed unarmed minority suspects. Further, the City, City Counsel, and Chiefs of Dallas Police Department had notice each time DPD officers shot at but either injured or missed unarmed minority suspects.

132. Despite having knowledge of Defendant Guyger's violation of the DPD's policies and other best police practice as described above, the City of Dallas, the City Council and Chief Hall refused to adequately discipline Defendant Guyger, including after her first officer-involved shooting of a minority suspect. The City of Dallas's failure to adequately supervise and/or discipline its Defendant Guyger after this first shooting, as well as other DPD officers who injured or killed unarmed minority suspects pursuant to DPD threat assessment and use of force training was therefore the moving force behind Plaintiffs' damages.

## VI.   <u>DAMAGES</u>

133. **Actual damages.** The preceding paragraphs are incorporated by reference.

Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs and Defendants should be held jointly and severally liable for the following damages:

    a.    **Estate of Botham Shem Jean (Survival Claim).**

        1.    Conscious pain and mental anguish suffered by Botham Shem Jean prior to his death;

        2.    Funeral and burial expenses; and

        3.    Exemplary Damages.

    b.    **Bertrum Jean (as wrongful death beneficiary of Botham Shem Jean).**

        1.    Mental anguish—the emotional pain, torment, and suffering experienced by Bertrum Jean because of the death of Botham Shem Jean—that Bertrum Jean sustained in the past and that he will, in reasonable probability, sustain in the future;

        2.    Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Bertrum Jean would have received from Botham Shem Jean had he lived—that Bertrum Jean sustained in the past and that he will, in reasonable probability, sustain in the future;

        3.    Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Bertrum Jean would have received from Botham Shem Jean had he lived—that Bertrum Jean sustained in the past and that he will, in reasonable probability will sustain in the future.

    c.    **Allison Jean (as wrongful death beneficiary of Botham Shem Jean).**

        1.    Mental anguish—the emotional pain, torment, and

suffering experienced by Allison Jean because of the death of Botham Shem Jean—that Allison Jean sustained in the past and that she will, in reasonable probability, sustain in the future;

2. Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Allison Jean would have received from Botham Shem Jean had he lived—that Allison Jean sustained in the past and that she will, in reasonable probability, sustain in the future;

3. Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Allison Jean would have received from Botham Shem Jean had he lived—that Allison Jean sustained in the past and that she will, in reasonable probability will sustain in the future.

134. **Punitive/Exemplary Damages against Amber Guyger**. Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Here, the conduct of Guyger was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of the Plaintiffs. As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.

135. Prejudgment and post judgment interest.

136. Costs of court.

137. Reasonable and necessary attorney's fees incurred by the Plaintiff through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C.

§ 1988.

## VII.    CONDITIONS PRECEDENT

138.    Plaintiffs reserve their rights to plead and prove the damages to which they are entitled to at the time of trial. All conditions precedent to Plaintiffs' recovery have been performed or have occurred.

## VIII.    TRIAL BY JURY

139.    Plaintiffs have paid a jury fee and demand trial by jury.

## IX.    PRAYER

140.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled.

Respectfully submitted,

By:*/s/ Bhavani Raveendran*
Daryl K. Washington, Esq. State Bar No. 24013714 WASHINGTON LAW FIRM, PLLC
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883
Fax: 214-751-6685
dwashington@dwashlawfirm.com

Antonio M. Romanucci *(pro hac vice)*

(IL Bar No. 6190290)
Bhavani Raveendran *(pro hac vice)*
(IL  Bar No. 6309968)
Ian P. Fallon *(pro hac vice)*
(Illinois Bar No. 6332303)
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
braveendran@rblaw.net
ifallon@rblaw.net

Benjamin L. Crump, Esq. BEN
CRUMP LAW PLLC
122 s. Calhoun St.240 N Magnolia Drive
Tallahassee, FL 32301
850-224-2020
ben@bencrump.com
***ATTORNEYS FOR PLAINTIFFS***

## Certificate of Service

I hereby certify that on **November 2, 2021**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

Amber Guyger                          Tatia R. Wilson
#02283505                             Senior Assistant City Attorney
TDCJ Mountain View Unit               tatia.wilson@dallascityhall.com
2305 Ransom Road                      7DN Dallas City Hall
Gatesville, Texas 76528               1500 Marilla Street
***Pro Se Defendant***                Dallas, Texas 75201
                                      ***Attorney for Defendant City of Dallas***


                    */s/ Bhavani Raveendran*
                    **Bhavani Raveendran**


**Plaintiffs' Second Amended Complaint**                    **Page 37 of 37**