**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| BERTRUM JEAN, Individually and as the surviving father of BOTHAM SHEM JEAN, ALLISON A. JEAN, Individually and as the surviving mother of BOTHAM SHEM JEAN, and ALLISA E. FINDLEY as the Administrator of the Estate of BOTHAM SHEM JEAN, | § § § § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO. 3:18-CV-2862-M-BH |
| v. | § § | |
| THE CITY OF DALLAS, TEXAS, and AMBER GUYGER, | § § § | |
| *Defendants*. | § | |

---

**DEFENDANT CITY OF DALLAS'S
REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.    **INTRODUCTION**................................................................................................1

II.   **ARGUMENTS IN REPLY**................................................................................2

a.    **The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that the Ms. Guyger acted under color of law. Therefore, Plaintiffs' *Monell* claims must be dimissed.**...........................................................................4

    i.    Ms. Guyger's actions and attire did not create an "air of authority" that pervaded the "entire incident."................................4

    ii.    The Response improperly assumes facts not in evidence about Ms. Guyger's mindset to create an issue of fact about her intentions....................................................................................8

b.    **The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that the City maintained unconstitutional policies or was deliberately indifferent to constitutional rights. Therefore, Plaintiffs' *Monell* claims must be dismissed.**........................................................11

    i.    The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that the City failed to train its officers on constitutional uses of force.....................11

        1.    The Response does not even criticize the City's training program.......................................................................12

        2.    The Response's "pattern of similar incidents" to show deliberate indifference neither constitute a "pattern," nor consists of "similar incidents." ...........................16

        3.    The Response's reliance on the "single-incident exception" is unavailing............................................18

    ii.    The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that the City failed to supervise or discipline its officers on constitutional uses of force. ................................................................................20

        1.    Ms. Guyger's prior use of force incident cannot constitute deliberate indifference in failing to supervise.....................20

2.      Even the Response does not fully claim Ms. Guyger's prior
        use of force was unconstitutional..........................................................................22

c.    **The Response points to no evidence in the record or supporting
      case law that creates a genuine issue of fact that any City policies
      were the moving force behind the shooting of Mr. Jean.
      Therefore, Plaintiffs' *Monell* claims must be dismissed.**.............................................23

III.  **CONCLUSION** ..........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997)......................... 13, 23

*Bennett v. City of Slidell,* 735 F.2d 861 (5th Cir.1984) ..................................................... 20

*Brown v. Bryan Cnty.*, OK, 219 F.3d 450 (5th Cir. 2000).................................................. 13, 21

*Burch v. Blockbuster, Inc.*, No. CV-03-BE-2990-E, 2005 WL 8158056 (N.D. Ala. July 15, 2005) ................................................................................................................................ 3

*Bustos v. Martini Club Inc.*, 599 F.3d 458 (5th Cir. 2010)........................................................ 2

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)................................................... 13, 14, 23

*Connick v. Thompson*, 563 U.S. 51 (2011) .................................................................. 12, 14, 19

*Davis v. Rockwall Cnty., Tex.*, No. 3:08-cv-1773-F, 2010 WL 11561759 (N.D. Tex. Dec. 16, 2010) ................................................................................................................................ 2

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009) ..................................................... 20

*Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214 (Tex. App. 2021)................................... 23

*First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978 (7th Cir.).... 25

*Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994)................................................................ 8

*Fraire v. City of Arlington,* 957 F.2d 1268 (5th Cir. 1992) ........................................ 21

*Gomez v. Galman*, 18 F.4th 769 (5th Cir. 2021)......................................................... 5, 6

*Henriquez v. City of Farmers Branch, Texas*, No. 3:16-CV-868-M-BN, 2022 WL 3127838 (N.D. Tex. July 8, 2022) ................................................................................................... 3, 5

*Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616 (5th Cir. 2018)............................... 19

*Martinez v. Smith*, 200 F.3d 816 (5th Cir. 1999) .......................................................... 2

*Moreno v. City of Dall.*, No. 3:13-CV-4106-B, 2015 WL 3890467 (N.D. Tex. June 18, 2015).. 17

*Oklahoma City v. Tuttle,* 471 U.S. 808 (1985) ............................................................. 12

*Pena v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018) ................................... 19

*Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009)....................... 16, 21

*Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) ...................................................... 16, 18

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) ................................................ 14, 20

*Tyson v. Sabine*, 42 F.4th 508 (5th Cir. 2022) ................................................................. 4

*United States v. Causey*, 185 F.3d 407 (5th Cir. 1999) ...................................................... 4

*Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010) ................................................... 19

*Weems v. Dallas Indep. Sch. Dist.*, 260 F. Supp. 3d 719 (N.D. Tex. 2017) ................................. 8

*Wyeth v. Levine*, 555 U.S. 555 (2009) ......................................................................... 8

**RULES**

Fed. R. Civ. P. 56(e) ......................................................................................... 23

Fed. R. Evid. 801(d)(2)(A) .................................................................................... 2

LR 56.6(b) .................................................................................................... 1

TO THE HONORABLE COURT:

The City submits the following Reply Brief in Support of its Motion for Summary Judgment ("Motion"). ECF No. 166. The City incorporates by reference its Brief in Support of its Motion for Summary Judgment (ECF No. 167) and Appendix in Support of its Motion for Summary Judgment ("App.," ECF No. 168), which were filed separately and concurrently with its motion for summary judgment in compliance with Local Civil Rule LR 56.6(b).

## I.    INTRODUCTION

Plaintiffs seek to hold the City liable for its off-duty employee's misuse of force in her private life. In its Motion, the City provided this Court a comprehensive record of Dallas Police Department ("DPD") officer-involved shootings from 2009 to 2019. The Motion explained the intricate processes of the DPD's training on the Fourth Amendment's restrictions on unreasonable seizures and the use of force, its investigating deployments of deadly force, and its assigning discipline. After access to more than 13,000 pages of the City's records, ten depositions of City employees, and the opinions of their multiple retained experts, nothing in Plaintiffs' Response ("Response") or the voluminous record before the Court creates a genuine issue of material fact that the City's policymaker, its City Council, permitted or enabled a policy or custom of Dallas police officers systemically violating individuals' Fourth Amendment right to be free from the use of excessive force or that any City policy or practice was the cause of Mr. Jean's death.

Instead, the record reveals the City's thorough training of its officers on the proper use of force, its professionalism in oversight of its officers in the field, and the integrity of its discipline.

After years of litigation, Plaintiffs have failed to raise a genuine issue of material fact on any one of their theories of municipal liability, the City is entitled to summary judgment on all claims against it, and the case against the City must therefore be dismissed.

## II.      ARGUMENTS IN REPLY

As an initial matter, the Response asserts that the City is "assert[ing] Defendant Guyger's arguments on her behalf" and stresses that Ms. Guyger has not filed a summary judgment motion. Resp. pp. 8-9. Yet Plaintiffs cannot maintain a section 1983 action against the City unless they first establish there was a *constitutional* violation. *Martinez v. Smith*, 200 F.3d 816 (5th Cir. 1999) (holding that plaintiff could not "show any constitutional injury that is attributable to the county" because she failed to "show any constitutional violation by the individual defendants.") If Ms. Guyger did not act under color of law, then the City necessarily cannot be held liable for her actions. *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) ("Because Bustos has alleged no constitutional injury attributable to the Officers, Bustos has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.") Plaintiffs cite no authority holding that it is improper for a municipality to address the constitutionality of the underlying incident and claims on which a plaintiff's *Monell* claim is based. The City, therefore, can and did argue that its former employee, Ms. Guyger, did not act under color of law when she shot and killed Mr. Jean. Mot. pp. 6-17.

Further, it is undisputed that Plaintiffs did not timely disclose evidence to Ms. Guyger (who is proceeding in this litigation *pro se*) as required by the Federal Rules of Civil Procedure. Indeed, Plaintiffs' implicit admission that they never disclosed any evidence to Ms. Guyger is apparent from their argument that they can use the trial transcript from her criminal case against her but list no other evidence. Resp. pp. 9-10. While the City does not concede that any undisclosed evidence is admissible at trial, it acknowledges that the only conceivable evidence that may be admitted from Ms. Guyger's trial transcript would be her own testimony. *Davis v. Rockwall Cnty., Tex.*, No. 3:08-cv-1773-F, 2010 WL 11561759, at *1 n.2 (N.D. Tex. Dec. 16, 2010) ("Defendants have

objected to Davis's use of the Deputies' prior testimony on the grounds of hearsay, irrelevance, and prejudice to the Defendants. The prior testimony is not hearsay because it constitutes an admission by a party opponent." (citing Fed. R. Evid. 801(d)(2)(A)). However, any testimony from any other individual from her criminal trial is inadmissible because Plaintiffs have not shown that "the remaining excerpts of testimony from the criminal trial, by witnesses who are not parties here, are admissible and thus competent summary judgment evidence." *Henriquez v. City of Farmers Branch, Texas*, No. 3:16-CV-868-M-BN, 2022 WL 3127838, at *12 (N.D. Tex. July 8, 2022), *report and recommendation adopted*, No. 3:16-CV-868-M, 2022 WL 3104844 (N.D. Tex. Aug. 4, 2022) (citing *Burch v. Blockbuster, Inc.*, No. CV-03-BE-2990-E, 2005 WL 8158056, at *2 (N.D. Ala. July 15, 2005) ("Blockbuster has made no attempt to show that any of the witnesses, none of whom are parties, will be available at trial, or that the testimony will otherwise be reducible to admissible form at trial. Therefore, the court will not consider the transcripts of the trial testimony in ruling on the motion for summary judgment.")) Thus, Plaintiffs' (somewhat inexplicable) claimed intention to "call as witnesses every person for whom they have used the trial transcripts," and their expectation that "each of those individuals" from trial will be able to testify in their civil case, are unfounded. Resp. p.10.

Therefore, in all likelihood, Plaintiffs will have to build their entire section 1983 case against Ms. Guyger at trial based on Ms. Guyger's criminal trial testimony – and that alone.[1]

---

[1] The City notes that Plaintiffs' admission adds yet more weight behind the City's Motion to Bifurcate. ECF No. 165. To establish their claim against Ms. Guyger, Plaintiffs will only have her scant trial testimony, whereas the City has produced approximately 13,000 pages of documents, numerous video and audio recordings, multiple fact witnesses, and multiple expert witnesses. It would be grossly unfair to both Ms. Guyger and the City to intermingle the City's vast universe of evidence in Plaintiffs' case against each Defendant.

     **a.  The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that Ms. Guyger acted under color of law. Therefore, summary judgment on Plaintiffs' *Monell* claims is proper.**

Plaintiffs state in the Response that the City "proposes that this Court adopt a new standard for determining" what constitutes actions under color of law. Resp. p. 18. Plaintiffs are incorrect. Instead, the City's Motion explicitly argues that "[w]hen *distilled down*, Fifth Circuit case law finding an officer was acting as an official rather than a private citizen – particularly after parties have had the opportunity to develop the record – *seems to require* the following: (1) a direct invocation of state authority; and/or (2) a thick set of facts from which a reasonable person would infer the invocation of state authority." Mot. p. 9 (emphasis added.) Plaintiffs' Response cites no case law that disputes this summation. Still, to save their claim, Plaintiffs rely on unsubstantiated assumptions to argue against a strawman of their own creation.

The Response alleges certain facts (generally without direct citation, and often simply assumed) are sufficient to show Ms. Guyger's actions in the 2-3 seconds prior to the shooting was the "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law . . ." *Id*. at 415 (emphasis added). *United States v. Causey*, 185 F.3d 407, 424–25 (5th Cir. 1999). These asserted facts can be categorized by what Ms. Guyger allegedly did, and what Ms. Guyger allegedly thought. But none of these assertions can create a genuine issue of fact about whether Ms. Guyger acted under color of law.

     **i.  Ms. Guyger's actions and attire did not create an "air of authority" that pervaded the "entire incident."**

Critically, the Response acknowledges that "there was no conversation during which Defendant Guyger could have invoked her position of authority . . ." Resp. p. 20. That removes Ms. Guyger's actions from the ambit of case law where such invocation is cited to establish color of law. *See, e.g. Tyson v. Sabine*, 42 F.4th 508, 523 (5th Cir. 2022) ("Deputy Boyd verbally

identified himself as a sheriff at the outset and wore a shirt identifying himself as a sheriff during the incident."); *Gomez v. Galman*, 18 F.4th 769, 776 (5th Cir. 2021). ("Defendants' . . . identification of themselves as officers of the law [ ] adds to the 'air of official authority' that pervaded the assault.") (citation omitted); *Henriquez*, No. 3:16-CV-868-M-BN, 2021 WL 5851445, at *3 ("Here it is alleged that 'as Johnson approached J.C.'s vehicle he shouted police commands, such as, 'Police, police, hands, let me see your hands, let me see your hands.' These allegations, taken as true, 'demonstrate an air of authority'" which was sufficient at the pleading stage.)

Instead, the Response points to Ms. Guyger's following salient actions: (1) she was in her DPD uniform; (2) she used her DPD service weapon; (3) she identified herself to a 911 operator as an officer after the incident; (4) she commanded Mr. Jean to "let me see your hands, let me see your hands." Resp. pp. 20-25. Glaringly, the Response cites no case law in the Fifth Circuit or any other that an off-duty law enforcement officer who commits an act in their private life, without specifically identifying themselves as a law enforcement officer or otherwise directly invoking their law enforcement status, can be determined to have acted under color of law for purposes of section 1983. Likewise, after exhaustive research, the City was unable to find a single case holding that an officer acted "under color of law" in a circumstance where an officer confronted an intruder in their home, took action in response to a perceived threat, and was found to have "activated" their police status sufficiently to immediately become a state actor. This total lack of legal support further confirms that this Court would be required to break new section 1983 ground and expand the definition of "color of law."

As the City's Motion explained, in the absence of direct invocation, color of law can be inferred by actions that the off-duty officer was nonetheless asserting state authority. Mot. pp. 7-

10. Illustratively, the Fifth Circuit found the following sufficient at the pleading stage to state a claim:

> First, Gomez alleges that when he exited the bar, Sutton "acting as a police officer, gave Mr. Gomez a direct order to stop and not leave the patio area of the bar." Gomez obeyed this order. Then, when he attempted to drive away after getting violently beaten, Sutton and Galman "ordered him to stop" and "ordered [him] to step out of his vehicle." Gomez claims that "[b]ecause they acted like police officers, [he] believed he was not free to leave, and did as he was ordered."
>
> *These allegations are key. A victim usually does not follow orders from someone who just attacked him without good reason to do so.* He is even less likely do so when—as alleged here—the victim was in the process of escaping his attackers. The fact that Gomez stopped and exited his vehicle at his attackers' commands lends significant credence to his allegation that he believed them to be police officers, because the complaint offers no reason for Gomez to obey Galman and Sutton unless they were "acting by virtue of state authority."

*Galman*, 18 F.4th 769, 776 (5th Cir. 2021) (citation omitted).

Here, unlike in *Galman*, this litigation is at the summary judgment stage where Plaintiffs must point to specific evidence in the record to establish or raise a genuine issue of material that Ms. Guyger was acting under color of law when she shot Botham Jean. Plaintiffs point to no evidence in the record showing that Mr. Jean knew or recognized that Ms. Guyger was a police officer. Indeed, there is no evidence indicating that Mr. Jean could even tell Ms. Guyger was dressed in her DPD uniform in his darkened apartment the night of the incident or was a police officer at all. Further, unlike in the *Galman* case, there is no allegation or evidence in the record that Mr. Jean ever complied with Ms. Guyger's "let me see your hands" instructions; the only evidence in the record of his reaction to those instructions was the following *non*compliance:

```
     Q.  Okay.  And the figure was moving around as
you've described?
     A.  Yes, I had -- I had my gun pointed, and I'm
saying, "Let me see your hands.  Let me see your hands."
     Q.  What were you focused on?
     A.  Him.
     Q.  Just him?
     A.  Yes.
     Q.  And then he began coming towards you.
     A.  Yes.
     Q.  Okay.  And as he came -- coming towards you,
that's when you heard him speak.
     A.  Yes.
```

App. 116.

During this portion of her examination, Ms. Guyger testified that Mr. Jean only said, "Hey. Hey. Hey."

```
     Q.  Okay.  I'm gonna go do that now, all right?
     A.  Yes, sir.

     Q.  Hey.  Hey.  Hey.
     A.  And that's at that point whenever I shot
towards --
     Q.  Somewhere in this area.
     A.  Yes, sir.
     Q.  When you shot, what happened?
     A.  He fell down.
```

*Id.* 116-17.

Lacking evidence of Mr. Jean's perception and reaction, the Response argues that a "reasonable juror could find that *anyone*" would have viewed Ms. Guyger's actions as those of a police officer utilizing her state power. Resp. p. 23 (emphasis in original). First, the case law focuses on what the alleged victim perceives, not what someone with the benefit of hindsight

7

surmises the victim might have perceived at the time. *See, e.g. Galman*, 18 F.4th at 776 (finding "key" the claims that "[b]ecause they acted like police officers, [he] believed he was not free to leave, and did as he was ordered.") Second, because there is no evidence that Mr. Jean perceived Ms. Guyger was asserting her state authority, a "reasonable juror" would have to speculate about what he was thinking in the 2-3 seconds before Ms. Guyger discharged her weapon. This type of speculation is insufficient to raise a genuine issue of material fact for trial. *See Weems v. Dallas Indep. Sch. Dist.*, 260 F. Supp. 3d 719, 726 (N.D. Tex. 2017) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence." (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994)).

Notably, the Response does not rebut, or even address, the City's concerns about the precedent that would be set if the Court were to interpret "under color of law" to include law enforcement officers' defending their homes. A judicial finding of potential section 1983 liability here would require off-duty officers to "factor in section 1983 liability in determining a reaction" to potential dangers in their private homes. Mot. p. 14 n.12. Many officers wear their official police issued uniforms to and from work. While our society rightfully expects officers to comport themselves with rectitude and respectfulness in and out of uniform, officers are entitled to have private lives. "[Bad] facts make bad law." *Wyeth v. Levine*, 555 U.S. 555, 604 (2009) (Alito, J., dissenting). And the Court should decline Plaintiffs' invitation through this lawsuit, no matter how tragic the events or sympathetic the victims, to impose section 1983 liability based on an off-duty police officers' conduct in the sanctity of what is arguably officers' one place of respite – home.

### ii. The Response improperly assumes facts not in evidence about Ms. Guyger's mindset to create an issue of fact about her intentions.

The Response – like some of Plaintiffs' other efforts in this case – attempts to delve into Ms. Guyger's mind. The Response assumes that as a law enforcement officer, Ms. Guyger "would

have been aware" of the elements for the crime of "burglary" in Texas, and that since she believed an intruder was in her apartment met that crime's elements, she therefore was "acting as a police officer." Resp. 21-22. The Response cobbles together the facts that Ms. Guyger was on the DPD's "Crime Reduction Team" with cursory allusions to internal police regulations and state laws concerning off-duty officers' requirements, to then proclaim "Defendant Guyger immediately became on [sic] on-duty officer under Texas law." *Id*.

First, Plaintiffs point to no competent summary judgment evidence to show that Ms. Guyger ever stated or implied that she thought she was responding to a crime, burglary, rape, murder, or any other criminal offense. To the contrary, the only direct evidence addressing the matter is Ms. Guyger's sworn declaration:

> From the time I entered the apartment until I fired my weapon, I believed I was in my apartment. In the seconds between entering the apartment and firing my weapon, I was acting as a private citizen defending myself in my own home. I did not have time to consider City policies or regulations. I did not fire my service weapon because DPD policy dictated I should or because I had any animus to Mr. Jean. I did not know Mr. Jean. I fired my service weapon only because I was in fear for my life. I did not have time to form a belief about why the individual was in my apartment other than I believed the individual was an intruder who was going to cause me serious bodily injury or death. I did not form a belief that I was responding as a police officer to a burglary, a home invasion, or any other crime I would respond to as a police officer. I was not on duty when I fired my service weapon. I reacted to what I perceived to be a life-threatening situation in my own home.

App. 1-2.

None of Ms. Guyger's prior statements (including her 911 call after the incident, her statements to first responders, and her police interviews) mentioned that she was acting in her capacity as a police officer or indicate any sort of thought process to infer that she was acting as an officer under color of law. Further, not even Ms. Guyger's criminal trial testimony lends support to any such assertion – in fact, it shows the exact opposite:

> Q. When you heard rustling inside as that door opened, did you stop and wait outside and think about what you were hearing?

9

A. No, I went in.

Q. How quickly was that happening?

A. Seconds.

Q. What was your thought when you thought you were going in your home and that door opened?

A. That somebody was inside.

*Q. Were you thinking as a policeman --*

*A. No.*

Q. -- answering a burglary call at all?

A. I was thinking I was relaxed right before, and all of a sudden, I come home, and then there's somebody inside my apartment. My heart rate just shot up.

Q. All these other things Mr. Hermus asked you about, about calling for backup or retreating to cover, any of that in your mind when you were face-to-face with this person you saw in the back?

A. No, it didn't. *It was -- I was going home. It wasn't a call.*

App. 186-87 (emphasis added).

To create a genuine issue for trial, the Response tries to impute thoughts and motives to Ms. Guyger based on rules and statutes for crimes she expressly disclaimed were ever part of her thought process when she entered the apartment. Yet, Plaintiffs understandably and illustratively failed to address whether Ms. Guyger considered the DPD's Use of Force regulations, which specifically exempt police officer status for the defense of one's own home: "Policy Restrictions - The restrictions of this policy shall not apply if an off-duty officer acts within the provisions of current state statutes to protect the employee's personal property. *In this case the officer is acting as a private citizen*." (App. 853) (emphasis added)).

In sum, the Response does not point to evidence that, in light of applicable case law, could allow a reasonable jury to find in their favor on the first element of their section 1983 claim, that Ms. Guyger acted under color of law when she shot and killed Mr. Jean. As a result, Plaintiffs' section 1983 claims fail as a matter of law.

**b. The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that the City <u>maintained unconstitutional policies</u> or was <u>deliberately indifferent</u> to constitutional rights. Therefore, summary judgment is proper on Plaintiffs' *Monell* claims against the City.**

Throughout this lawsuit, Plaintiffs' legal argument for why Ms. Guyger's shooting of Mr. Jean is attributable to the City's use of force policy and DPD's use of force training is as follows: Ms. Guyger testified that (1) she could not see Mr. Jean's hands; (2) her training told her that not being able to see a suspect's hands means they are very dangerous; so, (3) Ms. Guyger, therefore, fired her weapon 2-3 seconds after entering the apartment. *See* Resp. pp. 29-31. This theory amounts to a completely stolen base because there is no evidentiary nexus to link step (2) and step (3). In fact, there is a *complete absence of evidence* that the City has ever trained or permitted its officers generally – much less automatically – to discharge a firearm at a suspect when they cannot see their hands regardless of any other factors. In fact, as the City's Motion painstakingly explains, had Ms. Guyger followed the City's policy and training, she likely never would have shot Mr. Jean at all. Mot. pp. 48-49.

Regardless, other than inexplicably citing a handful of cases where courts mostly determined a DPD officer *did not* misuse force, the Response only provides weak conjecture and vague speculation about the training, oversight, and discipline of one person at the Dallas Police Department: Amber Rene Guyger. This is *respondeat superior* liability. This is what *Monell* strictly prohibits. This case must be dismissed.

**i. The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that the City <u>failed to train</u> its officers on constitutional uses of force.**

Plaintiffs do not dispute that the City requires its officers to complete one of Texas's longest – if not *the* longest – police training academies. Mot. pp. 23-24. Plaintiffs do not claim that

the City's training program is defective. Indeed, nothing in the evidence – or in Plaintiffs' Response or any of Plaintiffs' experts' reports – even implies that the City's overall training is anything but effective.

The Response's entire argument rests on *inferring* that Ms. Guyger was improperly trained, and imputing liability on the City based on performance inadequacies of that one police officer out of thousands. Because "[o]ne officer's unsatisfactory training will not establish municipal liability, because that individual's shortcomings or mistakes may have been caused by factors other than a deficient training program," even if Ms. Guyger was not properly trained, no *Monell* liability may attach to the City. *Morris v. Dallas Cnty.*, 960 F. Supp. 2d 665, 685 (N.D. Tex. 2013) (citation omitted).

### 1. The Response does not even criticize the City's training program.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*")). And it is in this "most tenuous" context that the Response makes the following key admission: "Plaintiffs do not criticize the general overall training of DPD; Plaintiffs' argument is that the *threat assessment training* received *by Defendant Guyger* was constitutionally inadequate." Resp. p. 31 (emphasis in original). In other words, Plaintiffs seek to hold the City liable for alleged deficiencies only *in Ms. Guyger's training*. United States Supreme Court and Fifth Circuit *Monell* law refuses to attach liability to a municipality for exactly what the Plaintiffs propose in their Response:

> That a particular officer may be unsatisfactorily trained will not alone

12

> suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989) (citations omitted).

To prevail on a *Monell* claim based on inadequate training, the Plaintiffs must show that a municipality's failure to train its employees in a relevant respect amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S., at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.,* at 389. And "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61–62 (citations omitted.) "And *City of Canton* admonishes that we must examine the evidence for deliberate indifference of the [municipality] and not be satisfied with mere negligence in failing to train." *Brown v. Bryan Cnty.*, OK, 219 F.3d 450, 459 (5th Cir. 2000).

Accordingly, a pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan*

*Cty.,* 520 U.S., at 409. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.,* at 407. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62 (citations omitted.)

As the Fifth Circuit has found, "[a] customary municipal policy cannot ordinarily be inferred from single constitutional violations." *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001) (citation omitted.) In sum, because "without more," "a city [would] automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior*." *Canton*, 489 U.S. at 387.

Here, the Response points to no evidence to even indicate Ms. Guyger received inadequate training. Instead, the Response makes offhanded critiques of the specific training Ms. Guyger received, but does not concretely point to anything specific about her training that was constitutionally inadequate, much less causal to the shooting at issue. Resp. pp. 31-33. The Response cites no expert testimony or case law that disputes or even implies that the amount of training hours and training content was anything less than professional and adequate to train officers not to misuse force. The Response does not compare the City's program (or what Ms. Guyger specifically received) with purported state or national "standards." The Response most certainly does not allege that the City's final policymakers had any information about Ms. Guyger that commanded additional action. Instead, as the competent summary judgment evidence record demonstrates, DPD provided adequate training to Ms. Guyger that included comprehensive and professional instruction on constitutional uses of force and also required her to implement her

14

training in real-world scenarios to ensure that she put that knowledge into practice. Mot. pp. 23-29.

As discussed below, even assuming that Ms. Guyger was improperly trained – which is completely belied by the evidence – the City cannot be held liable for one employee out of the many thousands it employs.

The Response seeks to hyper-granularize the alleged area of unconstitutional training into "threat assessment," which implies that it is somehow distinct from the broader use of force training that DPD officers receive. Resp. p. 31. Critically, the Response does not (and cannot) claim that Ms. Guyger received "no" threat assessment training. Nor does the Response specifically address the evidence that the City's training program instills, *inter alia*, the "Cover + Distance = Time" de-escalation designed to provide the opportunity to assess a potential threat:

> Proper use of cover (both physical barriers as well as having cover officers present) + keeping as much distance from the subject as the situation and environment allow = TIME. Time to assess the situation. Time to consider all available options. Time to coordinate a response with cover officers. Time to think and make a good decision instead of a rushed decision. Time to utilize lessor force options if appropriate ("talk the suspect into handcuffs," Taser utilization, 40mm less-lethal launcher utilization, etc.) The reasonableness of the action is based on the time available, the opportunity for performing the action and the facts apparent to the officer prior to and during the incident. When reasonable, under the totality of circumstances concerning time, distance, and cover, officers should gather information about the incident, assess the risks, assemble resources, attempt to slow momentum, and communicate and coordinate a response. Not every potentially violent confrontation can be de-escalated, but officers do have the ability to impact the direction and the outcome in many of the situations they handle, based on their decision-making and the tactics they choose to employ. Time buys options and generally brings resources. The end goal is to always try to successfully solve the problem with minimal force usage.

Mot. p. 26.

Nor does the Response offer countervailing evidence to criticize the DPD's Reality-Based Training program that places recruits in varying levels of threats (from the mentally ill to active

shooters) and requires them to "employ only the minimum force required to resolve the situation." Mot. p. 27.

Regardless, given that the Response makes no efforts to counter the City's Motion's extensive detailing of its advanced training procedures on the proper uses of force, Plaintiffs' failure to train claims fail at the outset.

### 2. The Response's "pattern of similar incidents" to show deliberate indifference neither constitutes a "pattern," nor consists of "similar incidents."

The Response does not challenge the City's Motion's methodology for determining potentially problematic officer-involved shootings, nor does the Response object to the final tabulation. *See* Mot. pp. 33-35 (calculating that the DPD had, at most, three problematic shootings from 2009-2019.) Instead, it cites <u>six</u> cases in an effort to show that the City has a pattern of improper uses of force. This is not evidence of deliberate indifference.

First, on its face, the slight number of incidents that Plaintiffs cite is fatal to their claim. For example, the Fifth Circuit found that in the city of Fort Worth, a much smaller municipality than Dallas,

> <u>27</u> incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*.

*Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851-52 (5th Cir. 2009) (emphasis added.)

The Response cites no case law holding that such a vanishingly small number of alleged uses of excessive force could ever constitute anything approaching a pattern of unconstitutional uses of excessive force. In fact, the Fifth Circuit has already found it cannot. *See, e.g. Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding that eleven incidents of warrantless

16

entry did not support a pattern of unconstitutional warrantless entry); *see also Moreno v. City of Dall.*, No. 3:13-CV-4106-B, 2015 WL 3890467, at *8–9 (N.D. Tex. June 18, 2015) (allegations of eight prior incidents in which police officers used excessive force were not sufficient to indicate a pattern).

Second, Plaintiffs inexplicably and confusingly rely on three cases that involve uses of force that either a jury or a judge in this Court determined were not unconstitutional. To wit, the Response cites a shooting involving Bertrand Davis. Resp. 34. On March 14, 2022, a jury found that Mr. Davis's constitutional rights were not violated. *Davis, et al. v. Terry*, 3:16-CV-2548 (N.D.Tex.) ECF No. 180. Likewise, the Response cites a shooting involving Genevieve Dawes and Virgilio Rosales. Resp. pp. 34-35. However, on August 11, 2022 in *Dawes et al. v. City of Dallas, Texas, et al.*, 3:17-CV-1424 (N.D.Tex.), Judge Starr granted the officers' summary judgment, finding they were entitled to "qualified immunity on the additional ground that they did not violate the Constitution." ECF No. 142 at 33-34. Further, the Response cites a shooting involving James Harper. Resp. p. 35. Again, a jury found that the officers in that case had not violated Mr. Harper's constitutional rights. *Harper v. City of Dallas, Texas, et al.*, 3:14-CV-2647 (N.D.Tex.) ECF No. 195.

The other three cases cited in the Response cannot be counted towards a legitimate pattern of unconstitutional acts, either. The Response cites a shooting involving Kelvion Walker. Resp. p. 36. That case resulted in a hung jury and the parties ultimately decided to settle rather than retry the case. *Walker v. Wilburn*, 3:13-cv-4896-K (N.D.Tex.) ECF Nos. 242, 266-67. The last two cases cited (McGee and Lyons) were investigated by the police department and it found no improper use of force. App. 10780; 10784-85.

Plaintiffs do not explain how the City's policymakers are supposed to even suspect – much

less be deliberately indifferent to – a custom of DPD officers misusing force against citizens based on three federal court findings of no unconstitutional use of force, one hung jury on misuse of force that ended in settlement, and two internal police investigations with no accompanying lawsuits alleging unconstitutional force. The Response does not cite any case law finding that an essentially unbroken record of *constitutional* uses of force suffice to establish a policymaker's deliberate indifference. The Response's arguments that, in fact, these six incidents were misuses of force is based on conjecture belied by judicial determinations and uncontroverted investigations.

In this context, it is illustrative that in *Pineda,* the Fifth Circuit held that eleven incidents of alleged warrantless entry did not support a pattern of constitutional violations. The court noted that in each of those eleven incidents, the officers had claimed either consent or exigent circumstances. 291 F.3d at 329 n. 12. The court observed that "[e]leven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces." *Id.* at 329. Here, Plaintiffs offer six incidents with essentially *unequivocal* evidence of Fourth Amendment *compliance* in one of the Nation's largest cities and police forces.

Because the Response fails to point to evidence sufficient to establish a pattern of unconstitutional acts, no reasonable jury could find the City maintained an unconstitutional policy on use of force or insufficient training, supervision, or discipline regarding the Fourth Amendment and its prohibitions against excessive use of force during seizures. Because Plaintiffs cannot meet the elements necessary to establish unconstitutional policies or deliberate indifference, the City is entitled to summary judgment.

### 3. The Response's reliance on the "single-incident exception" is unavailing.

To reiterate, a plaintiff normally must allege a "pattern of similar constitutional violations

by untrained employees" to show a policymaker acted with deliberate indifference. *Connick*, 563 U.S. at 62. But where, as in this case, a plaintiff does not allege such a pattern, it is still possible to establish deliberate indifference through the single-incident exception. *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018). The single-incident exception is "extremely narrow." *Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010). The "plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered." *Id.* (cleaned up). For a violation to be "highly predictable," the municipality "must have failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624-25 (5th Cir. 2018) (cleaned up). Critically, the single-incident exception "is generally reserved for those cases in which the government actor was provided *no training whatsoever*." *Pena*, 879 F.3d at 624 (emphasis added.)

Here, the Response does not allege – and the Plaintiffs point to no evidence to show or to raise a genuine issue of material fact – that the government actor, Ms. Guyger, received "no training." To the contrary, as detailed in the City's Motion, Ms. Guyger received 1,714 hours of training, a substantial amount of which was devoted to the proper use of force. Mot. p. 28.

Regardless, the Court should reject Plaintiffs' attempt to pigeonhole the single-incident exception to the facts of this case because it simply was not "highly predictable" that one of the City's off-duty employees would (1) inadvertently or mistakenly walk into someone else's apartment; (2) within seconds of entering pull her firearm; and (3) use her duty weapon to shoot an understandably-agitated resident whom she perceived was an immediate threat to her safety. The Response cites no case law, and the City is unaware of any, where this scenario has ever even happened once, much less any case law or even news reports that show the circumstances at bar

19

constitute a "situation[] that a particular employee is certain to face." *Littell*, 894 F.3d at 624 (cleaned up.)

Therefore, because Ms. Guyger received extensive training and the tragic shooting of Mr. Jean was in no way predictable, Plaintiffs cannot avail themselves of the "extremely narrow" exception to the general requirement of a pattern of similar unconstitutional acts.

> ### ii. The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that the City <u>failed to supervise or discipline</u> its officers on constitutional uses of force.

The Fifth Circuit has "extended *City of Canton* to cover a plaintiff's allegations that the municipality failed to properly discipline its employees." *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3. at 581) ("Self-evidently, a City policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens."). The Supreme Court has made clear that a plaintiff can prove the existence of a municipal policy like failure of supervision through, *inter alia,* the actions of the municipality's legislative body or an individual with final decisionmaking authority. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986). A plaintiff can also prove the existence of a municipal custom by pointing to a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc). Here, the Response does not allege that any relevant written policies are unconstitutional; so, Plaintiffs must rely on a "persistent, widespread" practice of failure to discipline. No such practice exists.

> ### 1. Ms. Guyger's prior use of force incident cannot constitute deliberate indifference in failing to supervise.

As shown above, the Response does not cite anything approaching a pattern of City

employees committing unconstitutional levels of force, but instead, six cases showing *proper* uses of force. Rather, the Response points to one event as evidence of the City's failure to supervise Ms. Guyger – but no one else – from a prior shooting Ms. Guyger was involved in. Resp. pp. 38-42. The City's Motion detailed how that incident was thoroughly investigated and no misuse of force was found. Mot. pp. 36-39.

At the outset, even assuming Ms. Guyger had previously misused force – which is not in evidence – the Response cites no case law that a large municipality can be held liable under *Monell* for failing to discipline one of its employees for a single prior incident. In fact, the Fifth Circuit has specifically found that "[a] custom or policy authorizing or encouraging police misconduct *cannot* be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278–79 (5th Cir. 1992) (cleaned up) (emphasis added); *see also Peterson*, 588 F.3d at 849-50 (rejecting failure to supervise claim for "failure to reprimand one officer for an instance of faulty recordkeeping would not alone raise a genuine issue of material fact on whether the obvious and 'highly predictable consequence of the department's actions was that citizens' Fourth Amendment rights would be violated.")

In rare cases, the hiring and lack of supervision of one employee can impose liability on an entire municipality; but that decision must originate from a policymaker, not a decisionmaker. For example, in *Brown*, the Fifth Circuit found *Monell* liability could attach to a county for the "provision of *no* training (and *no* supervision)" by its sheriff, "admittedly a policymaker," who himself hired an untrained officer via a family connection even though he knew the officer had a history of violence. *Brown*, 219 F.3d 450, 453; 462 (5th Cir. 2000) (emphasis in original.) As detailed in the City's Motion, however, the Dallas City Council is the City's policymaker. Mot.

17-19. As recently as 2016, the Fifth Circuit reiterated that by "consulting [its] binding precedent," it again found that "under Texas law, the final policymaker of the city of Dallas is the Dallas city council." *Groden v. City of Dallas, Texas*, 826 F.3d 280, 286 (5th Cir. 2016) (citing *Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 550 (5th Cir. 2008)). And there is no evidence in the record – and the Response does not argue – that the City Council even knew who Ms. Guyger was prior to the shooting of Mr. Jean, much less had any sort of hiring and supervision role like the sheriff in *Brown*. In other words, Plaintiffs have failed to point to any evidence, because there is none, connecting the City's policymaker with the specific decisions to hire, train, oversee, and discipline Ms. Guyger.

Therefore, given that the Response only directs this Court to one incident involving Ms. Guyger in which it seems to claim improper oversight, Plaintiffs' supervision and discipline claims fail.

### 2. Even the Response does not fully claim Ms. Guyger's prior use of force was unconstitutional.

Leaving out the black letter *Monell* law that requires a pattern or direct policymaker involvement, neither Plaintiffs' experts nor Plaintiffs in their Response unequivocally claim that Ms. Guyger previously misused force. Instead, the Response attempts to "Monday-morning-quarterback" the *internal police investigation* of Ms. Guyger's prior use of force incident, *implying* that there *may* have been a misuse of force there. The Response points to alleged "discrepancies in the DPD investigation," arguing that such a "deficient" single investigation "aided" Ms. Guyger "by not fully uncovering her tactical deficiencies *or* fully investigating identified discrepancies" of an officer on scene. Resp. p. 40 (emphasis added). This single event, along with some unrelated administrative issues with TASER training, the Response claims, should "have informed policy makers [sic], including those at the DPD and on the Dallas City Council, that DPD officers were

not properly trained in the use of force" a year and a half prior to the shooting of Mr. Jean. *Id*. pp. 40-41.

The Response's failure to supervise argument is not based on a pattern of unconstitutional acts or deficiencies in the oversight process explained in the Motion. Instead, the argument is founded on the theory that Ms. Guyger may have previously misused force on one occasion while on-duty responding to a call in which a suspect grabbed her TASER, which the City Council should have known about but did nothing, which, in turn, allowed Ms. Guyger to use her firearm to shoot Mr. Jean in an apartment that she mistakenly believed to be her own a year and a half after the prior incident. This type of speculation mixed with leaps in logic is insufficient to hold the City liable based on a theory of *Monell* liability.[2]

> **c.   The Response points to no evidence in the record or supporting case law that creates a genuine issue of fact that any City policies were the <u>moving force</u> behind the shooting of Mr. Jean. Therefore, the City is entitled to summary judgment on Plaintiffs' *Monell* claims.**

Plaintiffs must meet a heightened standard of causation to hold a municipality liable under section 1983. *See City of Canton*, 489 U.S. at 391–92. "The causal connection required for *Monell* liability is demanding." *Mansfield v. Williamson Cnty.*, 30 F.4th 276, 279 (5th Cir. 2022). The Fifth Circuit requires that the municipality's failure be the "moving force" that caused the specific constitutional violation. *Bryan County,* 219 F.3d at 461. In other words, the plaintiff must establish a "direct causal link" between the municipal policy and the constitutional injury. *Brown,* 520 U.S. at 404. "We have said that the connection must be more than a mere 'but

---

[2] All evidence in this case points to Ms. Guyger's making a tragic, momentary decision to shoot a man she thought was in her apartment. As such, it is noteworthy that even under Texas state tort law, the City likely would not be liable for Ms. Guyger's acts. Ms. Guyger was not on duty and the shooting was later adjudicated to have been murder.  "In cases involving assault, to impute responsibility for such intentional acts to an employer, it is incumbent upon the plaintiff to prove the assault was closely connected with the servant's authorized duties, and not the result of personal animus." And "[a]ssault is usually the expression of personal animosity and is not for purposes of carrying out the employer's business." *Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214, 231 (Tex. App. 2021) (cleaned up.)

for' coupling between cause and effect. The deficiency in training must be the actual cause of the constitutional violation." *Valle*, 613 F.3d at 546. As part of its Motion, the City moved for summary judgment on all elements of Plaintiffs' *Monell* claims – causation included. *See* Mot. pp. 45-50. Conspicuously absent from the Response is any attempt to formally address this necessary element. On this basis alone the Court should grant the City summary judgment on Plaintiffs' *Monell* claims against it.

Rather than repeat its causation arguments, the City refers the Court to its Motion, Mot. pp. 45-50, where it specifically identified not only the absence of facts in the record that could show that a City policy or practice could have caused Mr. Jean's death, but facts that show the opposite: Ms. Guyger's Declaration that no City policy caused her to shoot Mr. Jean; the City's robust training and oversight processes that instilled proper use of force and then closely monitored its use to mete out discipline; and the exemplar investigation into Ms. Guyger's prior shooting where multiple agencies thoroughly reviewed available facts and interviewed witnesses of the incident. *Id*.

Further, as the City notes in its Motion, even Plaintiffs' own proposed force expert opined: "*Opinion No. 1: The use of deadly force by Officer Guyger was inconsistent with her use-of-force training and DPD departmental policy and was therefore excessive under the circumstances*." Mot. p. 19 (emphasis in original) (citing App. 10637.) Indeed, because Plaintiffs have failed to point to any evidence to establish or raise a genuine issue for trial that the City had a pattern or widespread practice of misuse of force or that its employees violated City policy and training on use of force, no reasonable jury could find that the City Council was the cause of Plaintiffs' injuries.

Lastly, the City is unaware of any case law throughout the federal court system where a

municipality has been found liable for causing injuries arising from an off-duty shooting in a private circumstance like the one at bar. In fact, in *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago,* a closely analogous case, the Seventh Circuit recently reversed a $44.7 million judgment against the city of Chicago:

> Patrick Kelly shot his friend Michael LaPorta in the head during an argument at the end of a night of drinking together. LaPorta's injuries left him severely and permanently disabled. Kelly, a Chicago police officer, was off duty and not acting under color of state law at the time of the shooting. LaPorta nevertheless sued the City of Chicago under 42 U.S.C. § 1983 . . .
>
> The theory of the case was novel. LaPorta claimed that the City had inadequate policies in place to prevent the shooting—or more precisely, that the City's policy failures caused Kelly to shoot him. He identified several policy shortcomings: the failure to have an "early warning system" to identify officers who were likely to engage in misconduct, the failure to adequately investigate and discipline officers who engage in misconduct, and the perpetuation of a "code of silence" that deters reporting of officers who engage in misconduct.
>
> . . .
>
> We reverse. LaPorta's injuries are grievous, but his legal theory for holding the City liable is deeply flawed. Whatever viability it might have had under state tort law . . . it has no foundation whatsoever in constitutional law. When Kelly shot LaPorta, he was not acting as a Chicago police officer but as a private citizen. [ ] We remand with instructions to enter judgment for the City.

*First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 982–83 (7th Cir.) (citation omitted.)

Because Plaintiffs have not identified any evidence in the record that could lead a reasonable jury to find any City policy was the "moving force" behind Mr. Jean's death, the City is entitled to summary judgment.

## III.   CONCLUSION

For the reasons stated in its opening summary judgment motion and supporting brief and in this reply brief, the City is entitled to summary judgment on all of Plaintiffs' claims against it.

**CERTIFICATE OF SERVICE**

   I certify that on February 24, 2023, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means. I further certify that on the same day I mailed a copy of this Motion via First Class mail to the following address:


    Amber Guyger
    #02283505
    TDCJ Mountain View Unity Law Library
    2305 Ransom Road
    Gatesville, TX 76528-2962



           *s/ J. Cheves Ligon*
           Senior Assistant City Attorney