IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BERTRUM JEAN, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:18-cv-02862-M-BH |
| AMBER GUYGER, et al., | § § § | |
| Defendants. | § § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court in this civil action under 42 U.S.C. § 1983 are Motions to Bifurcate (ECF No. 165), to Exclude Experts (ECF Nos. 160–64), and for Summary Judgment (ECF No. 166) filed by the City of Dallas (the "City"). On August 23, 2023, the Court heard argument on the pending Motions. For the following reasons, the Court **GRANTS** the City's Motion for Summary Judgment and **DENIES AS MOOT** its other Motions.

**I.   Background**

   **A.  Botham Jean's Murder**

On September 6, 2018, at approximately 9:30 p.m., Officer Amber Guyger clocked out of her work shift at the Dallas Police Department ("DPD") headquarters. Wearing her police uniform, she drove to the Southside Flats Apartment Complex, where she lived on the third floor in apartment 1378. At about 9:41 p.m., she parked on the fourth floor of the apartment complex's parking garage. She then walked past approximately fifteen fourth-floor apartments before arriving at number 1478, Botham Jean's apartment. Guyger opened the door to Mr. Jean's apartment and allegedly believing an intruder to be in her apartment, fired two rounds at him, using her duty weapon. Mr. Jean died in the hospital.

1

There is no bodycam, other video, or any type of recording of the shooting. The evidence of what happened comes primarily from Guyger's testimony at her state criminal trial, after which she was convicted of Botham Jean's murder.

Relying on the trial testimony and physical evidence, Plaintiffs contend Guyger knew before she entered Mr. Jean's apartment that it was occupied. She had her duty weapon drawn and looked to "find that threat." The City's App'x at 112:14–16.[1] She stood in the doorway, located the "threat," and—Guyger claims—shouted: "let me see your hands, let me see your hands," while pointing her weapon at Mr. Jean. *Id.* at 113:17–19, 116:13–14. Plaintiffs contend Guyger either gave the "let me see your hands" command, or she shot Mr. Jean because she could not see his hands, all due to her DPD training.

Plaintiffs also allege the City had an unconstitutional policy of training officers to equate not being able to see a suspect's hands with that suspect presenting a lethal threat, so that officers would be authorized to use deadly force in non-deadly circumstances.

**B.  The City's Officer Training**

DPD recruits must pass a psychological exam and background investigation before entering the Police Academy's twenty-week session, which is comprised of weekly testing on the penal code and training on criminal procedure, constitutional law, use of force, conflict resolution and de-escalation, vehicle operations, and defensive tactics. *Id.* at 26–28. Only after they pass the Texas Commission on Law Enforcement's licensing exam do recruits move into an eighteen-week reality-based training. Totaling thirty-eight weeks, the length of the City's police training program is at the top of the list of other Texas cities. After graduation from the Police Academy, recruits have twenty-four weeks of field training, which is graded daily. If a recruit

---

[1] The City did not upload its appendix to ECF, instead providing it in a flash drive to the Clerk of Court.

2

does not satisfy the training requirements, the recruit is placed in remedial training, which can lead to termination if improvement does not follow. Once a recruit passes field training, then the recruit becomes a probationary police officer for six months. For the first eight weeks of the probationary period, the probationary officer must ride with another non-probationary officer. Ongoing training continues. After the probationary period, officers must complete forty hours of additional training every two years.

The City's written policies on the use of deadly force are set out in General Order 906, which provides the following for the "philosophy" of the use of deadly force:

> B. Protection of human life is a primary goal of the Police Department; therefore, police officers have a responsibility to use only the degree of force necessary to protect and preserve life.
>
> C. Deadly force will be used with great restraint and as a last resort only when the level of resistance warrants the use of deadly force. The Dallas Police Department places a greater value on human life than on the protection of property; therefore, the use of deadly force is not allowed to protect property interests.

*Id.* at 853. After describing this philosophy, General Order 906 provides the following Use of Deadly Force Policy:

> A. Justification for the Use of Deadly Force - In all situations, justification for the use of deadly force must be limited to the facts reasonably apparent to the officer at the time the officer decides to use the force.
>
> . . .
>
> C. Avoiding the Use of Deadly Force
>
> > 1. At the point when an officer should reasonably perceive the potential exists that deadly force may be an outcome of any situation, the officer must use reasonable alternatives if time and opportunities permit. The reasonableness of the action is based upon the time available, the opportunity of performing the action, and the facts apparent to the officer prior to and during the incident.
> >
> > 2. Planned and supervised hazardous entry situations are recognized as meeting the requirements of reasonable alternatives above.

3

> 3. Officers will not fire their weapons under conditions that would unnecessarily subject bystanders or hostages to death or possible injury except to preserve life or to prevent serious bodily injury.
>
> D. Authorization to Use Deadly Force - Officers will only use deadly force to protect themselves or another person from imminent death or serious bodily injury.
>
> . . .
>
> H. Policy Restrictions - The restrictions of this policy shall not apply if an off-duty officer acts within the provisions of current state statutes to protect the employee's personal property.  In this case the officer is acting as a private citizen.

*Id.* (cleaned up).

The City trains its officers on the concept of "Cover + Distance = Time." *Id*. at 23–24. "Cover" means using physical barriers and "having cover officers present."  "Distance," in light of situation and environment, means utilizing the maximum distance from a suspected hostile threat.  "Time" means taking time to assess the situation, consider all available options, coordinate a response with cover officers, think and make a good, unrushed decision, to utilize lesser force options, such as handcuffs or a taser.

In support of the City's summary judgment motion, Guyger's training officer submitted a declaration that Guyger satisfied the City's training standards, including safe weapons handling, that she showed no sign of behavioral problems or temperamental concerns, and that she passed tests showing an ability to use minimum force to resolve a conflict.  *Id*. at 24–25.  Guyger completed a total of approximately 1,714 hours of training, including on de-escalation.  *Id*. at 1587.

### C.  The City's Officer-involved Shootings

The declaration of Internal Affairs Division Lieutenant Matthew Allie described the City's process for investigating officer-involved shootings.  *Id*. at 3–20.  The DPD's Special Investigations Unit investigates whether the officer committed a crime by reviewing the scene,

talking to witnesses, and reviewing evidence, and then prepares a report. Each shooting case is submitted to a Grand Jury. The Special Investigations Unit may file criminal charges against the officer.

Separately, the DPD's Internal Affairs Division investigates every shooting, which culminates in a report from an Internal Affairs Division investigator, which ultimately goes to the Internal Affairs Division Commander. If after the officer has an opportunity to rebut the findings, wrongdoing has been found, the Internal Affairs Division conducts an evidentiary hearing. The Bureau Commander then renders a disciplinary decision. If the decision is for discharge, then a hearing is held before the Chief of Police, who decides the matter.

The City produced ten years of records of officer-involved shootings. *Id*. at 17–20. From 2009–19, 158 total firearm discharge incidents occurred which involved a citizen, all of which were by officers on duty. Four were found to have violated the DPD deadly force policy, which resulted in officer termination or suspension.

### D. Guyger's Previous Use of Deadly Force, Other Incidents, and Social Media

On May 12, 2017, about sixteen months before her fatal encounter with Botham Jean, Guyger and her partner, Officer Rivera, responded to a request for assistance in identifying a possible parole violator in a car. *Id*. at 6789–6917, 9919–10062. After the suspected parole violator exited the vehicle, contrary to the officers' instructions, Rivera attempted to frisk the suspect, Perez, and the two then wrestled to the ground. *Id*. at 6803, 9933. While attempting to handcuff Perez, Guyger claimed she saw Perez reach for his pocket, which she thought might contain a weapon. *Id.* She tased Perez twice, and he then took her taser. *Id.* Perez claimed he immediately threw the taser under the vehicle. *Id*. at 6795, 9925. Perez stated that Rivera told Guyger not to shoot Perez because he no longer had the taser, but Guyger drew her weapon and

5

shot Perez. *Id.* The video recording of the incident is in the record but does not show clearly who said what or where the taser was.[2] Rivera's internal statement on the incident stated he "yelled for Officer Guyger to 'shoot him,' because he was in fear for the life of Officer Guyger and himself" and that Rivera only realized Perez did not have the taser after he had been shot. *Id.* at 6792, 9922. The City's Internal Affairs Division found the shooting justified. *Id*. at 6804, 9934. Plaintiffs allege that the investigation revealed inconsistencies that were not properly resolved, and that the shooting forewarned of Guyger's proclivity to use unconstitutional deadly force.

Guyger received four instances of discipline for on-duty violations of DPD rules. *Id*. at 1578–85. They involved deactivating cameras before the completion of an incident and not utilizing lights and sirens when pursuing a homicide suspect. Plaintiffs' Second Amended Complaint separately includes details of Guyger's social media activity with posts including statements like "[p]eople are so ungrateful. No one ever thanks me for having the patience not to kill them." ECF No. 122 ¶ 36. Plaintiffs did not brief those incidents or Guyger's four on-duty violations of DPD Rules in response to the City's Motion for Summary Judgment, so the Court does not consider them here.

### E. Alleged Similar Incidents

Plaintiffs point to the following six incidents where DPD officers used deadly force when they were unable to see a suspect's hands to establish an alleged pattern of unconstitutional actions by the City's officers:

---

[2] Plaintiffs submitted the video recording by flash drive. ECF Nos. 201, 203 (providing "Exhibit 1: Body Worn Camera Video of Perez Incident (0569)"). The video shows that from 1:40–7:35, at critical moments, Guyger's body cam fell off so that the video only shows the ground and sound quality is diminished.

1. On July 24, 2012, officers responded to a call stating that five to six men with guns were moving a bound man. ECF No. 200 at 491. After arriving, officers engaged in a foot pursuit, and shot and killed a fleeing suspect when he reached toward his pocket. *Id.* at 491–510. No gun was found. A jury found no violation of the decedent's constitutional rights, and judgment was entered accordingly. *Harper, et al. v. City of Dallas, Tex., et al.*, Case No. 3:14-cv-2647-M (N.D. Tex.) ECF No. 195.

2. On November 25, 2012, police investigated racing vehicles and after approaching one of the vehicles, the officers allegedly saw the vehicle's passenger move around in the car without showing his hands. ECF No. 200 at 523–32. The officer fired his weapon, but apparently no one was injured. The City's App'x at 8155. The City's reply explains that the DPD investigated and found no improper use of force. *See id.* at 8154–56.

3. On December 9, 2013, officers tracked a stolen vehicle. ECF No. 200 at 533. The driver jumped out of the moving vehicle, leaving a passenger in the car. *Id*. at 552. One of the officers stated he could see only one of the passenger's hands. *Id.* The passenger contended both of his hands were raised in the air. *Id*. at 534. The officer shot the passenger. *Id*. at 552–53. No weapon was found in the car where the passenger allegedly concealed his hand. *See generally id*. at 533–59. The case was tried to a jury and then settled after the jury failed to return a verdict. *Walker v. Wilburn*, Case No. 3:13-cv-4896-K (N.D. Tex.) ECF Nos. 242, 266–67.

4. On October 22, 2014, in response to an alarm, an officer found two suspects inside a business. ECF No. 200 at 511. One fled. *Id.* The officer stated the other suspect reached toward his waistband and assumed a shooting stance, at which point the officer

7

shot him. *Id.* The City's reply states that the DPD investigated and found no improper use of force. *Id.* at 521.

5. On August 27, 2015, a DPD Senior Corporal shot and killed a robbery suspect who ran away after being tased, and then appeared to reach for a gun. *Id.* at 398. A BB gun was found. *Id.* at 417. A jury found no violation of constitutional rights of the decedent. *Davis, et al. v. Terry*, Case No. 3:16-cv-2548-L (N.D. Tex.) ECF No. 180.

6. On January 18, 2017, officers responded to a suspicious person call relating to a vehicle reported stolen. ECF No. 200 at 466. After the officers gave commands for the occupants to exit the vehicle, the car began to move in reverse. *Id.* at 467. The officers fired thirteen shots at the car, killing one. *Id.* at 474, 479. A court granted the officers summary judgment on qualified immunity grounds. *Dawes, et al. v. City of Dallas, Tex., et al.*, Case No. 3:17-cv-1424-X (N.D. Tex.) ECF No. 142. An appeal is pending.

## II.     Legal Standard and Analysis

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue for trial. *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The movant's burden can be satisfied by demonstrating that there is an absence of evidence to support the nonmoving party's case, which the nonmovant bears the burden of proving at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its initial burden, the nonmovant must show that summary judgment is not proper. *Edwards v. Oliver*, 2021 WL 6884649, at *4 (N.D. Tex. Nov. 24, 2021), report and recommendation adopted, 2022 WL 447085 (N.D. Tex. Feb. 14, 2022), aff'd sub nom. *Edwards v. City of Balch Springs, Texas*, 70 F.4th 302 (5th Cir. 2023) (citing

*Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992) (further citations omitted)). The party opposing the summary judgment motion must identify specific evidence in the record and state the precise way that evidence supports the party's claim. *Id*. (citing *Ragas v. Tenn. Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1988)). All evidence must be viewed in the light most favorable to the party opposing the summary judgment motion. *Id*.

Plaintiffs' Second Amended Complaint pleads three claims against the City: failure to train on threat assessment, failure to train on the use of force, and failure to adequately supervise/discipline. The Court first discusses municipal liability and then addresses Plaintiffs' failure to train claims to the extent that the law governing such claims differs from municipal liability. Finally, the Court addresses Plaintiffs' failure to supervise/discipline claim. The Court assumes, without finding, that Guyger acted under color of law.

### A. Municipal Liability

A plaintiff may sue a municipality for a violation of federal rights committed pursuant to a statute, ordinance, regulation, custom, or usage. *Edwards*, 70 F.4th at 307 (citing 42 U.S.C. § 1983). The plaintiff must identify a federal right that was violated "pursuant to an official municipal policy." *Id.* This claim, also known as a *Monell* claim, requires (1) an official policy, (2) promulgated by the municipal policymaker, (3) that was the moving force behind the violation of a constitutional right. *Id*. "Municipalities are not liable 'on the theory of respondeat superior' and are 'almost never liable for an isolated unconstitutional act on the part of an employee.'" *Hutcheson v. Dallas Cnty*., 994 F.3d 477, 482 (5th Cir. 2021) (quoting *Peterson v. City of Fort Worth, Tex*., 588 F.3d 838, 847 (5th Cir. 2009)).

#### 1. Official Policy

An official policy can arise in various ways. *Gomez v. Galman*, 18 F.4th 769, 777 (5th Cir. 2021); *Peterson*, 588 F.3d at 847; *James v. Harris Cnty*., 577 F.3d 612, 617 (5th Cir. 2009).

9

It may be a written policy, or an unwritten custom manifested in a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Galman*, *supra*, at 777.  A custom may be shown that "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson*, 588 F.3d at 850 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984), on reh'g, 739 F.2d 993 (5th Cir. 1984)).  That custom arises from a pattern that requires similarity and specificity pointing to the violation in question.  *Peterson*, 588 F.3d at 850–51; *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).  A pattern arises from a sufficient number of prior similar instances.  *Peterson*, 588 F.3d at 852 (twenty-seven alleged similar incidents did not suffice to establish a pattern); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (eleven alleged similar incidents did not suffice to establish a pattern).

The Second Amended Complaint alludes to thirty-six incidents from 2002 through July 2013 and twenty-one incidents in the six years preceding Botham Jean's death during which DPD officers discharged their weapons at unarmed individuals.  For summary judgment, however, Plaintiffs briefed only six incidents and claim they establish a pattern.  Given Fifth Circuit precedent, those six incidents are insufficient to establish a pattern.  From 2008–19, the DPD began and ended each year with over 3,000 officers.  The City's App'x at 20.  In that time, those officers dealt with, on average, 138,855 traffic stops and 698,501 calls for service annually. *Id.* at 19.  In *Peterson*, where twenty-seven similar incidents were alleged, the Fifth Circuit held that for a police force of 1,500 officers that faced 67,000 incidents of crime in the year before the

court's holding, twenty-seven incidents did not reflect a pattern for *Monell* purposes. *Peterson*, 588 F.3d at 851–52.

Further, the six incidents, even if sufficient in number to establish a custom, also do not, on their facts, establish a pattern of officers equating not being able to see a suspect's hands with that suspect presenting a lethal threat, so that officers would consider themselves authorized to use deadly force in non-deadly circumstances. The officers in the six incidents—all of whom were on duty during the incident—faced some combination of responding to a reported crime, fleeing suspects, and moving vehicles. Additionally, the suspect's hands were either obscured or moving in a way perceived to be threatening.

Those six incidents are significantly different from this case. At 9:41 p.m. on September 6, 2018, Guyger was not responding to any report of criminal activity; nor was she in pursuit of any suspect. She was off-duty and outside a unit at her apartment building. No threat presented by Mr. Jean had been communicated to Guyger by anyone else. Thus, the other incidents on which Plaintiffs rely are simply too dissimilar to establish a pattern. And without a custom or practice, the evidence is insufficient to raise a genuine issue as to whether the City had a policy of allowing officers to use deadly force when they could not see a suspect's hands.

### 2. Promulgated by the Municipal Policymaker

Plaintiffs also have not shown that the alleged policy was promulgated by the municipal policymaker, the Dallas City Council.[3] This requirement requires actual or constructive knowledge of the policymaker:

> Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had

---

[3] Plaintiffs adequately plead that the City Council was the City's policymaker and the City does not contest that. The Court finds that Plaintiffs adequately plead the City Council as the City's policymaker for it to consider the merits of Plaintiffs' claims.

> properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Pineda*, 291 F.3d at 330 (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)).

Plaintiffs do not provide evidence that the City Council had actual or constructive knowledge of an alleged policy regarding deadly force being employed when a person did not show his hands. Plaintiffs' brief suggests only that the City Council had knowledge of Guyger's shooting of Perez, asserting that: "this incident should have informed policy makers, including those . . . on the Dallas City Council, that DPD officers were not properly trained in the use of force as of May 2017." There is insufficient proof that the City Council knew of Guyger's shooting of Perez, but even if it did, there is no evidence of a policy or custom arising from that shooting.

### 3.  Moving Force

Because the Plaintiffs did not prove a policy promulgated by the City that Guyger followed, the Court need not address whether there was a policy of the City Council that was the moving force behind Botham Jean's murder.

### B.  Failure to Train

The Fifth Circuit recently explained:

> To succeed [on a failure to train claim], the plaintiff must demonstrate that: (1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

*Edwards*, 70 F.4th at 312 (internal citations and quotations omitted). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

### 1. The City's Training

As to the first element, "when officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381–82 (5th Cir. 2010) (citing *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)). The City's officers received training beyond what Texas law requires under the longest training program in the state. Officers are taught the philosophy that prioritizes the protection of human life as its "primary goal," are admonished to limit use of deadly force based on the facts presented and learn the Cover + Distance = Time formula. Use of deadly force merely to protect personal property is expressly unacceptable. Plaintiffs, who confine their arguments about the inadequacy of the City's training to the individual training received by Guyger, have not shown why the City's training, which exceeds the legal minimum, was inadequate. *Speck v. Wiginton*, 606 F. App'x 733, 736 (5th Cir. 2015) ("Complaints typically satisfy the first element by alleging facts related to the locality's actual training program.") (citing *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003).

### 2. Deliberate Indifference

To establish deliberate indifference, Plaintiffs' arguments toggle between alleging a pattern of similar constitutional violations and single-incident liability. *Hutcheson*, 994 F.3d at 482 ("To show deliberate indifference, a plaintiff normally must allege a pattern of similar constitutional violations by untrained employees. But where a plaintiff does not allege such a pattern, it is still possible to establish deliberate indifference through the single-incident exception.") (quotations and citations omitted). Early in their failure to train argument, Plaintiffs admit they "do not criticize the general overall training of DPD." ECF No. 199 at 31.

The single-incident exception to the policy requirement "is extremely narrow . . . ." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (citations omitted). It requires proof that the highly predictable consequence of a failure to train would result in the specific injury suffered and proof of the possibility of "recurring situations that present an obvious potential for violation of constitutional rights . . . ." *Id*. at 549 (quotation and citations omitted). It is generally reserved for "cases in which the government actor was provided no training whatsoever." *Edwards*, 70 F.4th at 313 (quotation and citation omitted).

Guyger went through the longest training program in Texas, was taught the primary goal of protecting human life, was admonished to limit use of deadly force, and instructed that use of such force to protect personal property was unacceptable. She was taught Cover + Distance = Time. Plaintiffs offer no evidence of a failure to train nor that Guyger's shooting of Mr. Jean was a "highly predictable consequence" of her training. *Valle*, 613 F.3d at 549.

### C. Failure to Supervise/Discipline

Plaintiffs' failure to supervise/discipline argument is based on Guyger's prior shooting of Perez. The elements of a failure to supervise/discipline claim are the same as those for failure to train. *Edwards*, 70 F.4th at 312.

Following the shooting of Perez, the Special Investigations Unit and the DPD's Internal Affairs Division conducted investigations. These processes involved several layers of review and opportunities for criminal charges and officer discipline if justified. The City's Internal Affairs Division found the shooting justified. The City's App'x at 6804, 9934. Although Plaintiffs contend the investigation revealed inconsistencies that were not properly resolved,

Plaintiffs fail to present evidence that Guyger's shooting of Mr. Jean was a highly predictable consequence of either her shooting of Perez or the City's investigation/discipline of that shooting. *Valle*, 613 F.3d at 549. This claim also suffers from the deficiency identified in the municipal liability analysis, in that there is no evidence the City Council had actual or constructive knowledge of Guyger's shooting of Perez.

### D. Ratification

The Second Amended Complaint alleges that the City ratified Guyger's use of excessive and deadly force, but Plaintiffs did not brief this argument on summary judgment, so it was abandoned. *See Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020). In any case, Guyger was terminated within days of shooting Mr. Jean, so the City did not ratify Guyger's conduct as a matter of law.

## III. Conclusion

The Court **GRANTS** the City's Motion for Summary Judgment and **DENIES AS MOOT** all of its other pending motions.

**SO ORDERED**.

September 29, 2023.

*[signature: Barbara M. G. Lynn]*
BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE