IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BERTRUM JEAN, Individually and as the surviving father of BOTHAM SHEM JEAN, ALLISON A. JEAN, Individually and as the § surviving mother of BOTHAM SHEM JEAN, and ALLISA E. FINDLEY as the Administrator of the Estate of BOTHAM SHEM JEAN,<br>　　　　Plaintiffs,<br><br>v.<br><br><br>AMBER GUYGER,<br>　　　　Defendant. | § § § § § § § § § § § § § § § § | CIVIL ACTION NO.<br><br>3:18-CV-2862 |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I. **Plaintiffs' Proposed Findings of Fact**

1. Jean was killed as a direct result of Defendant Guyger's use of force.

2. Defendant Guyger's use of force was clearly excessive and clearly unreasonable because Jean had been watching television in his own apartment, did not have a weapon, never made any threatening gestures toward Defendant Guyger, and did not pose an immediate threat—or any threat whatsoever—to the safety of Defendant Guyger or others.

3. Defendant Guyger was not provoked when she fired twice into an occupied residence for no lawful or justifiable reason.

4. Jean died as a result of a gunshot wound to his chest.

5. The excessive and deadly force used by Defendant Guyger was not reasonable or justified, nor was it necessary under the circumstances.

6. Defendant Guyger's actions were not objectively reasonable because Jean did not pose an immediate risk of serious physical harm to Guyger or any other person.

7. Defendant Guyger embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact, did cause Jean to suffer extreme and severe physical, mental and emotional distress, agony and anxiety.

8. In Texas, it is well established that an off-duty officer can still be engaged in the lawful discharge of his duties as a Texas peace officer.

9. Per DPD general orders, officers are considered on-duty 24/7.

10. According to Dallas Police General Order 906.02(D), "Authorization to Use Deadly Force," "Officers will only use deadly force to protect themselves or another person from imminent death or serious bodily injury."

11. General Order 906.02(E), "Drawing or Displaying Firearms," requires a threat or reasonable belief that there is a threat to life or that the officer have reasonable fear for their own safety and/or the safety of others, in order to authorize an officer to draw or display her/his firearm.

12. DPD General Order 906.02(D) authorizes the use of deadly force by officers "to protect themselves or another person from imminent death or serious bodily injury."

13. Per DPD Standard Operating Procedure 312, CRT members "are expected to exhibit the highest possible standards" of conduct, have "an extensive knowledge of search and seizure laws," and should "conduct themselves in a professional manner, treating both Citizens and suspects with dignity and respect."

14. Defendant, Amber Guyger, was a police officer acting in the course and scope of her employment for the City of Dallas and DPD.

15. It was Officer Guyger's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the DPD's rules, regulations, policies and procedures, customs and/or practices relating to the use of excessive and/or deadly force.

16. DPD trains its officers to use deadly force even when there exists no immediate threat to themselves or others, training officers that if they cannot see a suspect's hands, it is reasonable to believe that the suspect is a deadly threat to the officer justifying the use of deadly force against the suspect.

17. A reasonable officer in Defendant Guyger's position would have known that they, as sworn peace officers, had a duty under Texas law to prevent crime and arrest offenders, and would know that an off-duty police officer who observes a crime immediately becomes an on-duty officer, despite her unreasonable perception that a burglary was occurring.

18. A reasonable officer in Defendant Guyger's position would have known that she was required to follow DPD best practices, including taking cover and waiting for backup before engaging what she believed was a burglary in progress.

19. City of Dallas trains its officers on threat assessment and that threat assessment serves as the foundational analysis for the level of force which can be justified in interactions with suspects and the public in general.

20. The City of Dallas trains its officers that if a suspect's hands are not visible, that suspect "is reaching for a weapon that is gonna be used against [the officers]."

21. Officers are trained and instructed that if a suspect's hands are not visible during threat assessment, the suspect "is gonna kill [them]."

22. DPD threat assessment training instructs officers that an individual whose hands cannot be seen is an immediate threat to the life and safety of the officer or others.

23. The City's DPD threat assessment training on which Defendant Guyger testified that she relied during her interaction with Mr. Jean informed Defendant Guyger that Botham Jean was a lethal threat to her because she could not see Mr. Jean's hands and, pursuant to General Order 906.02(D), permitted and encouraged Defendant Guyger to therefore use deadly force in such a situation.

24. Defendant Guyger testified that Defendant, the City of Dallas, trains its police officer that if they cannot see the hands of a suspect, the suspect is "reaching for a weapon that's gonna [sic] be used against us."

25. On September 6, 2018 at approximately 9:30 p.m., Defendant Guyger clocked out of her work shift at Dallas Police Department Headquarters located at 1400 Lamar Street Dallas, Texas 75215.

26. Defendant Guyger was in her departmental issued police uniform as she drove into the Southside Flats Apartment Complex (the "Southside") located at 1210 Lamar Street Dallas, TX 75215.

27. Defendant Guyger was a member of DPD's Crime Reduction Team ("CRT"). A specialized unit, CRT requires applicants to go through an application and interview process to earn a position on the team. Defendant Guyger's duties as a member of the CRT included assisting in the prevention of motor vehicle burglary, residential burglary, theft and other offenses.

28. At or about 9:41 p.m., Defendant Guyger entered the security gates of the Southside and parked her vehicle on the fourth floor of the parking garage.

29. Defendant Guyger exited her vehicle and upon information and belief walked towards the fourth floor resident area of the Southside.

30. After exiting her car and entering the complex Defendant Guyger would have been confronted immediately with two signs, one of the outside and the other on the inside of the complex entrance, both indicating she had arrived to "Level 4" of the complex.

31. Defendant Guyger had to travel approximately one hundred fifty yards from her car, passing approximately fifteen fourth floor apartment doors, each bearing an illuminated apartment number and most displaying a unique floor mat, door marker or decoration of some kind.

32. Nevertheless, at approximately 9:53 p.m., Defendant Guyger arrived at apartment number 1478 where Botham Jean was then present as the lawful inhabitant.

33. Defendant Guyger disregarded the brightly colored red mat prominently displayed directly in front of Jean's door.

34. Defendant Guyger also disregarded the eye level illuminated door number indicating she was standing at apartment 1478 and not hers.

35. Defendant Guyger entered her electronic key fob into the keyhole of Jean's apartment.

36. The door would have not produced the identical mechanical unlocking sound Defendant Guyger hears daily at her apartment, which would indicate to a reasonable

police officer that she had entered her key into the wrong keyhole if that is indeed what happened.

37. In fact, the light above the keyhole would have flashed red, indicating to Defendant Guyger that her key did not match the lock she was then attempting to access.

38. Defendant Guyger pushes the door open and entered Botham Jean's apartment.

39. Although Botham Jean was sitting in a darkened room, light from the hallway would have entered the apartment from the open door.

40. Additional lighting emanated from the television Botham Jean was watching and his lit computer screen resting nearby on an ottoman.

41. Together the available lighting provided sufficient illumination for Defendant Guyger to observe the layout, furniture, and decor of the apartment, as well as the features, clothing and posture of Botham Jean who was then unarmed, sitting on his couch, and not fully clothed as she conducted her visual inspection of the apartment.

42. Defendant Guyger unlawfully entered Botham Jean's apartment and discovered Botham Jean in a seated position on his sofa.

43. After opening the door to Botham Jean's apartment, Defendant Guyger stated in an interview with the Texas Rangers that she drew her service weapon and began issuing verbal commands to Botham Jean, who was lawfully in his apartment.

44. At no time did Officer Guyger call for cover prior to entering Botham Jean's apartment.

45. Botham Jean attempted to comply by slowly arising from his seated position.

46. Without any lawful justification to do so and not asking the questions that a reasonable, well-trained officer would have to determine whether Botham Jean was a threat and whether force or deadly force was immediately necessary, Defendant Guyger fired upon Botham Jean, striking him in the upper chest near the heart although he was unarmed, in his own home, and not attempting to harm her or any other person.

47. Defendant Guyger was aware she had struck Botham Jean with at least one round from her service weapon and that she called 911 to report the shooting.

48. After shooting Botham Jean in his own apartment, Defendant Guyger began shouting additional commands to Botham Jean.

49. Botham Jean plead out desperately inquiring why Defendant Guyger shot him.

50. Defendant Guyger was aware she had struck Botham Jean with at least one round from her service weapon.

51. Defendant Guyger called her attorney and 911 to report the shooting.

52. Defendant Guyger made certain comments to Botham Jean, who was then still suffering from the gunshot wound to his chest and in a great deal of pain, while she knew or should have known she was being recorded by the 911 system.

53. At no time did Defendant Guyger attempt to render emergency aid to Botham Jean or take any lifesaving measures, despite being trained in emergency aid by DPD.
54. Botham Jean was allowed to remain on the ground, bleeding out, as he struggled to survive in extreme pain.
55. Botham Jean was not in possession of a weapon at the time Officer Guyger fired at him.
56. There was not a weapon in the sight of Officer Guyger when she fired her gun, fatally striking Botham Jean.
57. Officer Guyger initiated and escalated the interaction with Botham Jean to the point of excessive force.
58. Officer Guyger unlawfully shot and killed Botham Jean without any warning, although a reasonable officer in a similar position would have known that she was not in imminent danger and had less deadly alternatives available.
59. Officer Guyger failed to conduct an objectively reasonable threat assessment in full light of the facts available to her when she chose to use deadly force without properly attempting to use de-escalation and less-lethal tactics to question or apprehend Botham Jean before discharging her service weapon.
60. Defendant Guyger stated that she could not see Botham Jean's hands and therefore her training instructed her that he was going to kill her, "[c]ause I couldn't see his hands, he was gonna kill me."
61. Defendant Guyger observed the apartment door ajar and believed a burglary to be taking place.
62. Defendant Guyger failed to secure the location by shutting the door and calling for back up while taking a tactical position outside of the apartment.
63. Despite the fact that there were no visible signs of a forced entry on the door or doorframe outside the apartment. Defendant Guyger failed to exercise the most reasonable option available to her:  secure the location by shutting the door and calling for back up while taking a tactical position outside of the apartment.
64. By simply following proper police procedures, and the best police practices she was trained to follow, Defendant Guyger would have not shot Botham Jean.
65. Instead of rendering medical aid to Botham Jean, who was bleeding out on the floor in front of her, Defendant Guyger walked around the apartment, the hallway outside, and texted her partner, DPD Officer Martin Rivera, that she "fucked up" and needed his help.
66. Paramedics and additional law enforcement personnel arrived to the scene of the shooting sometime after Defendant Guyger fired the shots and found Botham Jean still suffering from the gunshot wound inflicted by Defendant Guyger.
67. Emergency Medical Technicians immediately began rendering aid to Jean and transferred him to a gurney where he was transported to an ambulance before being driven to a nearby hospital.

68. Medical professionals continued to treat Jean after he arrived at the hospital; however, he eventually succumbed to his wounds.

69. After additional law enforcement personnel responded to the scene of the shooting, Defendant Guyger was not placed under arrest but was instead allowed to continue to roam about the crime scene.

70. Defendant Guyger was allowed to remain in possession of her phone, make several phone calls prior to giving a statement to investigators, and spoke with several officers before being isolated and having her statement taken.

71. Guyger was not placed under arrest, she placed phone calls, and she entered her apartment.

72. Defendant Guyger has been a police officer for less than five years yet the shooting of Botham Jean represents the second shooting of an unarmed suspect of color.

73. Chief Hall considered the incident an Officer Involved Shooting (OIS) as Defendant Guyger was in full uniform at the time of the shooting, was performing the duties of a law enforcement officer, was donning a badge, used her service weapon, and was behaving as a police officer when she shot Jean after issuing verbal commands to him in his home, but failed to arrest Defendant Guyger or charge her with a crime.

74. Officer Guyger should have been well-trained to deal with unarmed citizens posing no threat of imminent bodily harm to her, other officers or the general public.

75. Officer Guyger should have been well-trained how to deal with what is perceived to be an active crime scene and the need to secure cover before confronting the suspects.

76. Defendant Guyger used deadly force.

77. No warrants were initially sought for the apartment, motor vehicle and/or service locker of Defendant Guyger— locations that potentially held important evidence probative to the homicide investigation underway.

78. Defendant Guyger's Pinterest posts include statements like "Personally I think I deserve a medal for getting through this week without stabbing someone in the neck with a fork"; "People are so ungrateful. No one ever thanks me for having the patience not to kill them"; "I wear all black to remind you not mess with me, because I'm already dressed for your funeral (saved to love to laugh with comment "yah I got meh a gun a shovel and gloves if I were u back da fuck up and get out of meh fucking ass."); "Stay low, go fast, kill first, die last, one shot, one kill, no luck, all skill" was saved to her quotes for inspiration.

79. Officer Guyger had a clear view of Jean; however, it is apparent that instead of using any sort of de-escalation techniques, she opted to use deadly force immediately.

80. Officer Guyger opened Jean's apartment door and immediately drew her weapon without a reasonable threat assessment or evaluation of what occurred or what was transpiring. She simply opened fire without having any knowledge of the situation.

81. Botham Jean was not attempting to harm anyone, nor did he appear menacing, threatening, or dangerous in any manner.

82. There is no credible evidence whatsoever that Officer Guyger or anyone else was in imminent danger that would indicate that the use of deadly force was justified.

83. At all times material hereto, Officer Guyger was acting in the scope of her employment as agent, servant, and employee of the Dallas Police Department, a part of the City of Dallas, within its executive branch, and was performing a governmental function.

84. No reasonably prudent police officer under similar circumstances could have believed that Officer Guyger's shooting of Mr. Jean was justified.

85. Botham Jean had nothing in his hands.

86. Botham Jean's kitchen counter was between Defendant Guyger and Botham Jean when Defendant Guyger shot him.

87. Botham Jean did not have pockets in the shorts he was wearing, and could not have had a concealed weapon on his person with which to threaten Defendant Guyger's safety.

88. There is no indication that Officer Guyger attempted to use her intermediate weapon or de-escalation training before resorting to the use of deadly force.

89. Pursuant to General Order 901.04(D)(3) a Taser, which Defendant Guyger had on her duty belt for the entirety of her interaction with Botham Jean, is an intermediate weapon and is justified for situations in which the officer believes empty hand control will be ineffective.

## II.    Plaintiffs' Proposed Conclusions of Law

1. Defendant Guyger used objectively unreasonable force on Botham Jean.

2. Botham Jean was killed as a direct result of Defendant Guyger's use of force.

3. Amber Guyger was acting under color of law during the use of force against Botham Jean.

Respectfully submitted,
By:/s/ Bhavani Raveendran

Daryl K. Washington, Esq. State Bar No. 24013714
WASHINGTON LAW FIRM, PLLC
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
dwashington@dwashlawfirm.com

Bhavani Raveendran *(pro hac vice)* (IL Bar No. 6309968)
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, Illinois 60654

b.raveendran@rblaw.net

***ATTORNEYS FOR PLAINTIFFS***

**Certificate of Service**

I hereby certify that on November 4, 2024, a copy of the foregoing document was mailed via mail to Defendant Amber Guyger at the following address:

Amber Guyger, Pro Se Defendant
#02283505
TDCJ Patrick O'Daniel Unit
Unit Law Library
2305 Ransom Road
Gatesville, TX 76528-2962

                              */s/ Bhavani Raveendran*
                                Bhavani Raveendran